```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3
   BLUEEARTH BIOFUELS, LLC,        ) CIVIL NO. 09-00181DAE
4                                  )
              Plaintiff,           ) Honolulu, Hawaii
5                                  ) October 5, 2009
         vs.                       ) 10:32 a.m.
6                                  )
   HAWAIIAN ELECTRIC COMPANY,      ) [74] FIRST MOTION TO DISMISS
7  INC.; MAUI ELECTRIC            )  DEFENDANT ALOHA PETROLEUM,
   COMPANY, LTD.; ALOHA           )  LTD.'S MOTION TO DISMISS
8  PETROLEUM, LTD.; AND, KARL     )  THE SIXTH THROUGH TENTH
   E. STAHLKOPF, Individually,    )  CAUSES OF ACTION ALLEGED IN
9                                  )  PLAINTIFF BLUEEARTH
              Defendants.          )  BIOFUELS LLC'S SECOND
10                                 )  AMENDED COMPLAINT
                                   ) [75] MOTION TO DISMISS
11                                 )  PLAINTIFF'S SECOND AMENDED
   _____)  COMPLAINT
12

13                  TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE DAVID ALAN EZRA,
14                UNITED STATES DISTRICT JUDGE

15  APPEARANCES:

16   For the Plaintiff        JOHN S. EDMUNDS, ESQ.
                              Edmunds Verga & Omonaka
17                            841 Bishop Street, Suite 2104
                              Honolulu, Hawaii  96813
18
                              MICHAEL K. HURST, ESQ.
19                            JAIME OLIN, ESQ.
                              Gruber Hurst Johansen & Hail
20                            1445 Ross Avenue, Suite 2500
                              Dallas, Texas  75202
21

22
     For Defendants HECO,     PAUL ALSTON, ESQ.
23   MECO, and Stahlkopf:     CLYDE J. WADSWORTH, ESQ.
                              Alston Hunt Floyd & Ing
24                            American Savings Bank Tower
                              1001 Bishop Street, Suite 1800
25                            Honolulu, Hawaii  96813
```

2

```
 1

 2     APPEARANCES (Cont'd.):

 3

 4     For Defendant Aloha          C. MICHAEL HEIHRE, ESQ.
       Petroleum, Ltd.:            TERI-ANN E. S. NAGATA, ESQ.
 5                                 Cades Schutte
                                   1000 Bishop Street, 12th Floor
 6                                 Honolulu, Hawaii  96813-4216

 7

 8

 9

10

11

12

13

14

15     Official Court             Cynthia Fazio, RMR, CRR
       Reporter:                  United States District Court
16                                P.O. Box 50131
                                  Honolulu, Hawaii 96850
17

18

19

20

21

22

23

24
       Proceedings recorded by machine shorthand, transcript produced
25     with computer-aided transcription (CAT).
```

1    MONDAY, OCTOBER 5, 2009                    10:32 A.M.

2            THE CLERK:  Civil 09-181DAE-KSC, BlueEarth Biofuels,

3    LLC, versus Hawaiian Electric Company, et al.

4            This case is called for various motions.

5            Counsel, please state your names for the record.

6            MR. EDMUNDS:  Good morning, Your Honor.  John Edmunds

7    for plaintiff.  With me is Michael Hurst, admitted pro hac

8    vice, and Jaime Olin, also admitted pro hac vice.

9            THE COURT:  All right.  Good morning.

10           MR. HURST:  Good morning.

11           MR. ALSTON:  Good morning, Your Honor.  Paul Alston

12   and Clyde Wadsworth appearing for Hawaiian Electric Company,

13   Maui Electric Company and Karl Stahlkopf, defendants.

14           THE COURT:  All right.  Good morning.

15           MR. HEIHRE:  Good morning, Your Honor.  Michael Heihre

16   and Teri Nagata on behalf of Aloha Petroleum.

17           THE COURT:  All right.  Good morning.  Why don't you

18   all be seated.

19           Before we -- I have to make a disclosure before we go

20   further.  I don't think this will pose a problem, but I need to

21   make the disclosure anyway.

22           I have been asked by the American Judicature Society

23   to co-chair a panel.  The purpose of the panel is to make a

24   recommendation to the Hawaii Supreme Court relating to an

25   extremely important issue having to do with the composition of

1    jury panels in state court.  More specifically, whether the

2    state courts should adopt a rule or seek legislation or a

3    constitutional amendment, as may be necessary, to determine

4    whether they should drop in civil cases to a minimum of six

5    jurors and possibly even look at criminal -- numbers of jurors

6    in criminal cases.

7        Now, that in itself is not a problem.  I mean it's a

8    major task, there's a lot of people on the panel which I'm

9    co-chairing.  Except the co-chair with me on the panel is the

10   president of -- I believe she's the president of Hawaiian

11   Electric.

12       MR. ALSTON:  Connie Lau, Your Honor?

13       THE COURT:  That's right.

14       MR. ALSTON:  Oh.  She's actually the president of

15   Hawaiian Electric Industries, the parent company.

16       THE COURT:  Okay.  So that being said, I don't -- you

17   know, I didn't choose who the co-chair would be.  But, you

18   know, I don't -- if anybody feels that this may create an

19   appearance of impropriety in some way, shape or form, I'm more

20   than happy to consider that.

21       MR. EDMUNDS:  Your Honor --

22       THE COURT:  And if you want to take -- and if you

23   would prefer to make this election out of my presence, I'll be

24   more than happy to have somebody else take the election.

25       MR. EDMUNDS:  There's no need, Your Honor.  We've

1    conferred.  Appreciate the disclosure.  We're prepared to waive

2    any objection, although we have no objection.

3            THE COURT:  Okay.  Mr. Alston.

4            MR. ALSTON:  No objection, Your Honor.

5            MR. HEIHRE:  No objection, Your Honor.

6            THE COURT:  All right.  You know, I just thought it

7    would be better to say it.  I don't want anybody later, Wait a

8    minute, what's this?  Ezra's on a panel with the, you know,

9    whoever.

10           But I can assure you that the panel has absolutely

11   nothing to do with anything having to do with this case and I

12   would never discuss with Ms. Lau, or with anybody else for that

13   matter, other than my law clerks, the substance of what this

14   case is about.

15           But, you know, given the circumstances, if I were to

16   be seen at a meeting or something with Ms. Lau, I wouldn't want

17   anybody to suggest that there was something inappropriate going

18   on such that it would be of concern.  Okay?

19           All right.  Okay.  Aloha Petroleum, you're first up.

20           MR. HEIHRE:  May it please the Court, Michael Heihre

21   on behalf Aloha Petroleum.

