IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

BLUEEARTH BIOFUELS, LLC,    )       CIV. NO. 09-00181 DAE-KSC
                            )
          Plaintiff,        )
                            )
     vs.                    )
                            )
HAWAIIAN ELECTRIC           )
COMPANY, INC.; MAUI         )
ELECTRIC COMPANY, LTD.;     )
ALOHA PETROLEUM, LTD.; AND  )
KARL E. STAHLKOPF,          )
Individually,               )
                            )
          Defendants.       )
_____ )

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT; GRANTING DEFENDANT HECO'S COUNTER-MOTION FOR
PARTIAL SUMMARY JUDGMENT

On August 19, 2010, the Court heard Plaintiff BlueEarth Biofuels,

LLC's Motion for Partial Summary Judgment and Defendants Hawaiian Electric

Company, Inc. and Maui Electric Company, Ltd.'s (the "HECO/MECO

Defendants") Counter-Motion for Partial Summary Judgment.  John S. Edmunds,

Esq., Michael K. Hurst, Esq., and Jaime Olin, Esq., who attended the hearing via

telephone, appeared on behalf of Plaintiff; Teri-Ann E.S. Nagata, Esq., and  C.

Michael Heihre, Esq., appeared at the hearing on behalf of Defendant Aloha

Petroleum, Ltd. ("Aloha"); and Clyde J. Wadsworth, Esq., Orlesia Tucker, Esq., and Paul Alston, Esq., who attended the hearing via telephone, appeared at the hearing on behalf of the HECO/MECO Defendants. After reviewing the motions and the supporting, opposing, and supplemental memoranda, the Court DENIES Plaintiff's Motion (Doc. # 268) and GRANTS the HECO/MECO Defendants' Counter-Motion (Doc. # 315).

<u>BACKGROUND</u>

Many of the background facts have already been discussed in this Court's prior order denying Plaintiff's Motion for Injunctive Relief on October 26, 2009 ("Order," Doc. # 188), and the Court recites only those facts necessary for determination of the instant Motion. This case involves failed plans to create and construct a biodiesel production facility on Maui. (Second Amended Complaint ("SAC"), Doc. # 65.)

In 2006, BlueEarth Biofuels, LLC's ("BlueEarth"), Hawaiian Electric Company, Inc. ("HECO") and Maui Electric Company, Ltd. ("MECO") began talks to jointly and exclusively develop a local biodiesel production facility to replace their use of petroleum diesel for power production. (<u>Id.</u> ¶ 12; Doc. # 325, Ex. 166.) The new facility would produce biodiesel, which is derived from vegetable feedstock. (<u>Id.</u>)

2

On September 27, 2006, BlueEarth executed Mutual Non-Circumvention and Non-Disclosure Agreements ("NDAs") with both HECO and MECO.  (SAC ¶¶ 14, 15.)  These NDAs established, among other things, that: (1) confidential information given by one party to another would remain property of the originating party; (2) such confidential information would not be disclosed or used for any purpose by the receiving party, other than for evaluation of the Project; (3) any contacts would be exclusive and valuable contacts of the disclosing party; (4) the party receiving contacts would not enter into direct negotiations or transactions with contacts; and (5) neither party would solicit or accept any business from sources made available by one party to the other without the express written permission of the disclosing party.  (Doc. # 269, Ex. A; id., Ex. B.)

After several months of negotiations, BlueEarth, HECO, and MECO signed a confidential Memorandum of Understanding (the "MOU") detailing the plan for the "evaluation, funding and development" of the large-scale biodiesel production facility to be developed by a newly formed limited liability company, originally termed "Newco," owned by the parties and located on MECO-owned land on Maui (the "Project").  (SAC ¶ 19; Doc. # 269, Ex. C.)  Although the MOU was entered into between BlueEarth, HECO, and MECO, HECO's responsibilities in the MOU were expressly contemplated to be superceded by an unregulated

subsidiary identified as "HUS" and were so designated by the MOU's terms.  (Id.)

HUS was defined as "[b]oth HECO and the Unregulated Subsidiary[.]"  (Id.)

The MOU specified how the parties would proceed with the Project's

planing, developing, permitting, funding, construction, and operation.  (Doc. # 269,

Ex. C.)  The MOU also contained a provision in which the parties agreed to "work

exclusively and in good faith with each other to develop" the Project.  (Doc. # 269,

Ex. C at 4.)  The MOU explicitly contemplated future formal agreements in

furtherance of the parties' business relationship, including a "Tolling Agreement"

for the long-term sale of biodiesel produced by the Project.  (SAC ¶ 21, n.1; Doc. #

269, Ex. C at 2.)  The Project was anticipated to be owned 51% by BlueEarth and

49% by HUS.  (Doc. # 269, Ex. C at 1-3.)  Specific formalities were left to an

"Investment Agreement" to be entered into the parties at a later date.  (Doc. # 269,

Ex. C at 1-5.)

Subsequent to the signing of the MOU, two companies were formed:

(1) the parties created the entity identified in the MOU as "Newco" and named the

company BlueEarth Maui Biodiesel LLC ("BEMB") (Doc. # 316, Ex. 111 at

H091481); and (2) HECO created the unregulated subsidiary contemplated in the

MOU as HUS and named it Uluwehiokama Biofuels Corp. ("UBC") (Doc. # 316,

Ex. 117).  The parties negotiated, and on February 4, 2008 signed, an Operating

4

Agreement and an Investment Agreement (collectively, the "BEMB Agreements") to govern the operation and ownership of BEMB as contemplated in the MOU. The BEMB agreements were entered into between BlueEarth, UBC and BEMB and were signed on February 4, 2008. (Doc. # 326, Exs. 102, 103.)

Sometime in 2007, BlueEarth began searching for potential fuel subcontractors who would manage and run logistics for a fuel terminal. (SAC ¶ 25.) The fuel terminal would be used to store and transfer the raw materials, such as palm oil, and fuel in connection with the Project. (SAC ¶ 26.) One of the subcontractors approached by BlueEarth was Aloha.[1] (Id.; MPSJ at 6 n.2; BECSF ¶ 7.) BlueEarth also subsequently considered Aloha as a candidate for providing an equity investment in the Project. (MPSJ at 6-7 n.2; BECSF ¶ 9; see Doc. # 300 Exs. 14 at BE022996, 93.) According to BlueEarth, over the course of the next two years BlueEarth spent over $1.2 million working to develop the Project. (SAC ¶ 23.)

As the Project progressed, BlueEarth and HECO worked jointly to develop the Tolling Agreement and originally engaged in negotiations with Energy

---

[1] Aloha's later role in the Project and HECO/MECO's alleged unilateral attempt to replace BlueEarth with Aloha is a matter of great contention between the parties.

Capital Partners ("ECP") for this purpose.[2]  (Doc. # 316, Ex. 104.)  After the

negotiations with ECP fell through, BlueEarth alleges that HECO, MECO, Karl

Stahlkopf—HECO's then-Vice President of Energy Solutions and Chief

Technology Officer—and Aloha began engaging in private negotiations

concerning the development, investment, and ownership of the Project.  (SAC ¶¶

32-35.)  BlueEarth further contends that HECO, MECO, and Aloha worked to

circumvent the MOU and their respective NDAs in order to cut BlueEarth out of

the Project altogether.  (Id.)

Eventually, negotiations for the Project fell through and plans ceased.

(SAC ¶¶ 31-35.)  In early October 2008, BlueEarth filed the instant lawsuit in the

Northern District of Texas, claiming that Defendants had violated the various

NDAs and the Confidentiality Agreement and engaged in a scheme to circumvent

BlueEarth's role in the Project.  (SAC ¶ 10.)  On April 21, 2009, the case was

transferred to this District.  (Id.)

On May 29, 2009, BlueEarth filed its SAC.  (Doc. # 65.)  The SAC

alleges the following eleven causes of action:

---

[2] The Court notes that although the responsibility for negotiations regarding the Tolling Agreement was a UBC obligation (Doc. # 326, Ex. 102, Schedule C), HECO and BlueEarth appear to have engaged in the negotiations as representatives of BEMB.  (Id.)