22           THE COURT:  Yeah.  And by the way, I should add for

23   the record, this is a rather small community and I happen to be

24   very close personal friends with virtually every lawyer in this

25   case.  So...

```
 1            MR. EDMUNDS:  Which means it'll probably --
 2            THE COURT:  And the only ones I'm not close personal
 3    friends that haven't met before.
 4            MR. EDMUNDS:  We'll probably get called on the merits,
 5    Your Honor.  Thank you.
 6            THE COURT:  All right.  Please go forward.
 7            MR. HEIHRE:  Thank you, Your Honor.
 8            Your Honor, with respect to the trade secrets argument
 9    and the briefing that's been submitted, there has been argument
10    raised, I believe fairly put, an argument raised by the
11    plaintiff as to the interpretation properly given to the
12    displacement effect of other law or the preemption.
13            THE COURT:  Preemption under the Hawaii statute.
14            MR. HEIHRE:  Yes, sir.
15            THE COURT:  Right.
16            MR. HEIHRE:  And --
17            THE COURT:  And that was something I'm going to
18    address with you in just a moment, but I don't want to
19    interrupt your argument.
20            MR. HEIHRE:  Your Honor, I think the most efficient
21    use of the Court's time is to respond to those questions that
22    the Court has.  So...
23            THE COURT:  Well, let me throw the giant medicine ball
24    out there that I assume everybody's been expecting would be
25    lobbed out there.  And that is, you know, in the past I've been
```

1   very reticent to certify questions to the Hawaii Supreme Court.

2   I have done it on a couple of occasions, more than a couple,

3   but not often.  What is the reason for that?  First of all,

4   they're very busy and it takes them a very long time to answer

5   the question usually.  I've waited 2 years in one instance for

6   an answer.

7        Second -- and I'm not criticizing them.  I mean

8   they're busy.  I mean it's just what happens.  The Ninth

9   Circuit takes 2 years sometimes to reach a decision.  Sometimes

10  longer.

11       Secondly, you know, my job is to make calls, to make

12  decisions.  And in diversity cases I make decisions about what

13  I believe Hawaii state law is or would be if the Hawaii Supreme

14  Court were to rule on it every day.  And if I were to certify

15  every question of Hawaii state law where there wasn't a -- you

16  know, Hawaii Supreme Court or Intermediate Court of Appeals

17  case on all fours, I'll be certifying virtually 60 percent of

18  the cases that come before me.  So, I don't make a practice of

19  doing it.

20       On the other hand, this is an important issue with

21  some ramifications down the road for not just this case but for

22  potentially others and it's never been decided.  And so it

23  certainly is something that, in looking at it, my law clerk and

24  I have been bouncing around, so to speak, as we've, you know,

25  talked about the case.

1          So I certainly want to hear counsel's views on that.

2          MR. HEIHRE:  Your Honor, I believe the last time that

3   this Court certified a question in a case that I was involved

4   in to the Hawaii Supreme Court, I returned with a three to two

5   decision adverse to my position.

6          THE COURT:  Which case was that?

7          MR. HEIHRE:  Richardson versus City and County of

8   Honolulu.  It related to the question of the preemption in

9   effect of various issues pertaining to the zoning ordinances.

10         THE COURT:  Oh, yeah.  Well, you got your final

11   victory in that however.  The City Council ultimately rescinded

12   it, but not until many years later.

13         MR. HEIHRE:  That's true.  So --

14         THE COURT:  But that was one of the cases I had in

15   mind that took several years to come down.

16         MR. HEIHRE:  And that case also was two to two split

17   on the retirement of a judge -- justice, and we reargued it

18   before a new justice, Justice Ramil --

19         THE COURT:  Right.

20         MR. HEIHRE:  -- who remained unpersuaded.  I have

21   great confidence if it had been decided here in the first place

22   it would have been decided correctly and right.

23         So, I do have experience tinging a bias towards having

24   this Court decide.  And I think, as I --

25         THE COURT:  Well, Mr. Edmunds may not agree with you.

 1    A case that he argued in front me, which I was ultimately

 2    affirmed on, I, with much regret, didn't agree with Mr.

 3    Edmunds' position.  Although I thought it was very well argued

 4    and it was a very interesting case.  But it was a medical

 5    malpractice case and Mr. Edmunds has never forgiven me for

 6    that, but that's all right.

 7            MR. HEIHRE:  Nor I with a three to two.

 8            But, Your Honor, certainly on behalf of Aloha

 9    Petroleum appreciate the considerations that go into weighing

10    this particular point.  The case law, I think it's fair to say,

11    throughout the United States has split their decision --

12            THE COURT:  It is.  The statutes aren't all the same,

13    unfortunately.  I mean, we're not dealing with a uniform

14    statute.  The statutes are slightly different.  We've looked at

15    this carefully.  And they really are, these decisions are all

16    over the board.

17            MR. HEIHRE:  And I think as -- as a practitioner who

18    generally likes to distinguish between state law matters and

19    federal law matters with a certain sense of the importance of

20    the sovereignty of the state in addressing matters of concern

21    to it, I think on balance that certifying it to the Hawaii

22    Supreme Court makes considerable sense.  I suspect that

23    whatever happens in this case, a decision on the trade secrets

24    treatment will influence not only the trade secrets per se, but

25    also related claims and as such, it does really cut into a

1    segment of the case that I think my view cross-sectionally is

2    that it's core.  And where one has core state law issues, I

3    would rather have the Supreme Court speak finally, at least as

4    finally as state courts can speak, and then not have to worry

5    about having this decision go from here to the Ninth Circuit,

6    the Ninth Circuit faced with the same conundrum and then we're

7    in the face of even more delay than had we started out with the

8    certification process to begin with.

9          THE COURT:  Well, that -- that is the other, and I

10   would address Mr. Edmunds on this.  That's the other concern I

11   have.  The Ninth Circuit is also empowered to certify.  And

12   my -- my concern is that even if I don't certify and I make a

13   decision, when it goes to the Ninth Circuit, I think they're

14   likely to certify.  Principally because even -- they don't have

15   the -- they do not have the same concerns that I do.  I mean

16   they're not the trial court, they're the appellate court.  So

17   they don't -- you know, a lot of the cases that I decide here,

18   diversity cases, never get appealed or are settled.  So, when

19   they get them, they get far fewer of them than I do on a direct

20   basis.  And so for them, they're more reticent to make an

21   important state law decision because they don't have to do it

22   as often as we do.  Just the very nature.

23         I had a long discussion with Judge Hall about that

24   once.  We were sitting on a panel together and Judge Hall was a

25   distinguished district judge before she went on the Court of

1    Appeals, and she and I were talking about this.  And she

2    came -- you know, this is what we were talking -- the very

3    thing we were talking about.  Obviously not in the context of

4    this case, this case wasn't even filed when we talked about it.

5    But her concern about, you know, them making these decisions,

6    and I think the Ninth Circuit is also not very happy to make a

7    decision and have the prestige of their court make a decision

8    involving state law only to have the Hawaii Supreme Court or

9    California Supreme Court come back and say, The Ninth Circuit

10   got it wrong.  You know, too bad.  And then they essentially

11   get, if you will, overruled, in quotes.  And they don't like

12   that.

13          So, you know, that's my concern.  I hate the thought

14   of sending it up there.  But we got a different Supreme Court

15   now.  Maybe it'll move faster now.  We got some more vigorous

16   judges.

17          MR. HEIHRE:  Your Honor --

18          THE COURT:  In terms of age at least.

19          MR. HEIHRE:  Your Honor, in sum on this part, I think

20   Aloha Petroleum would support the certification of this

21   question.