- <u>First</u>: breach of contract (HECO NDA) against HECO (SAC ¶¶ 42-46);

- <u>Second</u>: breach of contract (MECO NDA) against MECO (SAC ¶¶ 47-51);

- <u>Third</u>: breach of contract (MOU) against HECO and MECO (SAC ¶¶ 52-57);

- <u>Fourth</u>: quantum meruit/unjust enrichment against HECO and MECO (SAC ¶¶ 58-61);

- <u>Fifth</u>: breach of contract (Aloha NDA and Confidentiality Agreement) against Aloha (SAC ¶¶ 62-66);

- <u>Sixth</u>: unfair competition under Haw. Rev. Stat. §480-2 against HECO, MECO, Stahlkopf, and Aloha (SAC ¶¶ 67-74);

- <u>Seventh</u>: tortious interference with existing contracts (all NDAs and the Confidentiality Agreement) as to all Defendants (SAC ¶¶ 75-82);

- <u>Eighth</u>: tortious interference with existing contract (MOU) against Aloha (SAC ¶¶ 83-87);

- <u>Ninth</u>: misappropriation of trade secrets against all Defendants (SAC ¶¶ 88-90);

- <u>Tenth</u>: conversion against all Defendants (SAC ¶¶ 91-92);

- <u>Eleventh</u>: breach of fiduciary duty against HECO and MECO (SAC ¶¶ 93-98).

On June 29, 2009 Defendant Aloha filed a Motion to Dismiss (Doc. # 74) and HECO/MECO Defendants and Karl Stahlkopf filed a joint Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. # 75).  On October 7, 2009, this Court issued an order denying without prejudice Defendant Aloha's Motion to Dismiss and HECO/MECO Defendants and Karl Stahlkopf's joint Motion to Dismiss and directed the parties to submit proposed questions to be certified to the Supreme Court of Hawai`i.  (Doc. # 168.)

On September 14, 2009, BlueEarth filed a motion for a Temporary Restraining Order.  (Doc. # 143.)  On October 26, 2009, after significant briefing from both sides, this Court issued an order denying BlueEarth's motion.  (Order, Doc. # 188.)  Subsequently, this Court also certified  questions regarding the scope of Hawaii Uniform Trade Secrets Act ("HUTSA") to the Supreme Court of Hawai`i.  (Doc. # 191.)  An opinion of the Supreme Court on the Certified Questions was returned on July 21, 2010.  (Doc. # 301.)  These questions and Supreme Court opinion do not bear on the instant contract issues before this Court.

On May 18, 2010, BlueEarth filed its instant Motion for Partial Summary Judgment ("MPSJ") as to Counts 1-3 of the SAC against HECO and

MECO.  ("MPSJ," Doc. # 268.)  On May 19, 2010, Blue Earth filed a concise

statement in support of its MPSJ.  ("BECSF," Doc. # 269.)  Also on May 19, 2010,

BlueEarth filed additional exhibits to its concise statement in support.  (Docs. ##

271-274.) On July 19, 2010, although BlueEarth's MPSJ did not concern any

counts against it, Aloha filed an opposition to BlueEarth's MPSJ.  (Docs. ## 295

(redacted), 299 (sealed).)  The same day, Aloha filed a concise statement in support

of its opposition.  ("ACSF," Docs. ## 296 (redacted), 300 (sealed).  Aloha also

filed additional exhibits in support of its concise statement.  (Docs. ## 297, 298.)

On August 2, 2010, Aloha filed an amended opposition to BlueEarth's MPSJ.

("Aloha Opposition").  ("Aloha Opp'n," Docs. ## 312 (redacted), 314 (sealed).)

On the same day, Aloha filed an errata to its concise statement.  (Docs. ## 313

(redacted), 319 (sealed).)

On August 2, 2010, HECO/MECO Defendants filed their instant

Counter Motion for Partial Summary Judgment ("CMPSJ").  ("CMPSJ," Docs. ##

315 (redacted), 322 (sealed).)  The same day, HECO/MECO Defendants filed a

concise statement in support of their CMPSJ.  (Docs. ## 316 (redacted), 323

(sealed).)  HECO/MECO Defendants later filed an errata to Doc. # 316 and thereby

submitted exhibits 102 and 103.  (Doc. # 326.)  HECO/MECO Defendants also

filed additional exhibits in support of their concise statement.  (Docs. ## 317, 318,

325.)  Additionally, HECO/MECO Defendants filed a concise statement in

opposition to BlueEarth's MPSJ.  (Doc. # 324.)  On August 9, 2010, Aloha filed a

Joinder in HECO/MECO Defendants' CMPSJ.  (Doc. # 328.)

On August 9, 2010, BlueEarth filed a reply to Aloha's Opposition.

(Doc. # 329.)  Also on August 9, 2010, BlueEarth filed a reply in support of its

MPSJ/opposition to HECO/MECO's CMPSJ ("Opp'n to CMPSJ," Doc. # 330) and

a concise statement in support (Docs. ## 331, 333.)  On August 16, 2010,

HECO/MECO Defendants filed a reply in support of their CMPSJ.

("HECO/MECO Reply," Doc. # 337.)  This Court provided HECO/MECO

Defendants leave to respond to the power-point presented by BlueEarth at the

hearing, and on August 24, 2010, HECO/MECO Defendants filed a Response.

(Doc. # 342.)  On November 1, 2010, BlueEarth filed its Third Amended

Complaint.[3]  (Doc. # 387.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure ("Rule") 56 requires summary

judgment to be granted when "the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material

---

[3] Although the instant motions were brought as to BlueEarth's Second Amended Complaint, BlueEarth's Third Amended Complaint does not change any of the causes of action addressed herein.

fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings.  Porter, 419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party.  The nonmoving party's

11

evidence must be taken as true.  T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 632 (9th Cir. 1987) (internal citations omitted).

However, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment.  Instead, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.  Id. at 630 (citation omitted) (emphasis added).  The opponent "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the factual context makes the non-moving party's claim or defense implausible, the party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue of trial.  Id. at 587.

State law governs the resolution of substantive issues in this diversity action.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1090 (9th Cir. 2001).

## DISCUSSION

BlueEarth seeks summary judgment on two of its breach of contract claims against HECO for: (1) breach of the HECO NDA (Count 1);[4] and (2) breach of the MOU (Count 3).

As to the MOU, BlueEarth alleges that HECO breached the MOU by failing to timely provide a payment of $400,000 to the Project in early 2007 and failing to work exclusively with BlueEarth as Project Developer by having discussions beginning in June 2008 with Defendant Aloha.  As to the HECO NDA, BlueEarth alleges that HECO breached the HECO NDA by soliciting Aloha to invest in the Project and become the project developer without BlueEarth's express written permission.

I.    This Court's Prior Order Finding the MOU to be an Enforceable Contract

In this Court's prior Order denying BlueEarth a preliminary injunction, the Court addressed the threshold issue of the existence of a valid

---

[4]   Blue Earth's factual allegations appear to allege that in addition to breaching its own NDA that HECO breached the MECO NDA.  HECO/MECO Defendants contend that each NDA is mutually exclusive and cannot serve to bind the party that is not a signatory to it.  The SAC shows that BlueEarth has not alleged that HECO breached MECO's NDA or vice versa.  Because by its instant MPSJ BlueEarth's factual allegations relate only to HECO's conduct, the Court construes its motion as requesting relief only as to Count 1—the HECO NDA, and not as to Count 2—the MECO NDA, despite BlueEarth's contention that it is moving on all of its contract claims.

contract prior to ruling on BlueEarth's likelihood of success on the merits of its

contract claims.  The Court found that the MOU and NDA agreements were valid

enforceable contracts.  BlueEarth argues that the Court's prior ruling is the "law of

the case" and that HECO is bound by the ruling that the MOU and NDAs are valid

and enforceable.  Both HECO/MECO Defendants and Aloha urge the Court to

reconsider its prior Order because the Court's findings were "preliminary" in the

context of a preliminary injunction and not binding.  See Univ. of Tex. v.

Camenisch, 451 U.S. 390, 394 (1981) ("The purpose of a preliminary injunction is

merely to preserve the relative positions of the parties until a trial on the merits can

be held.  Given this limited purpose, and given the haste that is often necessary if

those positions are to be preserved, a preliminary injunction is customarily granted

on the basis of procedures that are less formal and evidence that is less complete

than in a trial on the merits.").