22          THE COURT:  Well, let me ask you this, and I would ask

23   if, Mr. Edmunds, if you'll rise and kind of chime in here on

24   this.

25          MR. EDMUNDS:  Your Honor, if I may, may Mr. Hurst

1    rise --

2          THE COURT:  Mr. Hurst can certainly make that

3    argument, yes.

4          MR. EDMUNDS:  He's the trade secret expert.

5          THE COURT:  All right.  Mr. Hurst, you certainly have

6    been here and you've heard the back and forth.  Plaintiffs

7    usually don't like to certify, principally because they want

8    the case to be decided as quickly as possible and the specter

9    of a certification doesn't bode well for that.  But -- and so I

10   can understand a natural reluctance to -- a natural reluctance

11   for you to be agreeable.

12         But my concern is really that it's going to happen

13   anyway.  And it just doesn't -- I don't see any way around it.

14   I mean this is one of those areas where we just -- I -- you

15   know, if we had a California case, you know, a California

16   statute was right in point and everything was great and you

17   just, Okay, well, it's all the same, the California Supreme

18   Court considered it and here's what they did.  And Washington

19   State Supreme Court considered it and here's what -- but these

20   states are all over the place on this.  And our statute is

21   slightly different than some.  It's similar to others.  And

22   even where it's similar, they're still all over the boards.

23         It almost becomes, I hate to say it, but a policy

24   decision for the State Supreme Court as much as a legal

25   decision.  The case that counsel was drawing our attention to,

1    the case that he was not successful in, was a case where it was

2    as much a policy decision there as to whether or not the

3    Supreme Court was going to adopt, the State Supreme Court was

4    going to adopt one version or another.  And I had a Dram Shop

5    Act case involving a minor which I certified which was similar.

6    I had a case involving fear of AIDS where vials of blood on a

7    Continental jet burst and sprayed a number of employees, and

8    the cases were all over the place with regard to that and --

9    nationally.  And it was a policy decision.  Even though, to be

10   honest with you, I could have fairly predicted that one, I

11   think, because the Hawaii Supreme Court in those days never saw

12   a plaintiff's cause of action they didn't like.  They adopted a

13   cause of action for fear of AIDS in that case, as I thought

14   they would.  But I also agreed with the parties that it should

15   have been certified, and it was.  And that one actually they

16   got out in about a year, maybe a little less than a year.

17        So what are your thoughts?

18        MR. HURST:  Your Honor, Michael Hurst.  May it please

19   the Court.

20        I think the question is:  What is it that we're

21   talking about certifying before the Hawaii Supreme Court or the

22   Ninth Circuit, whichever the case may be.  I read the cases,

23   and I've tried to read all of the cases that were cited by both

24   sides -- and I agree with everybody that they are in fact all

25   over the board -- as it relates to whether or not confidential

 1   information or trade secret information, if that is a
 2   preemption issue.  What I don't believe we're in so much
 3   disagreement about is the question of what I think are the key
 4   issues here, and that is, are the -- are other tort claims
 5   independent of the misappropriation of trade secret claims or
 6   are they the same claims dressed up differently.  Because
 7   that's really the argument that the defendants are trying to
 8   make, that the claims that are not misappropriation of trade
 9   secrets should be preempted if they are basically
10   misappropriation of trade secret claims that are dressed up
11   differently.
12       In all candor, Your Honor, our conversion claim
13   generally, as it looks right now, mentions trade secrets as the
14   primary thing that was, quote, converted, which to me would
15   fall under the cases that -- that -- well, almost all of the
16   cases that have been cited.  I can make an argument in front of
17   you that says that what they've converted is some of our money
18   or some of our tangible documentation.  But if you read our
19   pleadings themselves, I think that that would be the type of
20   claim that might potentially be preempted.  What I don't agree
21   with and what I think even their cases support our argument on
22   are the situations where there's tortious interference, unfair
23   trade practices, and breach of fiduciary duty as being
24   misappropriation of trade secrets claim under a different
25   dress.

1          In fact, the breach of fiduciary duty claims don't

2     rely upon the misappropriation of trade secrets.  The tortious

3     interference claims do not rely upon the misappropriation of

4     trade secrets.  And the unfair competition relies in small part

5     or we've pled in small part the misappropriation of trade

6     secrets, but that was the last of the parts that was mentioned

7     under the unfair trade secrets claims.

8          The case that I know Your Honor has read because

9     you've just mentioned that you've read it, is the -- that the

10    defendant's relied upon almost exclusively in their reply brief

11    is this New Hampshire case, Mortgage Specialists versus Joseph

12    Davey.  In that case it says -- and this is a case, again,

13    that's relied upon by the defendants:  "It is neither necessary

14    nor prudent to preclude all common law claims that are

15    connected with the misappropriation of what a plaintiff claims

16    are trade secrets.

17          "In determining whether a claim, quote, conflicts with

18    the Uniform Trade Secret Act, we agree with the majority of

19    courts, which have looked to the facts alleged or proved in

20    support of the claim and have found that the claim is preempted

21    when it is based solely" -- and I emphasize the word

22    "solely" -- "on, or to the extent that it is based on, the

23    allegations or the factual showings of unauthorized use of

24    information or misappropriation of trade secrets."

25          The court went on to say:  "Thus, to the extent that

1    the tortious interference claim is supported by more than mere

2    misuse of Mortgage Specialists' customer information, it is not

3    preempted."

4         Same thing with the unfair method of competition.

5    "Thus, to the extent that the CPA claim is supported by more

6    than mere misuse of customer information, it is not preempted."

7         This was not a breach of fiduciary duty case, but I

8    would likewise argue just by the reading of our pleadings

9    themselves that that claim would not be preempted even under

10   the cases that were cited by the other side.

11        I think the question is two-fold, and I think this

12   was -- if we were going to certify something, it would not

13   necessarily be appropriate here, and that would be the question

14   of whether the claims were basically misappropriation of trade

15   secret claims called something else, A; or B, that we, as the

16   plaintiff, were making the argument that confidential

17   information had some sort of different meaning or

18   interpretation from trade secret language, which is what those

19   cases seem to have a split on.  They don't seem to be split on

20   the idea that preemption is not appropriate when the claim is

21   something different than misappropriation of trade secrets.

22        I'd certainly ask the Court to take judicial notice of

23   our complaint as it is written and show that it is not -- these

24   are not misappropriation of trade secret claims.  For instance,

25   the tortious interference claim -- claims, because there are

1   several of them, had to do with, for instance, Hawaiian

2   Electric inducing Aloha Petroleum to breach their contract with

3   BlueEarth Biofuels.  That doesn't have -- now, whether trade

4   secrets are addressed in the confidential agreement are

5   separate and apart from whether they committed the act of

6   interference --

7           THE COURT:  Well, my understand -- I'm going to give

8   plenty of opportunity to address what you've suggested, but my

9   understanding, he can correct me if I'm wrong, is that his

10  contention is that the genesis of all those claims is the

11  alleged misappropriation of a trade secret.

12          Now, I understand that you take a much narrower view

13  really of and believe that your causes of action can be parsed

14  out and -- and you concede that some of them clearly have to do

15  with trade secrets but others do not.