     As this Court stated in its Order, "[n]one of the parties devote[d] a

considerable amount of time to an analysis of the likelihood of success on the

merits of BlueEarth's contract claims." (Order at 13.)  In fact, BlueEarth provided

no legal analysis or argument in the one-page section of its motion addressing the

issue and instead simply enumerated its allegations for why the HECO/MECO

Defendants breached their respective contracts with BlueEarth.  (Id.)  In the

14

context of the preliminary injunction analysis, this Court analyzed whether the

MOU and NDAs[5] were unenforceable as "agreements to agree" which were too

indefinite in terms and scope to warrant enforcement.  (Id.)  This Court found:

> The MOU is, essentially, an agreement to enter into a preliminary
> business relationship between HECO, MECO, and BlueEarth.  It
> recites the parties' goals in developing the Project, specifies certain
> construction and development obligations, limits the amount of
> investment by HECO, and protects the exchange of confidential
> information between the parties.  While it does contemplate future
> agreements between the parties, especially with respect to finalization
> of the Project itself, the MOU is a complete and enforceable contract
> in and of itself.  It is not lacking any essential terms for its purposes;
> rather, it establishes the preliminary relationship and covenants
> necessary for two complex and sophisticated parties to proceed with
> plans for a multi-million dollar project, and as such, it is subject to the
> Hawaii requirement of "good faith." . . . The MOU can be seen as the
> first contract binding the parties to certain duties that they hoped
> would result in a future contract with respect to a final, PUC-approved
> biodiesel plant.

(Id. at 15-16 (internal citations omitted).)

It is clear that in finding the MOU to be an valid and enforceable

contract, the Court did not have the benefit of the subsequent agreements nor the

parties' arguments regarding them.  However, the Court need not re-analyze

whether the MOU is an enforceable contract in light of the HECO/MECO

Defendants' arguments and this Court's finding below that, regardless, the BEMB

---

[5] HECO/MECO Defendants do not assert by their opposition or CMPSJ that
the NDAs are unenforceable.

Operating and Investment Agreements operate as a novation of the MOU.   The Court's ruling does not depend on whether the MOU was binding at the time it was executed and for the purposes of the instant motions the Court will assume that the MOU was a valid and enforceable contact without revisiting the issue.  What this Court addresses below is whether the MOU is the parties' <u>operative</u> contract.

II.   <u>The BEMB Agreements Operate as a Novation of the MOU</u>

BlueEarth argues that HECO breached two distinct provisions of the MOU.  First, BlueEarth argues that the MOU obligated HECO to place $400,000 into escrow upon signing the MOU on January 27, 2006 and release those funds from escrow once BlueEarth had expended $300,000 and provided HECO with an accounting of expenditures and future cash flow requirements.  (MPSJ at 15.) BlueEarth alleges that in contravention of these obligations, HECO never caused the $400,000 to be put into escrow, let alone release these funds to BlueEarth.  (<u>Id.</u>)

In opposition, HECO/MECO Defendants argue that the $400,000 payment under the MOU was never a HECO obligation, but was instead an obligation of the entity "HUS," which HECO/MECO Defendants argue became UBC (or that UBC assumed all HUS obligations), and UBC is not a party to this action.  (HECO/MECO Reply at 21-22.)  HECO/MECO Defendants further argue that the MOU was superseded by the BEMB Agreements because of the BEMB

16

Agreements' merger clauses and that even if the MOU was not superseded, that the BEMB Agreements caused a novation of the MOU.  HECO/MECO Defendants alternatively argue that BlueEarth failed to provide HECO with a proper accounting.  (Id. at 23-26.)

In response, BlueEarth states that the BEMB Agreements cannot be considered to have superseded the MOU because while HECO, MECO and BlueEarth were signatories to the MOU, the signatories to the BEMB Agreements were UBC, BEMB and BlueEarth, and therefore, there was no identity of parties as required by the merger clauses in order for the BEMB Agreements to supersede prior agreements, such as the MOU.  (Opp'n to CMPSJ at 4-6.)  BlueEarth further argues that the BEMB Agreements specify that earlier agreements between the parties are canceled only to the extent that they are based on the same subject matter, and that because "neither of the BEMB Agreements covers all the same subject matter as the MOU, they could not have canceled or superseded the MOU in its entirety, if at all."[6]  (Opp'n to CMPSJ at 7; Doc. # 326, Exs. 102, 103.)

---

[6] At the hearing, BlueEarth also raised the issue that HECO/MECO Defendants' merger, supersession, and novation arguments are barred by Rule 9(c) as unpled conditions precedent.  HECO/MECO Defendants similarly argue that BlueEarth had an obligation to plead that conditions precedent to HECO's performance under the MOU had occurred or been performed.  However, contrary to the parties' assertions, in Kiernan v. Zurich Cos., 150 F.3d 1120 (9th Cir. 1998),
(continued...)

<hr />

     [6](...continued)
the Ninth Circuit stated that Rule 9(c) "does not expressly require that performance of conditions be pled, it merely sets for the manner in which such pleadings should be made." Id. at 1124.  Rule 9(c) assumes that conditions have been satisfied when a general averment of performance has been made.

     As to a denial of a condition precedent, Rule 9(c) requires that the denial be pled with particularity or it is subject to waiver.  BlueEarth alleges that HECO/MECO Defendants failed to plead BlueEarth's alleged failure to provide an proper accounting as a condition precedent for HECO's obligation to complete the $400,000 funding obligation.  However, it is BlueEarth that failed to plead factual allegations in its SAC as to breach of the MOU based upon failure to pay the $400,000 funding obligation, and therefore, HECO/MECO Defendants could not have raised affirmative defenses to this allegation.  In fact, BlueEarth's failure to raise this factual allegation in the SAC likely makes the allegation improper before this Court.  See Navajo Nation v. United States Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008) ("where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such a claim in a summary judgment motion is insufficient to present the claim to the district court.") (emphasis added).  Regardless, the Court need not address HECO/MECO Defendants' allegation in order to make a determination on the MPSJ or CMPSJ.

     As to BlueEarth's allegations that HECO/MECO Defendants' merger, supersession, and novation arguments are barred by estoppel, the Court finds that nothing presented by HECO/MECO Defendants has been contrary to their current arguments that the MOU set out the parties' preliminary understandings.  Further, nothing obligated HECO/MECO Defendants to argue merger, supersession, or novation in opposition to BlueEarth's motion for temporary restraining order.

     Lastly, as to BlueEarth's assertion that HECO does not have standing to assert rights under the BEMB Agreements integration/merger clauses because it is not a signatory to those agreements, BlueEarth is mistaken.  HECO need not be a signatory to the BEMB Agreements in order to argue that the obligations found in the MOU have been superseded and/or canceled by the agreements.  Similarly, the letters from HECO officials professed by BlueEarth to estop HECO from arguing that the MOU is superseded and/or canceled do not provide any support for this proposition.  (See Doc. # 342 at 6-7 & Exs. 174-175.)

18

Second, BlueEarth argues that HECO breached the MOU by failing to work exclusively with BlueEarth "as Project Developer" by having discussions beginning in June 2008 with Aloha regarding the Project.  The parties submit many exhibits and provide extensive argument regarding HECO's alleged actions of offering Aloha a role in the Project and conducting "secret meetings" with Aloha. HECO/MECO Defendants argue that none of their communications with Aloha were secret, and that in fact, BlueEarth had knowledge of and agreed to offer Aloha a greater role in the Project.

The Court finds that the parties' factual arguments as to both provisions do not create a genuine issue of fact material to the Court's instant determination because the Court finds that a novation occurred as to the MOU in its entirety, including the MOU's $400,000 funding obligation and its provision of exclusivity between BlueEarth and HECO in developing the Project.[7]

A novation involves the discharge of a prior contractual duty by a party who neither owed the previous duty nor was entitled to its performance."

---

[7] For the same reason, the Court also does not address HECO/MECO Defendants' argument that Landis Maez secretly became an agent of ECP and caused BlueEarth to breach its contractual and fiduciary obligations thereby absolving HECO and MECO of any further obligations to the Project.

See <u>Hawaii Builders Supply Co. v. Kaneta</u>, 42 Haw. 111, 1957 WL 10618, *1

(Haw. Terr. 1957) (quoting Restatement of Contracts § 424).

      Restatement of Contracts § 424 defines novation as a contract that:

    (a) discharges immediately a previous contractual duty or a duty to
    make compensation, and

    (b) creates a new contractual duty, and

    (c) includes as a party one who neither owed the previous duty nor
    was entitled to its performance.