16          MR. HURST:  Sure.  And --

17          THE COURT:  And I think counsel -- I don't know, but I

18  may be wrong, but I think his contention is that they all fall

19  under the same umbrella.

20          But let me do this, before we get too far down the

21  road, let me have him respond and then I'll give you another

22  opportunity.

23          MR. HURST:  Thank you, Your Honor.

24          MR. HEIHRE:  Your Honor, in fairness, Mr. Alston, on

25  the preemption question, would you prefer to hear from him on

1    that before proceeding with essentially what's an argument --

2           THE COURT:  Well, unless you want to address his

3    arguments, I can allow Mr. Alston to address this.

4           MR. HEIHRE:  I'm sorry, sir, it was just on the

5    preemption question.

6           THE COURT:  All right.  Okay.

7           MR. HEIHRE:  That was all.

8           MR. ALSTON:  You are exactly right, Your Honor, we

9    disagree with Mr. Heihre -- with Mr. Hurst on this issue about

10   the breadth of his complaint.  And the fact is that in every

11   one of the claims that he describes narrowly today, in their

12   pleadings they incorporate all of the allegations that preceded

13   it, from Paragraph 1 all the way up to the beginning of that

14   particular claim.

15          So that in fact every claim is based upon the entire

16   universe of facts alleged in the complaint and in every

17   instance it all springs from the alleged misappropriation of

18   what they called trade secrets, what may be confidential

19   information.

20          Now, he's right that there are two questions that

21   could be certified to the Supreme Court.  One is whether the

22   UTSA preempts claims only if they are demonstrably and proven

23   to be based upon trade secrets as opposed to confidential

24   information.  Most of the cases say no.  We think that's the

25   right view.  We think that if it's confidential information,

1    trade secret or not, the claims are preempted.

2         The second related question is, how much of the claim

3    has to be grounded on the misuse of confidential information.

4    The cases are all over the park.  Some say all of it, some say

5    some of it.  We say in the way this case has been pleaded that

6    every one of their claims is virtually entirely based upon

7    trade secrets or confidential information.

8         So, we believe it's appropriate to find all of their

9    claims preempted as we've argued.

10        Now, if I could just address the question of

11   certification very briefly.  I think that the Court's concerns

12   in the past about the pace of decisions coming out of the

13   Hawaii Supreme Court was well-founded historically, but since

14   they have become a certiorari court, their caseload has dropped

15   to virtually nothing.  And so I understood that recently they

16   have three cases, three active cases on their docket.

17        THE COURT:  We won't send this transcript over, this

18   part we'll excise out.

19        MR. ALSTON:  It just means they are thinking --

20        THE COURT:  I heard that criticism of the U.S. Supreme

21   Court, by the way, recently.

22        MR. ALSTON:  So I think -- I think though that the

23   pace of their decision-making has speeded up because their

24   workload is --

25        THE COURT:  Well, there's definitely been -- I have

 1    not -- I have to be very candid, I have not certified a case to

 2    the Hawaii Supreme Court or asked them to take a case on

 3    certification since they changed over to this certiorari mode.

 4    And so I think you're right, it would be unfair to lay on them

 5    the old days.  I mean -- I mean after -- I won't mention the

 6    justice, but I happened to run in on the street one of the

 7    justices after they had answered a certified question, I had

 8    nothing pending up there at all, and this particular justice

 9    indicated some embarrassment about the amount of time it had

10    taken them to answer the question, and then cited the workload

11    that they were under.  And I certainly said, Well, there's

12    nothing to be embarrassed about, I mean it just happens.

13         But that's one of the reasons they changed the law.

14    So, yeah, I mean I think there is a potential we could get an

15    answer much more quickly.  And of course even -- and this is

16    not a suggestion as to the prior composition of the Hawaii

17    Supreme Court, but we do have new justices up there.  I mean

18    Justice Recktenwald is there now and he is known to move very

19    quickly.  Former Justice Levinson moved a little slower, that

20    was his reputation.  And so I think under the circumstances we

21    might get a little bit more action.

22         MR. ALSTON:  And if it were not for the fact that the

23    trade secrets issue is at the heart of this case, I'm sure you

24    wouldn't be considering it and we wouldn't be endorsing it.

25         THE COURT:  Well, I will tell you, I am absolutely

1    convinced beyond any reasonable doubt -- okay, this isn't a

2    criminal case, but it's a standard Mr. Edmunds knows well -- I

3    am convinced beyond any reasonable doubt that the Ninth Circuit

4    Court of Appeals will certify at least part of this case to the

5    Hawaii Supreme Court.  I just -- I sit there by designation,

6    I'm privileged to do it, I did it three times this year, I know

7    these judges pretty well.  I don't -- I'm certainly not a Ninth

8    Circuit judge and I don't claim to be and I don't have any lock

9    on what they do, and I could well be wrong, so I don't want to

10   appear to be presumptuous, but this just smells to me and

11   tastes to me and looks to me like roast beef and I think it's

12   roast beef.  I think this is going to the Hawaii Supreme Court,

13   either from my level or from the Ninth Circuit.

14        So the real question is whether I should go ahead and

15   make a decision, which would really be meaningless effectively.

16   Effectively my decision here on his issue would be meaningless

17   because if they certify -- see, they're not making a

18   decision -- they would not be making a decision based on my

19   record, you see.  If they certify, they certify a question.

20   And the question isn't:  Gee, here's what Dave Ezra did down at

21   the district court level, Hawaii Supreme Court.  It would be

22   based upon a certified question and they would answer it

23   de novo, so to speak, with little input from me.

24        I don't generally like to do things for nothing.  I

25   don't think it's real helpful to either side.  And therefore

 1   when I looked at this, I looked at it hard.  I'm pretty

 2   inclined to certify.  And so the real -- because I think then

 3   it would just be easier, you know.

 4        Heck, I had a case -- and you know, we're talking

 5   about situations where judges get it wrong.  I had a case, and

 6   you all remember the big duPont litigation and there was a

 7   question of whether if you accept a settlement, do you have to

 8   disgorge part of the settlement in order to move forward with

 9   the second cause of action.  And the courts were all over the

10   place.  And I made a decision, which I probably shouldn't have

11   made, that you do have to disgorge because that was really kind

12   of the majority view.  And they -- and the Ninth Circuit did

13   what I should have known they would do, they certified to the

14   New Hampshire Supreme Court, which in a close case decided that

15   you don't.  And so, my decision was effect -- I was effectively

16   reversed based on an opinion of a State Supreme Court which I

17   didn't -- never had the chance to really consider.  So, that's

18   fine.  You know, that's the way it should be.  You know, it was

19   state law and I had to try to guess what the New Hampshire

20   Supreme Court would do, and I guessed wrong.

21        And so, you know, in this case it just doesn't make a

22   lot of sense to me to be trying to make that determination, a

23   policy determination when I'm almost positive that the Ninth

24   Circuit will send it if I don't.

25        So then the real question, thus, is:  What do I

1    certify?  You know, what questions do I certify?  And I -- I'll

2    be honest, counsel, I think that Mr. Alston's approach is

3    actually the correct one as I thought about this.  I think

4    there really are at least two questions here.  One of them

5    having to do with the issues that are clearly, and we all

6    agree, predicated directly on trade secrets.  And then the next

7    question is how broad is the Hawaii statute or is the Hawaii

8    Supreme Court going to interpret the Hawaii statute, is really

9    what I mean to say.  Does it cover the other claims that you

10   have made because they are predicated at least in part or have

11   as their genesis at least in part trade secrets.  And some

12   courts say it doesn't matter, even the smallest percentage, you

13   know, is enough.  And other courts say it has to be kind of the

14   controlling part of the cause of action, which clearly I would

15   agree with plaintiff's counsel some of their causes of action

16   are not.