See <u>id.</u>  "It is generally held that the burden rests on the party relying on a novation

under circumstances like these to prove it." <u>Jan Ban v. Tsen Yim</u>, 15 Haw. 433,

1904 WL 1275 (Haw. Terr. 1904).

      The Restatement (Second) of Contracts § 280 defines a novation as "a

substituted contract that includes as a party one who was neither the obligor nor the

obligee of the original duty."  Restatement (Second) of Contracts § 280; <u>id.</u> cmt. d

("A substitution of obligors may . . . result when an obligee promises a third person

that he will discharge the obligor's duty in consideration for the third person's

promise to render either the performance that was due for the obligor or some other

performance. . . . If the obligor is an intended beneficiary (§ 302), there is a

novation.  The assent of the obligor is not required.").

The obligee's assent may be inferred from the obligee's conduct and the circumstances.  See Hawaii Builders Supply Co., 1957 WL 10618 at *2 ("[s]ubsequent conduct of the creditor may be taken into account in determining whether the release of the original debtor was intended"); Standard Management, Inc. v. Kekona, 53 P.3d 264, 273 (2001) (citation omitted) ("[t]he existence of mutual assent or intent to accept is determined by an objective standard."); see also Flooring Systems, Inc. v. Radisson Group, Inc., 761 P.2d 733, 735 (Ariz. App. 1988).

In Flooring Systems, a flooring subcontractor brought a breach of contract action against a hotel and project designer for failure to pay for carpet installation. The court ruled that the subcontractor's original contract with the designer had been superseded by its subsequent agreement with a general contractor.  Flooring Systems, 761 P.2d at 735.  The court inferred the subcontractor's assent from the circumstances, including that both contracts involved the same subject matter and the subsequent contract provided that payments would by made by the general contractor rather than the designer.  Id.

The court further observed that the issue of novation "is not always a question of the parties' intention."  Id.  Instead, the court held that

21

> [w]here the entire subject matter is covered, and there is nothing on the face of the second agreement to show that it is intended to be supplemental to the original agreement, it supersedes and rescinds the original, not as a question of intention, but by operation of law, as a result of steps taken by the parties. . . .

Id. (quoting Arizona-Parral Mining Co. v. Forbes, 146 P. 504, 508 (1915)).

Below, the Court lays out the factual background for why the BEMB agreements constitute a substituted contract and operate as a novation of the MOU with UBC as the new obligor assuming all HUS/HECO obligations. The recitation of facts below also demonstrates the obligee's—BlueEarth's—objective assent to the novation. BlueEarth's assent is first evidenced through the contractual provisions of the MOU that show that the parties intended[8] to supercede the MOU with more formal agreements and to transfer all HUS/HECO obligations to a yet to be formed HECO unregulated subsidiary. Further, BlueEarth's assent is also shown through its conduct in negotiating and signing both the MOU and the BEMB Agreements and through the language of the BEMB Agreements. Finally,

_____

[8] The Court's discussion below regarding the parties' intention as shown through documentary evidence including but not limited to the MOU and BEMB Agreements is not a use of evidence extrinsic to a contract in order to ascertain that contract's meaning. Rather, this discussion is for purposes of analyzing how BlueEarth's assent may be inferred from its conduct and the circumstances. See Hawaii Builders Supply Co., 1957 WL 10618 at *2 ("[s]ubsequent conduct of the creditor may be taken into account in determining whether the release of the original debtor was intended").

as demonstrated below, because the BEMB Agreements cover all of the subject matter of the MOU and nothing on the face of the agreements show they were meant to be supplemental—in fact, the BEMB Agreements' merger clauses provide they may not be supplemental and supersede any agreements on the same subject matter—the BEMB Agreements supersede and rescind the MOU by operation of law as a result of the steps taken by BlueEarth, HECO and UBS.

A.   The Parties Intended the BEMB Agreements to Operate as a Novation of the MOU and for UBC to replace HUS as the Obligor

Preliminarily, the MOU makes clear that its purpose is

to memorialize certain preliminary understandings between the parties with regard to their affiliation and business relationship with each other, in anticipation of future formal agreements in furtherance thereof, and to document the current understanding of the anticipated roles and responsibilities the Parties may undertake with respect to the evaluation, funding and development of a large-scale biodiesel production facility to be developed by a newly formed limited liability company ("Newco") owned by the Parties, located on MECO-owned land (called the Wa'ena site) on the Island of Maui, Hawaii ("Project").  The understandings contained herein may be incorporated into and made part of subsequent formal and binding agreements executed between the parties.

(BECSF, Ex. C at 1 (emphasis added).)  The MOU specifically anticipates that a future agreement will formalize the equity ownership and parties' investments:

Should these ownership assumptions change (e.g., changes in equity infusions, application of accounting standards and requirements, or

other changed circumstances), then the Investment Agreement shall
reflect the revised investment, debt and ownership percentages.

(BECSF, Ex. C at 3.)  As to the Investment Agreement, the MOU states that the

equity allocation is to be "further detailed in the formal Investment Agreement

("IA") to be negotiated and agreed upon between the parties[.]" (Id.)  The MOU

additionally refers to the Parties' development of the Investment Agreement that

would provide "the conditions under which each Party would participate and/or

invest in Newco and be credited for its respective contributions (cash, services and

in-kind) to the Project." (Id. at 4.)

The provisions of the MOU demonstrate that the parties intended that

through future agreements, a HECO unregulated subsidiary, once formed, would

take over HECO's obligations in the MOU.

The MOU states:

This Memorandum of Understanding ("MOU") is entered between
Hawaiian Electric Company, Inc. ("HECO"), [until a Project Specific
HECO Unregulated Subsidiary is formed (at which time the rights and
obligations of HECO may be transferred in whole or in part to the
HECO Unregulated Subsidiary] (both HECO and the Unregulated
Subsidiary are referred to in this document as"HUS" [sic]), Maui
Electric Company, Ltd. ("MECO") and BlueEarth Biofuels LLC
("BlueEarth") (individually, "Party," and collectively, the "Parties").

24

(BECSF, Ex. C at 1.)  As to the $400,000 initial funding obligation, the MOU

specifically anticipates that this payment be made by HUS.  (Id. at 2.)  The MOU

also states that $400,000 in matching funds will be provided by BlueEarth.  (Id.)

The specifics of how HUS's payment was to be made are also directed toward

HUS.  (Id. at 4; see also id. at 5 ("plus HUS's contribution to Due Diligence of

$400K").)  Although BlueEarth states to the Court that HECO has admitted that it

had, and failed to fulfill, the responsibility of providing $400,000 (MPSJ at 17),  in

fact, HECO's admission was that HUS did not fund the $400,000 upon the signing

of the MOU (id.; BECSF, Ex. D; id., Ex. Z).

As to the responsibilities outlined for the parties, the MOU provides

for mutual responsibilities, and individual responsibilities for both HUS and

BlueEarth.  (Id. at 4-5.)  The MOU also states that project ownership will be split

between HUS (49.8% ) and BlueEarth (50.2% ) and states that "IN NO CASE

WILL HECO or HUS BE ASKED OR REQUIRED TO CONTRIBUTE MORE

THAN THEIR INITIAL $400K UPFRONT INVESTMENT TO THE

DEVELOPMENT EFFORT OF THE PROJECT."  (Id. at 3.)  However, the equity

ownership premise in the MOU is based on

> 1.) $6.1MM Project Capital Cost,  2[.]) $3.9MM MECO Wa'ena site
> Land Appraisal as also reflected in the Leased Property Equity

Agreement, <u>$400k HECO up-front cash investment</u>, BlueEarth $2MM upfront investment and 89% LTV debt financing.

(<u>Id.</u>) (emphasis added).

HUS is defined in the MOU to consist of both HECO and HUS. (<u>Id.</u> at 1.) Although the acronym "HUS" is not defined, it is logical that HUS stands for <u>H</u>ECO <u>U</u>nregulated <u>S</u>ubsidiary. The MOU itself is not entirely clear as it generally seems to anticipate HUS to be distinct from HECO (<u>see</u> <u>id.</u> at 4 ("pursuant to the rules of the HUS-HECO-MECO conflict screen guidelines[]")), but at other times seem to imply that HUS <u>is</u> HECO (<u>id.</u> at 5 (HUS's responsibilities include forming "an unregulated subsidiary to negotiate and be the lessee on the land lease with MECO." )). Regardless of the meaning of "HUS," the Court finds that although the MOU demonstrates that the parties anticipated future formalized agreements and that a HECO unregulated subsidiary would replace any HUS/HECO obligations, it is HECO that signed the MOU and had responsibility for any and all obligations under it until those obligations were transferred.