17          I mean they're really not -- I think your argument is

18   right, I think some of your causes of action are not really

19   controlled by trade secrets, but they do have as a part of

20   their makeup the issue of trade secrets because that was what

21   happened here.  I mean that was what occurred here if we are to

22   believe your view of the facts and I -- and in a motion such as

23   this, which is a Motion to Dismiss, I really have to look at

24   your case as if you're making out a, you know, a prima facie

25   case.  You know, I have to look at your case in a light most

1   favorable to your set of the facts.

2          So, that's where we are.

3          Mr. Edmunds?

4          You can stay where you are, Mr. Alston.

5          MR. ALSTON:   Thank you.

6          MR. EDMUNDS:   Your Honor, in view of the way you're

7   leaning, and given the fact that Mr. Alston correctly described

8   that each of our counts in the complaint does indeed

9   incorporate all the allegations into the other counts.

10          THE COURT:   It does, yeah.

11          MR. EDMUNDS: The current state of this pleading.

12          THE COURT:   Right.

13          MR. EDMUNDS:   Would Your Honor consider giving us

14   leave to come back and re-plead, separate out what we can, and

15   then make your decision?  Because whether or not you choose to

16   certify and what you choose to certify may get made easier and

17   it will force counsel, and we're certainly willing to sit down

18   with them, although they don't have an obligation, to try to

19   see which ones, if any, stand alone independent of the trade

20   secret preemption issue and which aren't.  Certainly a cleaner

21   record if you are going to certify will exist.  I think there's

22   no prejudice to anybody by doing that and then Your Honor could

23   revisit the decision.

24          Also implicated, of course, is whether assuming you

25   certify, whether or not you grant my -- go along with the

1    suggestion, what we do with the injunction pending the

2    certification.  But we'll get to that.

3         THE COURT:  Yeah.

4         MR. EDMUNDS:  In other words, I'm asking for leave to

5    unhook, we can, from the trade secret preemption.

6         THE COURT:  Well, I don't -- you know, we all are

7    aware in federal court I have to, even if it's a -- even if

8    it's a diversity case, I have to apply the well-pleaded

9    complaint rule.  And so regardless -- I mean if you take, in

10   the words of old Chief Judge Chambers, you take a mongoose and

11   put a fur coat on him, he's still a mongoose, you know.

12        It may be that in originally pleading your causes of

13   action you -- and I don't mean this in a derogatory way, but

14   in, you know, in just putting together a complaint quickly,

15   it's very common practice to just incorporate by reference all

16   the previous allegations, people just use that term.  So you

17   might have inartfully pled your complaint.  And I'm not

18   pointing you personally, Mr. Edmunds, but it might have been

19   inartfully pled in the sense that you may not have intended to

20   make that broad incorporation and you have stand-alone claims.

21        You know, I'm not going to certify to the Hawaii

22   Supreme Court claims that can clearly be decided here.  I mean

23   if we have a straight breach of contract claim that has nothing

24   to do with trade secrets, trade secrets just happens to be a

25   component, but it is not really the moving force, I mean then

 1    that wouldn't necessarily be something that should be

 2    certified.

 3         But if it -- if the driving force of the breach of

 4    contract claim is what would otherwise be preemptable, then it

 5    goes.

 6         MR. EDMUNDS:  No, I understand.

 7         THE COURT:  And changing the name isn't going to

 8    necessarily change what's going on.

 9         MR. EDMUNDS:  Very well.

10         THE COURT:  So, that doesn't mean I'm not going to

11    agree with you.  I mean, I don't know, I would assume since to

12    some degree Mr. Alston has you over a barrel here on this, he's

13    not going to be too thrilled to, you know, let you up.

14         MR. ALSTON:  Actually, Your Honor, I was about to say

15    since there's been no -- I take it back, there has been an

16    answer filed.

17         THE COURT:  There has been, yeah.  So you do have a

18    right to object.

19         MR. ALSTON:  Also, Your Honor, I think when you

20    certify questions, it's on a barren record.  I mean you

21    don't --

22         THE COURT:  There isn't much, yeah, it's a legal

23    issue.

24         MR. ALSTON:  You don't send a draft or even the

25    amended complaint over, you just say:  Here are these

1    questions and --

2         THE COURT:  No, but I -- look, generally speaking,

3    Mr. Alston, if you were the plaintiff, and you have been in

4    many cases here in federal court, and you came in and said,

5    Look, Judge, I've looked at this again.  I really think I

6    mis-pled or I didn't articulate my complaint properly, I'd like

7    an opportunity to file an amended complaint, the general rule

8    in federal court is that amendments like that are to be

9    liberally granted.  Unless they're for a devious or un --

10   inappropriate purpose, and they're not here clearly.

11        So, my general -- my general inclination would be to

12   permit that.  That would just kind of delay things a bit.  The

13   only concern I have is we've got this kind of outstanding

14   injunction issue which just kind of hangs out there.

15        Now, the injunction is premised, as it currently

16   stands, on the original complaint.  The request for an

17   injunction.

18        MR. EDMUNDS:  It's an amended, second amended --

19        THE COURT:  Well, I understand, but it's a complaint

20   that would no longer exist.

21        MR. EDMUNDS:  No, that's true.

22        THE COURT:  Because you would be filing a third

23   amended complaint, and the third amended complaint would, you

24   know -- may not be different in that regard, but it's not going

25   to be the second amended one, which is what the injunction was

1    predicated on wouldn't be around.

2         MR. EDMUNDS:  Your Honor, despite what I said, if I

3    may interrupt, we will withdraw the request.  Mr. Hurst feels

4    we can --

5         THE COURT:  Live with what you got?

6         MR. EDMUNDS:  I understand you are not going to

7    certify the complaint, you are going to certify issues.

8         THE COURT:  Well, that's right, but I mean if you

9    really -- I mean if one -- we're going to get down to a point

10   here, regardless of how the Hawaii Supreme Court rules -- I

11   mean let's say that they rule against you and they say, Okay,

12   the matters that have as its genesis, at its heart trade

13   secret, they're preempted, good-bye.  But those other claims

14   are only preempted -- the other -- they are only preempted to

15   the extent that they are really predicated on trade secrets,

16   and you will then come back and say, Well, Judge, I know what

17   our complaint says, but it's not really what it means.  And but

18   then by then it may be a bit too late to be filing an amended

19   complaint.  So I don't know what your thoughts are.