The parties' actions in preliminary negotiations of the MOU further clarify their intentions to supersede HUS/HECO' responsibilities in the MOU with another agreement designating a HECO unregulated subsidiary as the obligor. In October 2006, BlueEarth sent HECO a preliminary draft of the MOU via email.

26

(HECO/MECO Reply, Ex. 172.)  The email was sent from Landis Maez, President of BlueEarth, to Karl Stahlkopf, and Robert Wellington, the other principal of Blue Earth, among others.  (Id.)  Attached to the email, the preliminary draft of the MOU, as drafted by BlueEarth, had as parties to the agreement "HECO Unregulated Subsidiary ("HUS" until formed and named), and BlueEarth Biofuels LLC ("BlueEarth")[.]"  (Id. at BE003270.)  Accordingly, the term "HUS" in the MOU was originally anticipated to mean only a HECO Unregulated Subsidiary. However, UBC, HECO's unregulated subsidiary specific to the Project, was formed after the signing of the MOU.  (See Doc. # 316, Ex. 117 (Articles of Incorporation for UBC signed September 25, 2007).

Therefore, it appears to the Court from the relevant uncontradicted record, that because UBC had yet to be formed, the parties used HECO as a signatory and designated almost all responsibilities not those of BlueEarth or MECO to HUS as a placeholder until, as stated in the MOU, "a Project Specific HECO Unregulated Subsidiary is formed (at which time the rights and obligations of HECO may be transferred in whole or in part to the HECO Unregulated Subsidiary."  (BECSF, Ex. C.)  However, as stated above, in so doing, the MOU provided rights and obligations to HECO until its rights and obligations were transferred as anticipated by the parties.

27

B.     The BEMB Agreements Contain All of the Provisions of the MOU and Demonstrate that UBC Replaced HUS as the Obligor

As demonstrated above, it is clear from the MOU that future formal agreements were anticipated between the parties, in particular, the Investment Agreement.  The Investment Agreement was entered into by UBC, BEMB and BlueEarth in conjunction with the Operating Agreement to form the BEMB Agreements that govern the Project.  As discussed below, the BEMB Agreements—with UBC is substituted as the obligor for HUS—cover all provisions of the MOU, including those allegedly breached by HECO.

The evidence provided by the parties shows that HECO and BlueEarth began negotiating the BEMB Agreements in or before May 2007, less than four months after the MOU was signed, when BlueEarth emailed the first draft of the Operating Agreement to HECO.  (Doc. # 316, Exs. 111, 112.)  That email, from Maez to Stahlkopf, among others, was sent seven days after BlueEarth formed the "Newco" entity BEMB on May 21, 2007.  (Doc. # 316, Ex. 111.)  In his email, Maez stated that BlueEarth's counsel had, as with the MOU, used HECO as the counter-party to the draft Operating Agreement.  (Id.)  Nevertheless, BlueEarth stated that it understood that "an unregulated HECO subsidiary will be a counterparty to the agreement." (Id.)  UBC had still had not yet been formed.

28

1.      The MOU's $400,000 Funding Obligation was Intended to be Superseded by the BEMB Operating Agreement's $400,000 Capital Contribution

On January 9, 2007, HECO's Board of Directors approved the investment of $400,000 to continue due diligence and negotiations with BlueEarth for the biodiesel project on Maui.  (BECSF, Ex. Y.)  However, it is undisputed that the actual funding of the $400,000 was completed in March 2008, over a year later, after the Operating Agreement took effect.  (MPSJ at 17; BECSF, Ex. Z.)

BlueEarth argues that because HECO's Board of Directors had approved payment of the $400,000 on January 9, 2007 (BECSF, Exs. Y & Z) and the MOU provided a payment date of January 2007 upon the signing of the MOU, that HECO knew it was in breach of its obligation to fund the money after the MOU was signed on January 27, 2007.  (MPSJ at 17; BECSF, Ex. C. at 4.) However, the undisputed evidence demonstrates that the parties were waiting for the Operating Agreement to be signed before the money would be funded.

As early as May 2007, the parties' draft Operating Agreement anticipated a payment of $400,000 as a capital contribution to be paid by UBC to BEMB on the date that the Operating Agreement was signed.[9]  (Id. at H091483

_____

[9] The December 2007 drafts of the Operating and Investment Agreements contained similar language indicating that the $400,000 contribution would be paid

(continued...)

¶ 3.01, H091503 (Schedule A).)  This capital contribution obligation is identifiable as that contained in the MOU because the draft Operating Agreement Schedule A ("draft Schedule A") states that both BlueEarth and HECO (as a stand-in for the HECO Unregulated Subsidiary as previously acknowledged by Maez) would each pay $400,000 and result in an ownership of BEMB equal to 50.2% for BlueEarth and 49.8% for the HECO Unregulated Subsidiary, which is an arrangement identical to that provided for by the MOU.  (Compare id. with BECSF, Ex. C.)

The draft Schedule A was modified in the final Operating Agreement signed on February 4, 2008.  (Doc. # 326, Ex. 102.)  The final Operating Agreement replaced HECO with UBC as the "HECO Unregulated Subsidiary" and split the capital contribution of $400,000 into two payments—one up-front payment of $380,000[10] due on the date the agreement was to be signed and one payment of $20,000 due at a later date in order to better meet HECO's tax

_____

[9](...continued)
upon execution of the Operating Agreement.  (Doc. # 325, Ex. 116 at H120741-43, H120768.)

[10] The UBC $400,000 capital contribution, payable in two increments of $380,000 and $20,000, is also memorialized in the Investment Agreement, which reflects that this contribution was provided in order to purchase an interest in BEMB.  (Doc. # 326, Ex. 103 at H002490.)  Additionally, the Investment Agreement clarifies that the actual payment of the $380,000 could be made on the date of signing, February 4, 2008, or at "such other time and place as the Company and the Purchaser mutually agree upon, orally or in writing[.]" (Id.)

and funding considerations.  (Id. at H002485 (Schedule A); BECSF, Ex. Z.)  The

draft and final Operating Agreements demonstrate that HECO and HUS were used

as stand-ins until UBC could be formed and that the MOU's funding obligation

was a precursor to the Operating Agreement's capital contribution.

        HECO/MECO Defendants' assertion that the MOU $400,000

funding obligation was superseded by the Operating Agreement $400,000 capital

contribution obligation is further supported by undisputed evidence that the parties

agreed to postpone any payment obligation under the MOU until execution of the

BEMB Agreements, specifically the Operating Agreement.  (CMPSJ at 22.)

Although the first draft Operating Agreement was sent in May 2007, the parties'

negotiations continued into 2008 with the full understanding that the Operating

Agreement would supersede the MOU's $400,000 funding obligation.

        Internal BlueEarth communications show that BlueEarth did

not anticipate the $400,000 funding from HUS until after signing the Operating

Agreement.  On August 29, 2007, Maez updated other BlueEarth members

regarding the Project Development status by stating that HECO would make the

"$400K Investment upon execution" of the BEMB Operating Agreement.  (Doc. #

325, Ex. 113 at BE005840; see also Doc. # 325, Ex. 116 at H120741 (December 3,

2007 email to Maez stating "I believe UBC is ready to fund its capital contribution

subject to completing" the BEMB Agreements.)  Similarly, on September 7, 2007,

Wellington told the BlueEarth members that the $400,000 investment would come

"on the heels of" the BEMB Operating Agreement.  (Doc. # 316, Ex. 114.)

Moreover, Maez, in a September 9, 2007 email to Wellington, among others,

expressed that "[t]he $400k has been approved by both [HECO and MECO]

boards, their new LLC (who will join us in BlueEarth Maui Biodiesel [BEMB])

has been formed and the management selected . . . and the operating agreement is

being reviewed."  (Doc. # 316-19, Ex. 115.)  HECO/MECO Defendants assert that

this understanding that the $400,000 would be paid upon the signing of the

Operating Agreement was "clearly the reason that Maez made regular phone calls

to HECO in early 2008, i.e., 'to check on the status of the operating agreement and

infusion'" (BECSF, Ex. Z)– not, as BlueEarth now argues (MPSJ at 18), to

complain about any missed payment under the superseded MOU.  (CMPSJ at 25.)