20        MR. EDMUNDS:  Well, a barrel, I feel I'm over a couple

21   barrels here.  Mr. Alston is very good at that.  Maybe arm

22   wrestling --

23        THE COURT:  Well, you do all right, Mr. Edmunds.

24        MR. EDMUNDS:  But there are two issues.  One, we would

25   like leave to try to amend, but at the same time we think the

1   injunction issue is ripe for decision by you now regardless of

2   how the second amended complaint is pled.  So if we can do

3   that, if we can move forward to a decision on --

4            THE COURT:  Yeah, well, the injunction is not before

5   me today right now.

6            MR. EDMUNDS:  We were --

7            THE COURT:  It's pending, but I don't have it on the

8   calendar.

9            MR. EDMUNDS:  Well, we were told on the message that

10  we got from your clerk by phone last week, Your Honor, to come

11  prepared to argue --

12           THE COURT:  Okay.

13           MR. EDMUNDS:  -- on the injunction.

14           THE COURT:  Okay.  All right.  I probably said that.

15  You know, I've been on the Mainland, I've been dealing with --

16  I just flew back.  So...

17           MR. EDMUNDS:  It's your calendar, Your Honor.

18           THE COURT:  No, no, no.  No, no.

19           MR. EDMUNDS:  I understand.  But if we could have

20  leave to do that, in other words, I'm not asking to amend and

21  then ask you to issue or not issue --

22           THE COURT:  All right.  Well, let me say this, after

23  carefully considering, and I did last night, when I thought

24  about it, and I reread the papers this morning, including some

25  things that my law clerk prepared for me, I am pretty convinced

1   that I'm going to certify the issues.

2         And so what I'm going to do is, I'll have to work out

3   exactly how to do that, but I'm going to obviously -- there's a

4   procedure by which I'm going to be issuing an order asking the

5   parties for their draft of the certified issues and we have --

6   there's a way to go about that, there's a whole rule that we

7   have to follow on how to do that.  And so I'm -- the motions

8   that are before me today are not going to be decided by me

9   today, okay, or anytime in the immediate future until we get a

10   response from the Ninth Circuit.

11         MR. ALSTON:  Hawaii Supreme Court.

12         THE COURT:  Oh, that's right.  Hawaii Supreme Court.

13   Thank you.  I'm so used to dealing with the Ninth Circuit,

14   right?

15         They're coming into town next week, by the way.  It's

16   always pleasant to have them here.

17         So, then that leaves us with the injunction.  So,

18   Mr. Edmunds, who's going to argue the injunction issue?

19         MR. EDMUNDS:  I was going to argue that, Your Honor.

20         THE COURT:  All right.

21         MR. EDMUNDS:  Please Your Honor, the fact or set of

22   facts that I hope emerges from everything that we've filed is

23   that there are unquestionably factual allegations which must be

24   taken as true here which deal with information, confidential

25   information and trade secrets which are in the hands of HECO,

1     MECO and Aloha and which they cannot explain away.  They have

2     gone to great lengths to attempt to explain away certain

3     things, but when you look at their valiant effort to do that,

4     there is much which is left that is either confidential or

5     trade secret or both.  And I would cite the Court to

6     particularly items one through five on pages 14, 15 and 16 of

7     our supplemental memorandum and backed by Mr. Maez's affidavit.

8     In other words, those are situations where HECO provided site

9     specific information only, but BlueEarth provided everything

10     else.  And that's what's alleged.  They don't deny it.  That

11     therefore means there is in their hands confidential and/or

12     trade secret information covered by the three NDAs.

13     As I say, they've made a valiant effort to try to pick

14     and choose and say, Well, as to this one we didn't get that

15     information from BlueEarth or we didn't use it, but there's

16     much that remains in what we've alleged that they did get and

17     they did use.

18     In addition, Your Honor, they attack certain of our

19     allegations and say, The material is in the public domain.  But

20     the mere fact that something is a trade secret and then is put

21     into the public domain does not per se erase it it from being

22     either a trade secret or confidential information.

23     There can be a cause of action for misappropriation of

24     a trade secret even where there is not a written agreement.

25     And the case, Your Honor, although it's California state law,

1    not Hawaii state law, is Cybertek, C-Y-B-E-R-T-E-K, Computer

2    Products versus Whitfield, 1977 Cal. App. Lexis 2140, decided

3    in 1977.  It's dicta because the court there -- well, court

4    said there can be a claim for misappropriation of trade secret

5    where there's no underlying written agreement.

6          In addition, counsel citing the eBay case, which is a

7    patent case, not a trade secret case, but counsel there cited

8    language out of the United States Supreme Court, which counsel

9    here claims inverts what Your Honor said.  Your Honor said, and

10   correctly said last time, that where there's a trade secret,

11   the usual presumption is inverted.  I'm putting it

12   simplistically, but that's in effect what you said.  And the

13   eBay said in a patent case, where there is patent and there is

14   a violation, we're not going to invert the rule.

15         But they're trying to get you to apply that here.

16   There is no case doing that, number one.  Number two, that case

17   did not involve what this case fundamentally involves, and that

18   is a contract which acknowledged that there was a right to

19   injunctive relief.  And try as they might, no matter how many

20   times we go round about it, Your Honor, the three NDAs state

21   the parties agree they would not have an adequate remedy at law

22   and would be irreparably harmed in the event any provisions of

23   the agreement were not performed or were breached.  So they

24   have stipulated to irreparable injury.  And everything that you

25   see in their briefing about there is no irreparable injury, we

1    can't show irreparable injury, as a matter of contract law has

2    been stipulated to, that takes it out from under the eBay

3    holding, even assuming you were to apply patent law to this

4    situation, entitled to injunctive relief to prove -- and

5    breaches of this agreement, and to specifically enforce its

6    terms, in addition to any other remedy to which it may be

7    entitled, law or equity.

8         So they're clearly contemplating tort remedies, breach

9    of contract remedies and an injunction.  There is irreparable

10   injury, it's been stipulated to, there are sufficient facts.

11   And frankly, Your Honor, there were back when we were before

12   you, before the supplement was filed.  You've now had an

13   opportunity to see the remaining allegations in the complaint

14   which Ms. Nagata did not refer to when she said we had not

15   specified, but you saw they were specified in the complaint,

16   they had been specified in the supplemental memo and in

17   Mr. Maez's declaration.  I don't know why they're arguing

18   there's no irreparable injury.  They've stipulated to it.  And

19   we would therefore ask that an injunction issue.

20        The troublesome thing, Your Honor, is their argument

21   seems to be we entered into a contract --

22        THE COURT:  Well, let me ask you this, Mr. -- I

23   understand your argument, Mr. Edmunds -- what kind of

24   injunction?  What is it that you want me to preclude them from

25   doing exactly?  Given the posture today, what is it practically

1  speaking that I can do?

2          MR. EDMUNDS:  You can enjoin them from making use of,

3  directly or indirectly, any confidential information and/or --

4          THE COURT:  They're claiming they're not.

5          MR. EDMUNDS:  Well, then -- then -- pardon me, Your

6  Honor, I know of course they're claiming they're not.

7          THE COURT:  Well --

8          MR. EDMUNDS:  But if -- if they are enjoined, they

9  should have no problem.  If -- but if you put it in those

10  terms, if you put it in terms of anything within the meaning of

11  the contract, which is either confidential information or a

12  trade secret, they are enjoined from using directly or

13  indirectly.  That's what we're seeking.