BlueEarth does not dispute that it agreed to tie the payment with the execution of

the Operating Agreement.  Instead, BlueEarth simply states that the evidence

shows that BlueEarth wanted the payment as soon as possible and was unsure of its

status.  (Doc. # 331 ¶ 9; CMPSJ, Ex. 143; MPSJ, Exs. Z, AA, at ECP00007087, F

at 110:1-3, E at 56:19-57:1; Doc. # 316-19, Ex. 115 (Maez indicates that he will

press HECO/MECO to move faster with the money, but not that the payment was overdue or missed).)

This understanding is confirmed by internal UBC communications.  On January 31, 2008, Tayne Sekimura, Financial Vice President and Treasurer of UBC (see Doc. # 316-4, Declaration of Tayne Sekimura ("Sekimura Decl.") ¶ 4), stated in an email to other UBC personnel that:

> we have 2 options regarding the next steps which I would like your concurrence on BEFORE proceeding:
>
> 1) Sign the operating agreement now which already allows for the additional equity investor scenario.  Infuse the $400,000 that BlueEarth is awaiting.  I believe that with the current MOU in place, we were already obligated to make the infusion.  We don't want to be the reason for the project's inability to proceed so this option allows the project to continue.  Note that with an additional equity investor, it would dilute our interest.
>
> 2) Hold on to the operating agreement, wait until the additional equity investor scenario is resolved and don't infuse any cash. . . . .

(BECSF, Ex. Z at H009106.)  Scott Simon, the then President of UBC (see Doc. # 341-4 at 65), stated that he had explained to Maez that "we need to break out the $400k into $380k now and the remaining $20k after we get our 2008 monies approved.  He's fine with that.  I'll coordinate the appropriate revisions to the document [presumably the Operating Agreement] with Greg."  (BECSF, Ex. Z at

33

H009105.)  UBC then proceeded with Option 1 and Simon stated that he would prepare a check for "Tayne's signature."  (Id.)  Accordingly, HUS's $400,000 funding obligation from the MOU was superseded in the Operating Agreement by UBS' $400,000 capital contribution split into two payments and both parties anticipated signing the Operating Agreement prior to releasing the $400,000, thereby making the Operating Agreement the operative agreement and UBC the substituted obligor.

2.      The Exclusive Development Obligation

The MOU mandates, inter alia, that the parties will have a mutual responsibility to "[w]ork exclusively and in good faith with each other to develop the Maui Wae'na site biodiesel Project concept in preparation for the HI PUC's approval of concept and agreements[,]" (hereinafter, "MOU's Mutual Responsibility No. 2").  (BECSF, Ex. C at 4 (emphasis added).)  As described above, the Project concept was to evaluate, fund and develop a large-scale biodiesel production facility to be "developed by a newly formed liability company ("Newco")," to be jointly "owned by the parties."  (Id.)  After the execution of the MOU, Newco became BEMB, and under the BEMB Agreements, BEMB was owned by BlueEarth and UBC.

34

Therefore, BlueEarth and UBC were members of BEMB—the entity created to develop the Project.  (Doc. # 326, Ex. 102 at H002445, H002452, H002461, H002484.)

Even if Mutual Responsibility No. 2 is read, as urged by BlueEarth, to cover anything more than developing the "Project concept," the development provisions of the BEMB Agreements do not provide BlueEarth with exclusive development rights.  Subsequent to the MOU, the Operating Agreement made clear that BEMB was to develop the Project (Doc. # 326, Ex. 102 ¶ 2.3) and that BlueEarth had transferred to BEMB all of its development work and related rights (id. ¶ 3.01(a)) that it had accumulated since the signing of the MOU thereby terminating the MOU's Mutual Responsibility No. 2.   The Operating Agreement did not provide BlueEarth with an exclusive right, or any right, to project development, and moreover, BlueEarth has not alleged a cause of action under the Operating Agreement.

Additionally, it appears that BlueEarth concedes that the MOU does not support its claim to an exclusive development role.  In opposition to HECO/MECO Defendants' CMPSJ, Maez declared that "[d]espite the language in the parties' agreements, BlueEarth, in practice, had the sole development role in the Project" (Doc. # 331 ¶ 24; id., Ex. YY Declaration of Landis Maez ("Maez

35

Decl.") ¶ 9), thereby conceding that the MOU does not grant the exclusivity right

that BlueEarth seeks to enforce in its MPSJ.

Instead, the BEMB Agreements provided BlueEarth with

specific responsibilities identified in Schedule B to the Operating Agreement (Doc.

# 326, Ex. 102 at H002461) and any Project development tasks provided therein

were not made "exclusive" to BlueEarth.  BlueEarth, in its PowerPoint

presentation to this Court, admitted that BlueEarth's responsibilities under the

Operating Agreement superseded BlueEarth's responsibilities under the MOU by

demonstrating that the Project development responsibilities provided to it by the

MOU were also provided to it by the Operating Agreement.  (See Hearing,

PowerPoint Presentation at 32.)  However, the Operating Agreement made

BlueEarth's primary role that of investor in, and co-manager (with UBC) of,

BEMB.  (Doc. # 326, Ex. 102 at H002453 ("Each Member . . . hereby represents

and warrants that [i]t is acquiring an interest in the LLC for its own account for

investment only . . . ."); H002461-63 ("the business and affairs of the LLC shall be

managed by and under the direction of a Board of Managers" with three members

selected by BlueEarth and two members selected by UBC).

3.      All Other MOU Obligations and Provisions are Covered by the
        BEMB Agreements

In addition to Mutual Responsibility No. 2, the BEMB

Agreements also specifically address the other two mutual responsibilities

provided for under the MOU  First, Mutual Responsibility No. 1, to [n]egotiate

exclusively with each other in good faith to develop the Investment Agreement

(IA), or its equivalent, stating the conditions under which each Party would

participate and/or invest in Newco and be credited for its respective contributions

(cash, services and in-kind) to the Project[,]" was completed by BlueEarth and

HECO unregulated subsidiary UBC's entry into the BEMB Investment Agreement.

Mutual Responsibility No. 3, to "[w]ork exclusively and in

good faith with each other to negotiate and expedite an acceptable tolling

arrangement and leased property equity agreement between Newco and HUS[,]"

was also covered by the Operating Agreement (Doc. # 326, Ex. 102 at H002461,

H002488), which gave UBC the responsibility to "facilitate the negotiations

between [BEMB] and MECO with respect to the Leased Property Equity

Agreement and the Tolling Agreement described in the definition of 'Additional

Capital Commitment  Conditions.'" (Doc. # 326, Ex. 102 at H002445, H002488.)

In the definition of Additional Capital Commitment

Conditions, the Operating Agreement describes the Tolling Agreement as "a

Tolling Agreement with MECO, in form and substance acceptable to [BEMB] and

each of BlueEarth Biofuels and UBC, with respect to the production of biodiesel

from the Project."  (Doc. # 326, Ex. 102 at H002445); see also id. at H002488

("Responsibilities of UBC": "Facilitate the negotiations between [BEMB] and

MECO with respect to . . . the Tolling Agreement").  The Leased Property Equity

Agreement is described as an "Agreement with UBC, in form and substance

acceptable to [BEMB] and each of BlueEarth Biofuels and UBC, pursuant to which

the LLC would have access to the UBC leased property on which the Project will

be located."  Id.

Significantly, the unfinished "BlueEarth Responsibilities" and

"HUS Responsibilities" identified in the MOU (BECSF, Ex. C at 4-5) were

explicitly restated—nearly verbatim—in the Operating Agreement as

"Responsibilities of BlueEarth Biofuels" (Doc. # 326, Ex. 102 at H002487) and

"Responsibilities of UBC" (id. at H002488), respectively.

For all the reasons above, the Court finds that the BEMB

Agreements contain parallel terms to all provisions of the MOU.  The Court notes

that although challenged at the hearing to find one provision of the MOU not

covered by the BEMB Agreements, counsel for BlueEarth failed to identify a

single provision.  BlueEarth's Opposition to HECO/MECO Defendants' CMPSJ

also fails to identify a single provision.  The transfer of HUS/HECO obligations in

the MOU to obligations of UBC in the BEMB Agreements, which were signed by

BlueEarth, demonstrate the parties' intent for the BEMB Agreements to novate the

MOU.