14          THE COURT:  All right.

15          MR. EDMUNDS:  And, Your Honor, you actually came up

16  with the solution.  If there then becomes a problem with it --

17  well, you didn't -- I don't want to misquote you, but your idea

18  of invoking the powers of the magistrate, if they think there's

19  a blurry line, if they think there is a particular fact that

20  they want to make use of, give them leave to come back before

21  the magistrate, but start with the injunction under the terms

22  of the contract.

23          They were the same people who were here telling you

24  that the contract that they negotiated was vague,

25  unintelligible -- well, they didn't say unintelligible, but so

 1    vague as to be unenforceable.  Hold them to the terms of that,

 2    Your Honor.  As you said, they had their own counsel who was

 3    sophisticated.

 4         THE COURT:  All right.  Thank you.

 5         MR. EDMUNDS:  Thank you.

 6         THE COURT:  Who's going to -- please.  You got kind of

 7    preempted last time, so maybe --

 8         MR. HEIHRE:  I was both preempted and displaced, Your

 9    Honor.

10         Your Honor --

11         THE COURT:  Now, am I correct in -- in my statement,

12    because I want to be sure that I'm correct, that it's your

13    client's position that your client and the people that your

14    client is currently doing business with are not utilizing in

15    any way, shape or form any trade secrets or confidential

16    information from Mr. Edmunds?

17         MR. HEIHRE:  That's absolutely correct, Your Honor.

18         THE COURT:  All right.

19         MR. HEIHRE:  And the declaration Mr. Grimes set forth

20    in particular, the process that Aloha has proposed with respect

21    to the HECO supply of biodiesel, there's a flow chart, the flow

22    chart compares it to the petroleum model that Aloha has been

23    using to take gasoline to Kauai for a substantial period of

24    time before discussions were started in this case.  Declaration

25    goes on to point out that in Hawaii, the use of this process

1   has been quite common, at least the 1990s, and that there are

2   no trade secrets, either directly or indirectly, that Aloha has

3   in any fashion used to propose a logistics plan which is, with

4   the exception that it's biodiesel and it's to Maui as opposed

5   to Kauai, is the same as the delivery of gas on Kauai.

6          There's an alternative proposal that Sime Darby is

7   considering with the use of flex bags.  As pointed out in the

8   declaration, that is not something ever proposed by BlueEarth.

9   No trade secrets.  Aloha has the asset of having a very large

10  tank farm in Barbers Point, has dedicated pipelines used and it

11  follows the logistics model for petroleum as it would in the

12  proposal made to Sime Darby, which Sime Darby in turn has

13  submitted to the HECO folks.

14         So, Your Honor, whatever is the theoretical basis of

15  this stack of materials, including contracts, negotiated

16  versions of contracts, putting the stamp of trade secret or

17  confidential information on it, whatever is the theoretical

18  universe, when we take that down, as I think we're required to,

19  and apply it here to what is being proposed, is what is being

20  proposed by Aloha firm, concrete and clear?  And it is.  Is

21  there rebuttal to that?  No.  From the basis of what has been

22  said, looking at the process, there's no trade secrets here.

23         So, Your Honor, when we address it at that level, you

24  talk about an injunction, the plaintiff talks about an

25  injunction, and the injunction would pertain, theoretically,

1    they say to that, because they don't know what's really going

2    on in the minds of anybody.  But that's not enough, Your Honor.

3    They have to demonstrate to this Court that a risk of

4    irreparable harm is immediate.  Is immediate.  It's not enough

5    to say even irreparable harm.  They have to meet the test of

6    immediacy.  And beginning with their briefing they've pointed

7    out that the immediacy turns on the PUC, it turns upon the

8    finalization of contracts, and then it turns into if you're

9    going to do it and you're going to ship under the MECO proposal

10   submitted by Sime Darby and followed by Aloha, you're going to

11   bring finished biodiesel, not palm oil, finished biodiesel

12   here.

13          Your Honor, there is loads of time to get a ship from

14   Malaysia once the contract has been approved by the PUC, if

15   it's approved by the PUC.  For a plaintiff to come in and say,

16   That process that's occurring right there, clear, identifiable,

17   something that Judge Ezra can clearly specify in an injunction

18   order is or is not to be done.  But here this vacuous ambiguity

19   of cosmic we've got all of this stuff and somehow they're using

20   all of this stuff is betrayed when we just look at the solid

21   facts here.

22          And the court last time had a discussion that the

23   Third Circuit, including a member now who is on the Supreme

24   Court, said that trial court -- this is at 351, I believe, 614

25   F.2d, the trial court appeared to find credible the testimony

1    that the employee, who was supposedly going to disclose, did

2    not intend to disclose, and Amico -- the Aloha -- did not

3    intend to use any of Continental's confidential information.

4         Your Honor, we have submitted to the Court in

5    declaration form what it is that Aloha has proposed.  Looking

6    at that information and comparing it to BlueEarth's process,

7    the Court can determine that there is no possibility of the use

8    of BlueEarth's confidential information.

9         So, we have here concluding that the non-moving

10   parties will not be harmed by being enjoined from something

11   they did not intend to do, and that the moving party would be

12   harmed if the act enjoined were unintentionally done, the

13   district judge held that the order should properly be granted.

14   The court said no, Third Circuit said no, uh-uh.  Trial court

15   is saying it's credible as to what Aloha is saying.  Trial

16   court is saying it's credible as to what the defendants here

17   are saying.  And it said they're not going to use it.  You can

18   measure, Your Honor, the credibility of Aloha's presentation by

19   looking at that declaration of Mr. Grimes and comparing the

20   processes and then comparing it to whatever has been submitted

21   by BlueEarth.

22        BlueEarth was bringing in feedstock, supposedly, palm

23   oil, you know, sort of Crisco.  We're talking here finished

24   biodiesel.  BlueEarth was going to run it through a terminal on

25   Maui.  Aloha is running it through its terminal here.

1    BlueEarth was going to run it through a biodiesel processing

2    plant.  Biodiesel processing plant here is in Malaysia.  This

3    is finished product that's being imported.

4         Your Honor, where is the imminency?  Where is the

5    irreparability?

6         And under the case law, I would respectfully submit

7    that at least in the Third Circuit it's not enough to say,

8    Well, they don't intend to do it, so what's the harm, what's

9    the problem of entering an injunction?  Well, there's a lot of

10   harm.  There's a lot of overlooking of that fundamental element

11   in injunctive relief of imminency that sustain the common law's

12   position on the issuance of that relief.

13        eBay, for whatever else, states nine zero.  Nine zero.

14   Couple of concurring opinions.  That you can't shortcut the

15   weighing process.  There's no presumptions when you examine

16   these elements.  You have to determine each what is the

17   irreparability, what is the immediacy.

18        Your Honor, we would ask under these circumstances

19   that the Court reject the issuance of any injunction applicable

20   to Aloha.