> B.     The BEMB Agreements' Merger Clauses Demonstrate that the
> Agreements were Not Intended to be Supplemental to the MOU

In addition to the fact that the BEMB Agreements cover all the same

subject, the merger clauses contained in the BEMB Agreements evidence that the

BEMB Agreements were not intended to be supplemental to the MOU.  Instead,

the merger clauses show that the parties' intended and agreed to supersede the

MOU and replace HUS with UBC as the obligor.  The Operating Agreement states

> This Agreement, including all schedules to this Agreement and, if any,
> schedules to such schedules, contains the entire agreement amount
> [sic] the parties relative to the matters contained in this Agreement
> and supersedes any and all prior agreements or arrangements (oral or
> written) among any of the parties hereto regarding the subject matter
> hereof.

(Doc. # 326, Ex. 102 at H002482.)[11]  Similarly, the Investment Agreement's merger clause states

> This Agreement, and the documents referred to herein constitute the entire agreement between the parties hereto pertaining to the subject matter hereof, and any and all other written or oral agreements relating to the subject matter hereof existing between the parties hereto are expressly cancelled.

(Doc. # 326, Ex. 103 at H002500-01.)  The plain language of both merger clauses anticipates that the BEMB Agreements would supersede, in whole or in part, a prior agreement between the same parties that contained the same subject matter. Although the Operating Agreement anticipates superseding just portions of prior agreements that regard the same subject matter, the Investment Agreement expressly cancels all agreements that pertain to the same subject matter.  Contrary to BlueEarth's assertion, neither merger clause requires that the prior agreement sought to be superseded cover <u>all</u> of the same subject matter. (Opp'n to CMPSJ at 7 (BlueEarth alleges that "neither of the BEMB Agreements covers all the same subject matter as the MOU, they could not have canceled or superseded the MOU in its entirety, if at all.").)

---

[11] The Operating Agreement's merger clause additionally acts as an integration clause.  (<u>See</u> Doc. # 326, Ex. 102 at H002482.)

Although the merger clauses supersede a prior agreement only if both
agreements are between the same parties, because the BEMB agreements operate
as a novation of the MOU identity of parties is immaterial.  Instead, the Court
relies on the merger clauses as evidence that the BEMB Agreements were not
intended to be supplemental to the MOU.

> D.   BlueEarth Objectively Assented to a Novation of the MOU by the
> BEMB Agreements and to a Transfer of HUS Obligations to UBC by
> Drafting and Signing the BEMB Agreements

On its face, the MOU was only a preliminary agreement.  In the
MOU, the parties expressly contemplated the creation of final agreements and the
transfer of rights and obligations to the yet-to-be-formed HECO subsidiary UBC.
As this Court stated in its prior Order, "[t]he MOU can be seen as the first contract
binding the parties to certain duties that they hoped would result in a future
contract with respect to a final, PUC-approved biodiesel plant.  (Order at 15-16
(internal citations omitted).)  Once the final agreements—the BEMB Agreements
including the Investment Agreement expressly anticipated in the MOU—were
prepared, the parties intended to supersede and cancel the MOU in part through use
of the integration and merger clauses and ultimately (because of the change in
parties) by novation.  As described in detail above, the BEMB Operating

Agreement[12] operated to discharge all obligations under the MOU, create new

contractual obligations based on unfinished obligations previously provided by the

MOU, and substitute UBC as the obligor.  In fact, it is undisputed that the BEMB

Agreements, not the MOU, were the operative agreements for continuing to

develop the Project.

There are no facts supporting BlueEarth's proposition that the BEMB

agreements, specifically the Operating Agreement, did not operate as a novation so

as to extinguish HUS/HECO's obligations under the MOU and replace UBC as the

obligor.  Instead, as clearly intended by the parties, novation operated to substitute

the BEMB Agreements for the MOU and supersede all of its provisions;

Accordingly, the BEMB Agreements were the transfer of "the rights and

obligations of HECO" to "the HECO Unregulated Subsidiary" as anticipated by

the MOU.  In fact, if the BEMB Agreements were not intended to supersede the

MOU's $400,000 payment obligation, then UBC and HUS/HECO (according to

BlueEarth) would both obligated to make $400,000 payments.  Nothing in the

record, or even the BlueEarth's arguments, supports this view.

---

[12] The Court notes that BlueEarth does not assert that the Operating
Agreement was not a valid and binding contract.

BlueEarth states that it never understood that UBC took HECO's place at any time with regard to its obligations under the MOU.  (See Opp'n to CMPSJ at 6; Doc. # 331, Maez Decl. ¶ 26.)  However, as stated above, the standard for assent is objective, not subjective.  The MOU expressly anticipated the BEMB Agreements would formalize the MOU's obligations and that HECO would create an unregulated subsidiary—UBC—to take over all HUS/HECO's obligations.  BlueEarth's objective assent to the novation is evidenced through its demonstrated knowledge that UBC, once formed, would carry the HUS's obligations under the MOU and that the MOU would be superseded by the BEMB Agreements, which BlueEarth drafted and signed.  Further, UBC, not HECO, satisfied the amended funding obligation without objection by BlueEarth when it delivered $380,000 to BEMB on the effective date of the Operating Agreement—February 4, 2008—and the final $20,000 on March 31, 2008. (Doc. # 316-4, Sekimura Decl. ¶ 9; Doc. # 325, Exs. 118, 119); see Hawaii Builders Supply Co., 42 Haw. 111, 1957 WL 10618.

Here, as in Flooring Systems, the language of the MOU and the circumstances surrounding its drafting and the drafting of the Operating Agreement demonstrate that the BEMB Agreements were intended to supersede the MOU.  Because a different party—UBC—was substituted as the obligor for HUS/HECO,

43

this supersession was a novation.  From the beginning, the MOU reflected the parties' intent that HUS (and HECO) serve as a stand-in until UBC could be formed and assume any HUS/HECO responsibilities. Once BEMB and UBC were formed, the parties finalized the BEMB Agreements, which covered the same subject matter as the MOU, but provided further detail and formalization such as assigning all former HUS/HECO responsibilities to UBC.  As UBC's predecessor, HUS/HECO was an intended beneficiary of the BEMB Agreements' integration clauses, because HUS/HECO was relieved of all obligations under the MOU as anticipated by the MOU and was discharged of any further obligation.  See generally Jones v. Don L. Gordon Corp., 586 P.2d 1024, 1027 (Haw. 1978) (the trial court's conclusion was "supportable only on the theory of a novation which substituted Star for Gordon and relieved Gordon from responsibility for performance of the contract.").  Moreover, given the fact that the MOU and BEMB Agreements cover the same subject matter and there is nothing on the Agreements' face to show that they were intended to be supplemental as demonstrated by the merger clauses, the BEMB Agreements are a novation of the MOU by operation of law.

For all the reasons above, the Court finds that UBC superseded HUS/HECO as to all the obligations contained in the MOU because the BEMB

44

Agreements operate as a novation of the MOU.  Accordingly, the Court DENIES

BlueEarth's Motion for Partial Summary Judgment as to Count Three and

GRANTS HECO/MECO Defendants' Motion for Partial Summary Judgment as to

Count Three.

III.    Breach of the HECO NDA (Count 1)

        A.    The NDA Provision

               BlueEarth asserts that both the HECO and MECO NDAs provide for

identical non-circumvention or non-solicitation provisions.  (MPSJ at 32.)  Each

NDA signed by Defendants contains the following language:

> The parties shall not in any manner solicit nor accept any
> business from sources nor their affiliates that are made
> available by the other party or parties to this Agreement
> at any time without the express written permission of the
> party or the parties who made the source available.

(BECSF, Ex. A at 3; id., Ex. B at 3.)  The provisions in both the HECO and MECO

NDAs are identical.  (See id.)  As to Count 1, BlueEarth states that Aloha was a

source made available to HECO by BlueEarth and that HECO breached the NDA

by soliciting business from Aloha without BlueEarth's express permission.  (MPSJ

at 32.)

               BlueEarth does not contend that it introduced Aloha to HECO/MECO

in the first instance.  (BE Reply at 13.)  Instead, BlueEarth asserts that to the best

of its knowledge, that before the September 2006 signing of the NDA, Aloha and

HECO had never previously worked together on developing renewable energy

opportunities (id.; Doc. # 331, Maez Decl. ¶ 4) and that certainly BlueEarth

introduced Aloha to HECO as to the Project.  (MPSJ at 33.)  Therefore, BlueEarth

argues that Aloha was its "source."  In so arguing, BlueEarth states that the NDA

speaks to renewable energy opportunities only.  (BE Reply at 14.)  The

HECO/MECO Defendants argue in opposition that the NDA language is clear and

speaks to "sources . . . made available by the other party," not "sources as to the

Project."  (CMPSJ at 40.)