21        THE COURT:  All right.  Mr. Alston?

22        MR. ALSTON:  Thank you, Your Honor.

23        THE COURT:  I assume that Mr. Heihre has kind of

24   covered the universe here, but --

25        MR. ALSTON:  Close to it, Your Honor.

1          THE COURT:  All right.

2          MR. ALSTON:  And that is this, the point I want to

3   make is this:  This would be a very different case if my

4   clients were going forward with the construction of a biodiesel

5   plant on Maui.  They are not.  That project is dead.  There is

6   no plan ever --

7          THE COURT:  No, I think everybody concedes that.

8   That's right.

9          MR. ALSTON:  Right.  So what we're talking about is

10   the company looking at alternative ways to fulfill the State's

11   mandate that the power companies find some way to wean

12   themselves off fossil fuels and use alternative energy.  That's

13   what we're doing.

14          And yet, when Mr. Edmunds comes and stands before you

15   and says, What's at risk here are trade secrets, what he points

16   to is not things that relate to the biodiesel industry

17   generally but things that relate to specific aspects of the

18   development of the defunct biodiesel plants on Maui.  And what

19   they offer in their papers as to things that are unrelated to

20   the development of the biodiesel plant is a list of people,

21   including the Latham & Watkins law firm, the Carlsmith Ball law

22   firm, a variety of experts that the company has worked with for

23   years that simply cannot be within the scope of any protection

24   of trade secrets.

25          They are not trade secrets.  They are not -- HECO

1   didn't find these people because of BlueEarth, it dealt with

2   them in large part before BlueEarth.  It didn't learn about

3   Cargill and Sime Darby because of BlueEarth, it learned about

4   them independently.  And therefore none of that is protected

5   and none of the agreements that flow out of the effort to

6   fulfill the State's mandate to move from fossil fuels is

7   protected here.

8        What they have failed to do is to provide you a road

9   map to the kind of specificity that Rule 65 requires you put

10  into an injunction.  They say you should enjoin us from doing

11  things that are prohibited by the contract.  That's not the

12  kind of specificity that's required.  They have to point to

13  specific facts, to specific people, to specific ideas and they

14  haven't done that, they just dumped six or eight pages of paper

15  on you.

16       And lastly, Your Honor, I would suggest that any

17  consideration of whether you should issue an injunction, in

18  addition to considering the imminence of any harm and the

19  likelihood of success, would require you to look at the public

20  interest, it's not here, and look at the need to post a bond

21  and they haven't offered any bond.

22       THE COURT:  Very briefly, Mr. Edmunds, because I've

23  got another matter.

24       MR. EDMUNDS:  I understand.  Of course, Your Honor,

25  the matter of the bond is up to the discretion of the Court.

1  We are not assuming that we would be bond free, the rule does

2  require one.

3           Another alternative, Judge, would be for you to enjoin

4  them from using any of the processes which we've described.

5           What I have heard here, number one, is an argument

6  that there's no immediacy.  But, Your Honor, if there is

7  irreparable injury, and they've stipulated in the contract that

8  what we've shown is irreparable, if it's irreparable, it's

9  immediate.  If it's irreparable, it is irreparable right now

10 and therefore it is immediate.  And they really don't have an

11 answer for that, Your Honor.

12          The other point is that of course there's that

13 evergreen provision in the contract so that tomorrow the PUC

14 could move forward, you have that supplemental pleading or that

15 supplemental exhibit about the Life of the Land is now going to

16 be permitted to intervene, the thing could -- or had been

17 denied from intervening.

18          THE COURT:  I think they had been denied intervention.

19          MR. EDMUNDS:  Had been denied intervention.  So this

20 could move very quickly.

21          But the most important override, Your Honor, is this

22 turns into what I call -- and this is my last point -- the

23 boo-hoo, please pity us argument.  That is, we negotiated a

24 contract, we made it as broad as all outdoors in order to get

25 from BlueEarth what they got, and you've seen the enormous

1  amount of information we've turned over.  Now that we come to

2  them and say, Hold it, you got it, you breached, we don't want

3  you to use it.  They say, But this is not fair, it's

4  impossible.  What you're asking for is so broad, you don't want

5  us to use anything you've furnished over to us, but you can't

6  specify as to how we're using them.  Your Honor, that's the

7  argument that they waived when they entered into such a broad

8  contract.  They want to turn the breadth of the contract around

9  to their advantage.  They should be estopped from doing that.

10 They should be enjoined from using whatever it is that's

11 covered by that contract.  And if there's a question, they

12 should have leave to come back before the magistrate and

13 ultimately this court.  But that's where the presumption should

14 be.  Thank you.

15         THE COURT:  Thank you, Mr. Edmunds.

16         All right.  Here's what I'm going to do:  First of

17 all, with respect to the motion that was actually on the

18 calendar, I am going to issue a written order pursuant to the

19 local rules relating to certification and then we'll move

20 forward on that certification process.

21         Of course, you know, the Hawaii Supreme Court doesn't

22 have to accept certification and if they deny certification,

23 say they are not to accept it, they wouldn't accept it from the

24 Ninth Circuit either and then we can go forward, it's not a

25 problem.  Okay.  Then I -- you know, we've done what we can do.

44

1   But I -- I'm not contemplating that.  I think they will

2   probably take the question.

3          With respect to the injunction which we've just heard

4   argued, I will issue on order on that and I'll do it as quickly

5   as I possibly can.

6          MR. EDMUNDS:  May I have one second with counsel

7   before you adjourn?

8          THE COURT:  Sure.

9                (Counsel conferring.)

10         MR. EDMUNDS:  Your Honor, the issue has come up, we

11  have a deposition scheduled this week.

12         THE COURT:  Oh.

13         MR. EDMUNDS:  And I was just asking counsel what his

14  position was on whether those would go forward.  Our position

15  is that we should be given leave to move forward with those.

16  We've got Mr. Maez -- I'm sorry, Mr. Stahlkopf and a 30(b)(6)

17  from Aloha set this week.

18         THE COURT:  Where are the depositions?

19         MR. EDMUNDS:  Here.

20         THE COURT:  Here.  So nobody has to go flying away?

21  No, I think you ought to go forward, just go forward with the

22  depositions.

23         MR. EDMUNDS:  Thank you.

24         MR. ALSTON:  Fine, Your Honor.

25         THE COURT:  Okay.  Thank you very much, counsel.  I'll

1   take a brief --

2           MR. HURST:  Thank you, Your Honor.

3           THE COURT:  Thank you.  Nice to meet you.

4           MR. HURST:  It was nice to meet you.

5           THE COURT:  And the Court will just take the matters

6   under advisement, as I've just indicated.

7           I got to take a real brief recess and go grab some

8   papers for the next matter.

9           (The proceedings concluded at 11:39 a.m., October 5,

10   2009.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              COURT REPORTER'S CERTIFICATE

2

3         I, CYNTHIA FAZIO, Official Court Reporter, United

4    States District Court, District of Hawaii, Honolulu, Hawaii, do

5    hereby certify that the foregoing pages numbered 1 through 45

6    is a true, complete and correct transcript of the proceedings

7    had in connection with the above-entitled matter.

8
          DATED at Honolulu, Hawaii, October 8, 2009.
9

10

11                         /s/ Cynthia Fazio
                        CYNTHIA FAZIO, RMR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```