The determination of whether Aloha was BlueEarth's source depends

on the construction and legal effect of the NDAs.[13]  "[A]s a general rule, the

construction and legal effect to be given a contract is a question of law."

Foundation Int'l, Inc. v. E.T. Ige Const., Inc., 78 P.3d 23, 30-31 (Haw. 2003)

(quotations and marks omitted).  "[A]bsent an ambiguity, [the] contract terms

should be interpreted according to their plain, ordinary, and accepted sense in

---

[13]  Although the Court does not reach the issue, what constitutes solicitation under the NDAs also depends on construction of the contracts.  Here, the solicitation for which BlueEarth asserts HECO violates the NDA's non-solicitation provision regards HECO's invitation to Aloha for it to take over an investment role on the Project.  (Id. at 14.)  The Court doubts, but does not decide, whether contacting another party's source within the context of the project for which the NDA was written is in violation of the NDA.

common speech." Id. at 31 (quotations and marks omitted, second alteration in original).

"[T]he determination of whether a contract is ambiguous is also a question of law." Foundation Int'l, Inc., 78 P.3d at 32 (citation omitted). This Court's review is limited to the express terms of the contract unless an ambiguity exists in the contract terms. Id.; see also Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 839 P.2d 10, 31 (Haw. 1992); United Public Workers, AFSCME, Local 646, AFL-CIO v. Dawson Intern., 149 P.3d 495, 508-09 (2006) (citing State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc., 978 P.2d 753 (Haw. 1999)).

"To determine whether ambiguity exists," Hawai`i courts do not look for "particular ambiguous words or phrases"; rather, the courts consider "'whether or not particular words or phrases in themselves be uncertain or doubtful in meaning.'" Id. at 32-33 (quoting Hokama v. Relinc Corp., 559 P.2d 279, 282 (Haw. 1977)). "A contract term or phrase is ambiguous only if it is capable of being reasonably understood in more than one way." Wittig v. Allianz, A.G., 145 P.3d 738, 744 (Haw. App. 2006). "'[T]he parties' disagreement as to the meaning of a contract or its terms does not render clear language ambiguous.'" Foundation Int'l, Inc., 78 P.3d at 33 (quoting State Farm Fire & Cas. Co. v. Pacific Rent-All, Inc., 987 P.2d 753, 762 (Haw. 1999) (internal marks omitted)). Under the parol

47

evidence rule, a court may not resort to extrinsic evidence to determine the parties' intent where the contract's language is unambiguous.  See Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 839 P .2d 10, 31 (Haw. 1992) (citation omitted).

B.      Scope of the HECO NDA Non-Solicitation Provision

The NDA's stated goal is that the parties were "mutually desirous of working together for their common benefit with regard to Renewable Energy Opportunities[.]"  (BECSF, Ex. A at 1; id., Ex. B at 1.)  In order to do so, the parties had to furnish information ("Information") to each other that the parties wished to keep confidential.  (Id.)  The NDA instructs that "[t]he Information may be disclosed to and used by the Parties' Representatives, as defined above, but such Information will not be used for any purpose other than evaluating the transaction referred to above."  (Id.)  While no specific "transaction" is referenced, the form appears to be a standard NDA form provided by BlueEarth[14] and the personalization of the form to the parties is the reference to "Renewable Energy Opportunities."

---

[14] It is undisputed between the parties that BlueEarth drafted the NDAs. (Doc. # 316-8, Ex. 104 Declaration of Karl E. Stahlkopf, former Senior Vice President for Energy Solutions and Chief Technology Officer at HECO, ¶¶ 3-4; Doc. # 331 ¶ 2.)  Further, the NDAs are on BlueEarth letterhead.  (BECSF, Ex. A; id., Ex. B.)

Importantly, the NDA states:

> The confidentiality obligations of this Agreement will not apply to
> any portion of the Information that (a) is in the public domain through
> no act or omission of the receiving party, (b) becomes available to the
> receiving party on a non-confidential basis from another source,
> provided that such source is not bound by a confidentiality agreement
> with either party or otherwise prohibited from transmitting the
> Information, or (c) <u>was already known to the receiving party on a non-
> confidential basis or was independently developed</u>.

((<u>Id.</u> at 1-2 (emphasis added).)   Part of the "Information" desired to be kept

confidential is the contacts or sources of the other party.  (<u>Id.</u> at 2.)  In addition to

confidentiality, as to both sources and contacts, the NDA prohibits accepting

business from sources "made available by" or contacts "revealed by" the other

party.

The Court finds that the contract language is unambiguous, although

non-specific.  In the absence of any ambiguity, a question of construction arising

upon the face of the instrument is for the court to decide.  <u>Foundation Intern., Inc.</u>,

78 P.3d at 33 (Haw. 2003) (citing <u>Reed & Martin, Inc. v. City & County of</u>

<u>Honolulu</u>, 440 P.2d 526 (Haw. 1968); <u>Clarkin v. Reimann</u>, 638 P.2d 857 (Haw.

App. 1981)).  Because the entire purpose of the NDA is to protect the parties'

confidential Information, contacts, and sources that one party revealed to the other

in order to enable the parties to evaluate the transaction of Renewable Energy

49

Opportunities, i.e., the Project, the Court finds that the NDA's exceptions to

confidentiality obligations apply to solicitation of sources.  The NDA only

mentions "sources" in two consecutive paragraphs of the NDA:

> The parties shall not in any manner solicit nor accept any business
> from sources nor their affiliates that are made available by the other
> party or parties to this Agreement at any time without the express
> written permission of the party or the parties who made the source
> available.

> The parties shall maintain complete confidentiality regarding each
> other's business sources or their identities and shall disclose only to
> named parties pursuant to the express written permission of the party
> who made available the said source.

(BECSF, Ex. A at 3; id., Ex. B at 3.)  Clearly, because the confidentiality

obligations do not apply to the identity of a source that was already known to the

receiving party on a non-confidential basis or was independently developed, a

party who already knew a source of the other party could not violate the NDA by

soliciting business from that non-confidential source.

This Court noted in its previous Order that it found it "incredible that

HECO/MECO, who together are responsible for 95% of Hawaii's energy, and

Aloha, an extremely notable figure in petroleum supply in the state, would have no

contact with each other prior to BlueEarth's introduction in 2007."  (Order at 21-

22.)  In fact, the evidence now before the Court demonstrates that Aloha has had an

ongoing relationship with HECO since the late 1990s.  (See HECO/MECO Reply at 39; Doc. # 316, Ex. 120 ¶¶ 3-5; id., Ex. 105 ¶ 6.)  Moreover, BlueEarth concedes that HECO/MECO had previous contact with Aloha prior to the Project.  (MPSJ at 32-33; BE Reply at 13.)  Therefore, Aloha was a source that was already known to the HECO/MECO on a non-confidential basis or was independently developed and any business solicited by HECO/MECO from Aloha was not in contravention of the NDAs.[15]

Accordingly, the Court DENIES BlueEarth's Motion for Partial Summary Judgment as to Count One and GRANTS HECO/MECO Defendants' Counter Motion for Partial Summary Judgment as to Count One.[16]

---

[15] The Court additionally notes that although BlueEarth asserts its NDA claim against Defendant MECO by defining HECO to include MECO, BlueEarth failed to provide any independent evidence against MECO or to even to include the entity in any of its briefing.

[16] In granting HECO/MECO Defendants summary judgment as to Count One, the Court notes that its Order addresses only one of multiple factual grounds upon which BlueEarth seeks relief as to the HECO NDA.

CONCLUSION

For the reasons stated above, the Court **DENIES** BlueEarth's Motion

for Partial Summary Judgment as to Counts One and Three (Doc. # 268) and

**GRANTS** HECO/MECO Defendants' Counter Motion for Partial Summary

Judgment as to Counts One and Three (Doc. # 315).  The Court **VACATES** its

further hearing set for December 1, 2010 at 9:00 AM.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, November 15, 2010.



_____
David Alan Ezra
United States District Judge

BlueEarth Biofuels, LLC v. Hawaiian Electric Company, Inc., et al., Civ. No. 09-
00181 DAE-KSC; ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT; GRANTING DEFENDANT HECO'S COUNTER-
MOTION FOR PARTIAL SUMMARY JUDGMENT