# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BLUEEARTH BIOFUELS, LLC,   ) | CIV. NO. 09-00181 DAE-KSC |
|                   ) | |
|        Plaintiff,     ) | |
|                   ) | |
|     vs.            ) | |
|                   ) | |
| HAWAIIAN ELECTRIC    ) | |
| COMPANY, INC.; MAUI     ) | |
| ELECTRIC COMPANY, LTD.;  ) | |
| ALOHA PETROLEUM, LTD.; AND ) | |
| KARL E. STAHLKOPF,    ) | |
| Individually,         ) | |
|                   ) | |
|        Defendants.    ) | |
| _____ ) | |
|                   ) | |
| HAWAIIAN ELECTRIC    ) | |
| COMPANY, INC., AND MAUI  ) | |
| ELECTRIC COMPANY, LTD.,  ) | |
|                   ) | |
|    Counterclaim-Plaintiffs, ) | |
|                   ) | |
|     vs.            ) | |
|                   ) | |
| BLUEEARTH BIOFUELS, LLC,  ) | |
| AND LANDIS MAEZ, Individually, ) | |
|                   ) | |
|     Counterclaim-    ) | |
|     Defendants.     ) | |
|                   ) | |
| _____ ) | |

ORDER: (1) GRANTING PLAINTIFF AND COUNTERCLAIM-DEFENDANT BLUEEARTH BIOFUELS, LLC AND COUNTERCLAIM-DEFENDANT LANDIS MAEZ'S MOTION TO DISMISS FIRST AMENDED COUNTERCLAIM OF HAWAIIAN ELECTRIC COMPANY, INC. AND MAUI ELECTRIC COMPANY, LTD.; (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS HAWAIIAN ELECTRIC COMPANY, INC., MAUI ELECTRIC COMPANY LTD. AND KARL E. STAHLKOPF'S MOTION FOR SUMMARY JUDGMENT ON THE FIRST, SECOND, FOURTH, SIXTH, SEVENTH, NINTH, TENTH, AND ELEVENTH CAUSES OF ACTION OF THE THIRD AMENDED COMPLAINT; (3) GRANTING IN PART AND DENYING IN PART DEFENDANT ALOHA PETROLEUM LTD.'S MOTION FOR SUMMARY JUDGMENT ON THE CLAIM FOR LOST PROFITS AND ON THE FIFTH THROUGH TENTH CAUSES OF ACTION OF THE THIRD AMENDED COMPLAINT; (4) GRANTING DEFENDANTS HAWAIIAN ELECTRIC COMPANY, INC., MAUI ELECTRIC COMPANY, LTD. AND KARL E. STAHLKOPF'S JOINDER IN DEFENDANT ALOHA PETROLEUM, LTD.'S MOTION FOR SUMMARY JUDGMENT AND; (5) DISMISSING <u>COUNT SIX OF THE THIRD AMENDED COMPLAINT</u>

On April 25, 2011, the Court heard: (1) Plaintiff and Counterclaim-Defendant BlueEarth Biofuels, LLC and Counterclaim-Defendant Landis Maez's Motion to Dismiss First Amended Counterclaim of Hawaiian Electric Company, Inc. and Maui Electric Company, Ltd. ("BlueEarth's Motion"); (2) Defendants Hawaiian Electric Company, Inc., Maui Electric Company Ltd. and Karl E. Stahlkopf's Motion for Summary Judgment on the First, Second, Fourth, Sixth, Seventh, Ninth, Tenth, and Eleventh Causes of Action of the Third Amended Complaint ("HECO/MECO Defendants' Motion"); (3) Defendant Aloha Petroleum LTD.'s Motion for Summary Judgment on the Claim for Lost Profits and on the

Fifth through Tenth Causes of Action of the Third Amended Complaint ("Aloha's Motion"); and (4) Defendants Hawaiian Electric Company, Inc., Maui Electric Company, Ltd., and Karl E. Stahlkopf's Joinder in Defendant Aloha Petroleum, Ltd.'s Motion for Summary Judgment ("Joinder Motion"). John S. Edmunds, Esq., and Jamie Olin, Esq., appeared on behalf of Plaintiffs; Paul Alston, Esq., Clyde J. Wadsworth, Esq., C. Michael Hehre, Esq., and Calvert G. Chipchase, IV, Esq., appeared on behalf of Defendants. After reviewing the motion as well as the supporting and opposing memoranda, the Court: (1) **GRANTS** BlueEarth's Motion (Doc. # 425); (2) **GRANTS IN PART** and **DENIES IN PART** the HECO/MECO Defendants' Motion (Doc. # 437); (3) **GRANTS IN PART** and **DENIES IN PART** Aloha's Motion (Doc. # 433); (4) **GRANTS** the Joinder Motion (Doc. # 463) and; (5) **DISMISSES** Count Six of the Third Amended Complaint.

BACKGROUND

This case involves failed plans to create and construct a biodiesel production facility on Maui. (Third Amended Complaint ("TAC"), Doc. # 387; First Amended Counterclaim ("FACC"), Doc. # 411.)

In 2006, BlueEarth Biofuels, LLC's ("BlueEarth"), Hawaiian Electric Company, Inc. ("HECO") and Maui Electric Company, Ltd. ("MECO") began

talks jointly to develop a local biodiesel production facility to replace their use of petroleum diesel for power production. (Id. ¶ 12; Doc. # 325, Ex. 166.) The new facility would produce biodiesel, which is derived from vegetable feedstock. (Id.)

On September 27, 2006, BlueEarth executed Mutual Non-Circumvention and Non-Disclosure Agreements ("NDAs") with both HECO and MECO. (TAC ¶¶ 14, 15.) These NDAs established, among other things, that: (1) confidential information given by one party to another would remain property of the originating party; (2) such confidential information would not be disclosed or used for any purpose by the receiving party, other than for evaluation of the Project; (3) any contacts would be exclusive and valuable contacts of the disclosing party; (4) the party receiving contacts would not enter into direct negotiations or transactions with contacts; and (5) neither party would solicit or accept any business from sources made available by one party to the other without the express written permission of the disclosing party. ("HECO NDA," Doc. # 269, Ex. A; "MECO NDA," id., Ex. B.)

After several months of negotiations, BlueEarth, HECO, and MECO signed a confidential Memorandum of Understanding (the "MOU") detailing the plan for the "evaluation, funding and development" of the large-scale biodiesel production facility to be developed by a newly formed limited liability company,

originally termed "Newco," owned by the parties and located on MECO-owned land on Maui (the "Project"). (TAC ¶ 19; Doc. # 269, Ex. C.) Although the MOU was entered into between BlueEarth, HECO, and MECO, HECO's responsibilities in the MOU were expressly contemplated to be superceded by an unregulated subsidiary identified as "HUS" and were so designated by the MOU's terms. (Doc. # 269, Ex. C.) HUS was defined as "[b]oth HECO and the Unregulated Subsidiary[.]" (Id.)

The MOU specified how the parties would proceed with the Project's planning, developing, permitting, funding, construction, and operation. (Id.) The MOU also contained a provision in which the parties agreed to "work exclusively and in good faith with each other to develop" the Project. (Doc. # 269, Ex. C at 4.) The MOU explicitly contemplated future formal agreements in furtherance of the parties' business relationship, including a "Tolling Agreement" for the long-term sale of biodiesel produced by the Project. (TAC ¶ 21, n.1; Doc. # 269, Ex. C at 2.) The Project was anticipated to be owned 51% by BlueEarth and 49% by HUS. (Doc. # 269, Ex. C at 1-3.) Specific formalities were left to an "Investment Agreement" to be entered into the parties at a later date. (Doc. # 269, Ex. C at 1–5.)

Subsequent to the signing of the MOU, two companies were formed: (1) the parties created the entity identified in the MOU as "Newco" and named the company BlueEarth Maui Biodiesel LLC ("BEMB") (Doc. # 316, Ex. 111 at H091481); and (2) HECO created the unregulated subsidiary contemplated in the MOU as HUS and named it Uluwehiokama Biofuels Corp ("UBC"). (Doc. # 316, Ex. 117). The parties negotiated, and on February 4, 2008 signed, an Operating Agreement and an Investment Agreement (collectively, the "BEMB Agreements") to govern the operation and ownership of BEMB as contemplated in the MOU. The BEMB agreements were entered into between BlueEarth, UBC and BEMB and were signed on February 4, 2008. (See "Operating Agreement," Doc. # 326, Ex. 102; "Investment Agreement," id., Ex. 103.)

Under the BEMB Agreements, BlueEarth and UBC were members of BEMB—the entity created to develop the project. (FACC ¶ 15; Operating Agreement at 40.) BlueEarth transferred to BEMB all of its development work while the HUS responsibilities were transferred to UBC. (FACC ¶ 15) The business affairs of BEMB, pursuant to the BEMB Agreements, were to be managed by and under the direction of a Board of Managers with three members selected by BlueEarth and two selected by UBC. (Operating Agreement at 28, 19).

BlueEarth appointed Counterclaim Defendant Landis Maez ("Maez") as one of its three BEMB managers on February 4, 2008. (Id.)

Sometime in 2007, BlueEarth began searching for potential fuel subcontractors who would manage and run logistics for a fuel terminal. (TAC ¶ 27.) The fuel terminal would be used to store and transfer the raw materials, such as palm oil, and fuel in connection with the Project. (Id. 27–28.) One of the subcontractors approached by BlueEarth was Aloha.[1] (Id.) BlueEarth also subsequently considered Aloha as a candidate for providing an equity investment in the Project. (See Doc. # 300 Exs. 14 at BE022996, 93.) According to BlueEarth, over the course of the next two years BlueEarth spent over $1.2 million working to develop the Project. (TAC ¶ 25.)

As the Project progressed, BlueEarth and HECO worked jointly to develop the Tolling Agreement and originally engaged in negotiations with Energy Capital Partners ("ECP") for this purpose.[2] (Doc. # 316, Ex. 104.) After the

---

[1] Aloha's later role in the Project and HECO/MECO's alleged unilateral attempt to replace BlueEarth with Aloha is a matter of great contention between the parties.

[2] The Court notes that although the responsibility for negotiations regarding the Tolling Agreement was a UBC obligation (Doc. # 326, Ex. 102, Schedule C), HECO and BlueEarth appear to have engaged in the negotiations as representatives of BEMB. (Id.)

negotiations with ECP fell through, BlueEarth alleges that HECO, MECO, Karl Stahlkopf—HECO's then-Vice President of Energy Solutions and Chief Technology Officer—and Aloha began engaging in private negotiations concerning the development, investment, and ownership of the Project. (TAC ¶¶ 32–36.) BlueEarth further contends that HECO, MECO, and Aloha worked to circumvent the MOU and their respective NDAs in order to cut BlueEarth out of the Project altogether. (Id.)

Simultaneously, the HECO/MECO Defendants allege that Maez negotiated a side-deal pursuant to which ECP paid him $50,000 to negotiate the Tolling Agreement on ECP's behalf. (FFAC ¶ 20.) The HECO/MECO Defendants allege that, notwithstanding the fiduciary duties Maez owed to BEMB and UBC, Maez accepted ECP's money without disclosing this deal to BEMB, UBC, HECO or MECO and that ECP's interest in the negotiations were adverse to those of BEMB, HECO and MECO. (Id. ¶ 21.) The HECO/MECO Defendants also allege that Maez falsified emails that he forwarded to HECO, MECO and others to make it appear that a deal was closer than it actually was. (Id ¶ 23.)

Eventually, negotiations for the Project fell through and plans ceased. (TAC ¶ 39.) In early October 2008, BlueEarth filed the instant lawsuit in the Northern District of Texas, claiming that Defendants had violated the various

NDAs and the Confidentiality Agreement and engaged in a scheme to circumvent BlueEarth's role in the Project.  (Id. ¶ 10.)  On April 21, 2009, the case was transferred to this District.  (Id.)

On September 13, 2010, UBC transferred and assigned to HECO all of UBC's claims against BlueEarth and Maez arising from or relating to (a) BlueEarth, (b) BEMB, (c) the Project, (d) the BEMB Agreements, (e) this action and/or the transactions and occurrences alleged in this action.  (FACC ¶ 28.)

On November 1, 2010, BlueEarth filed its Third Amended Complaint ("TAC").  (Doc. # 387.)  The Complaint alleges the following eleven causes of action:

- First: breach of contract (HECO NDA) against HECO (TAC ¶¶ 44–48);

- Second: breach of contract (MECO NDA) against MECO (Id. ¶¶ 49–53);

- Third: breach of contract (MOU) against HECO and MECO (Id. ¶¶ 54–59);

- Fourth: quantum meruit/unjust enrichment against HECO and MECO (Id. ¶¶ 60–63);

- <u>Fifth</u>: breach of contract (Aloha NDA and Confidentiality Agreement) against Aloha (<u>Id.</u> ¶¶ 64-68);

- <u>Sixth</u>: unfair competition under Haw. Rev. Stat. § 480-2 against HECO, MECO, Stahlkopf, and Aloha (<u>Id.</u> ¶¶ 69–76);

- <u>Seventh</u>: tortious interference with existing contracts (all NDAs and the Confidentiality Agreement) as to all Defendants (<u>Id.</u> ¶¶ 77–84);

- <u>Eighth</u>: tortious interference with existing contract (MOU) against Aloha (<u>Id.</u> ¶¶ 85–89);

- <u>Ninth</u>: misappropriation of trade secrets against all Defendants in violation of Haw. Rev. Stat. § 482B-2 (<u>Id.</u> ¶¶ 90–93);

- <u>Tenth</u>: conversion against all Defendants (<u>Id.</u> ¶¶ 94–95);

- <u>Eleventh</u>: breach of fiduciary duty against HECO and MECO (<u>Id.</u> ¶¶ 96–101).

On June 29, 2009, Defendant Aloha filed a Motion to Dismiss (Doc. # 74) and HECO/MECO Defendants and Karl Stahlkopf filed a joint Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. # 75). On October 7, 2009, this Court issued an order denying without prejudice Defendant Aloha's Motion to Dismiss and HECO/MECO Defendants and Karl Stahlkopf's joint Motion to

Dismiss and directed the parties to submit proposed questions to be certified to the Supreme Court of Hawai`i.  (Doc. # 168.)

On September 14, 2009, BlueEarth filed a motion for a Temporary Restraining Order.  (Doc. # 143.)  On October 26, 2009, after significant briefing from both sides, this Court issued an order denying BlueEarth's motion.  (Doc. # 188.)  Subsequently, this Court certified questions regarding the scope of Hawaii Uniform Trade Secrets Act ("HUTSA") to the Supreme Court of Hawai`i.  (Doc. # 191.)  An Opinion of the Supreme Court answering the Certified Questions was returned on July 21, 2010.  (Doc. # 301.)  In response, Blue Earth requested permission to file its Third Amended Complaint, which was granted on October 27, 2010.  (Doc. # 349.)

On May 18, 2010, BlueEarth filed a Motion for Partial Summary Judgment as to Counts 1–3 of the SAC against HECO and MECO ("MPSJ").  (Doc. # 268.)  On August 2, 2010, HECO/MECO Defendants filed a Counter-Motion for Partial Summary Judgment ("CMPSJ").  ("CMPSJ,"  Docs. ## 315 (redacted), 322 (sealed).)  On August 9, 2010, Aloha filed a Joinder in HECO/MECO Defendants' CMPSJ.  (Doc. # 328.)  On November 15, 2010, the Court issued an Order Denying Plaintiff's Motion for Partial Summary Judgment

and Granting Defendant HECO'S Counter-Motion for Partial Summary Judgment ("November Order").  ("Nov. Order," Doc. # 389.)

On December 22, 2010, the HECO/MECO Defendants filed their First Amended Counterclaim ("FACC").  (Doc. # 411.)  The HECO/MECO Defendants allege the following causes of action:

- First: breach of contract (BEMB Agreements) by HECO as UBC's assignee against BlueEarth (FACC  ¶¶ 29–36);

- Second: breach of fiduciary duty by HECO as UBC's assignee against BlueEarth and Maez (Id. ¶¶ 37–43);

- Third: breach of fiduciary duty by HECO and MECO against BlueEarth (Id. ¶¶ 44–49);

- Fourth: breach of contract (the NDAs) by HECO and MECO against BlueEarth (Id. ¶¶ 50–55);

- Fifth: tortious interference with contracts (the BEMB Agreement and NDAs) by HECO, for itself and as UBC's assignee, and MECO, all against Maez  (Id. ¶¶ 56–61).

On November 15, 2010, the HECO/MECO Defendants filed their Amended Motion to Dismiss the Fourth, Sixth, Seventh, Ninth, Tenth, and Eleventh Causes of Action of Plaintiff's Third Amended Complaint.  (Doc. # 392.)

On December 9, 2010, Aloha filed a Motion for Judgment on the Pleadings on Counts Six through Ten of the Third Amended Complaint.  (Doc. # 406.)  On February 8, 2011, the Court granted in part and denied in part the Motion to Dismiss and the Motion for Judgment ("February Order").  ("Feb. Order," Doc. # 484.)  Specifically the Court dismissed Counts Four, Seven, Eight, and Ten of the TAC.  (Id. at 2.)  Count Six of the TAC was dismissed without prejudice. (Id.)

On February 1, 2011, BlueEarth filed a Motion for Relief from the Court's November 15, 2010 Summary Judgment Order.  (Doc. # 479.)  On March 28, 2011 the Court denied BlueEarth's relief motion.[3]  (Doc. # 568.)

On January 14, 2011, BlueEarth filed its Motion to Dismiss the FACC.  ("MD," Doc. # 425.)  On February 28, 2011, the HECO/MECO Defendants filed their Opposition to BlueEarth's Motion.  ("MD Opp'n," Doc. # 512.)  On March 7, 2011, BlueEarth filed its Reply.  ("MD Reply," Doc. # 540.)

On January 19, 2011, Aloha filed its Motion for Summary Judgment.  ("AMSJ," Docs. ## 433, 446).  On February 28, 2011, BlueEarth filed its Opposition.  ("AMSJ Opp'n," Docs. ## 513, 529).  On March 21, 2011, Aloha filed its Reply.  ("AMSJ Reply," Docs. ## 555, 566.)

---

[3] BlueEarth filed a Motion to Reconsider this order on April 11, 2011.  (Doc. # 598.)

On January 19, 2011, the HECO/MECO Defendants also filed their

Motion for Summary Judgment.  ("HMSJ," Docs. ## 437, 447.)  On February 28,

2011, BlueEarth filed its Opposition.  ("HMSJ Opp'n," Docs. ## 520, 531).  On

March 21, 2011, the HECO/MECO Defendants filed their Reply.  ("HMSJ Reply,"

Doc. # 553.)

## STANDARD OF REVIEW

I.    Motion to Dismiss

       A.    Standing

             Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1), a

defendant may move to dismiss a complaint for lack of subject matter jurisdiction.

In a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the

initial burden of proving that subject matter jurisdiction exists.  Robinson v. United

States, 586 F.3d 683, 685 (9th Cir. 2009); Rattlesnake Coalition v. U.S. E.P.A.,

509 F.3d 1095, 1102 n.1 (9th Cir. 2007).  "In considering the jurisdiction

questions, it should be remembered that 'it is a fundamental principle that federal

courts are courts of limited jurisdiction.'" Stock West, Inc. v. Confederated Tribes

of the Colville Reservation, 873 F.2d 1221, 1225 (9th Cir. 1989) (quoting Owen

Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978)). Upon a motion to

dismiss, a party may make a jurisdictional attack that is either facial or factual.

<u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack occurs when the movant "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." <u>Id.</u> By contrast, a factual attack occurs when the movant "disputes the truth of the allegations, that by themselves, would otherwise invoke federal jurisdiction." <u>Id.</u>

In resolving a facial attack on the allegations of the complaint, the court must accept the allegations of the complaint as true. <u>Mason v. Arizona</u>, 260 F. Supp. 2d 807, 815 (D. Ariz. 2003); <u>see also</u> <u>Savage v. Glendale Union High School</u>, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003); <u>White v. Lee</u>, 227 F.3d 1214, 1242 (9th Cir. 2000). "Unlike a Rule 12(b)(6) motion, however, the court will not reasonably infer allegations sufficient to support federal subject matter jurisdiction because a plaintiff must affirmatively allege such jurisdiction." <u>Mason</u>, 260 F. Supp. 2d at 815. When subject matter jurisdiction is challenged in a motion to dismiss, the plaintiff has the burden of proving jurisdiction. <u>Kingman Reef Atoll Investments, L.L.C. v. United States</u>, 541 F.3d 1189, 1197 (9th Cir. 2008) (citing <u>Tosco Corp. v. Comtys. for a Better Environment</u>, 236 F.3d 495, 499 (9th Cir. 2001)).

B.     Failure to State a Claim

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule") "tests the legal sufficiency of a claim."  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts alleged to support a cognizable theory.  Id.  (citing Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.1990)).  Because a Rule 12(b)(6) motion to dismiss focuses on the sufficiency of a claim statement, review is generally limited to the face of the complaint.  Lee v. City of Los Angeles, 250 F .3d 668, 688 (9th Cir. 2001) (citation omitted); Clegg v. Cult Awareness Network, 18 F.3d 752, 754 (9th Cir. 1994) (citations omitted).  The Court must accept all allegations of material fact as true and construe them in a light most favorable to the nonmoving party.  Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).  The Court, however, need not accept as true conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences.  Id.

As to a plaintiff's pleading burden, the Supreme Court has held that while a complaint "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555 (2007)).  "Factual allegations must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555. Thus, to survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Id. at 570.  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556).  If a court dismisses the complaint or portions thereof, it must consider whether to grant leave to amend.  Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000) (finding that leave to amend should be granted "if it appears at all possible that the plaintiff can correct the defect" (quotations and citations omitted)).

II.    Summary Judgment

Rule 56 requires summary judgment to be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See id. at 323. Before granting summary judgment, however, a non-moving party must have a "'full and fair opportunity to ventilate the issues [related to] the . . . claims.'" Norse v. City of Santa Cruz, 629 F.3d 966, 972–73 (9th Cir. 2010) (quoting Greene v. Solano Cnty. Jail, 513 F.3d 982, 990 (9th Cir. 2008).

A moving party without the ultimate burden of persuasion at trial — usually, but not always, the defendant — has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323). This assertion must be supported by citations "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . .admissions, interrogatory answers, or other materials," or by demonstrating "that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings. Porter, 419 F.3d at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers. S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties."). "[A]t least some 'significant probative evidence'" must be produced. T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134. Further, the Ninth Circuit has "refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." Villiarimo v. Aloha Island Air, Inc.,

281 F.3d 1054, 1061 (9th Cir. 2002) (citing <u>Kennedy v. Applause, Inc.</u>, 90 F.3d 1477, 1481 (9th Cir. 1996). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." <u>Rivera v. Nat'l R.R. Passenger Corp.</u>, 331 F.3d 1074, 1078 (9th Cir. 2003). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, a court may either give the party an opportunity to support or address the fact, consider the fact undisputed for purposes of the motion and grant or deny summary judgment accordingly, or issue any other appropriate order. Fed. R. Civ. P. 56(e).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. <u>Porter</u>, 419 F.3d at 891. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. <u>Id.</u>; <u>see also</u> <u>Nelson v. City of Davis</u>, 571 F.3d 924 (9th Cir. 2009) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (citations omitted). However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts

that the judge is required to resolve in favor of the nonmoving party.  T.W. Elec.

Serv., 809 F.2d at 631.

## DISCUSSION

I.      Motion to Dismiss

        BlueEarth moves to dismiss each Count of the FACC with prejudice.

(MD at 19.)  BlueEarth argues that the HECO/MECO Defendants lack standing to

pursue UBC's claims as assignees.  (Id. at 1.)  BlueEarth also argues the

HECO/MECO Defendants have failed to state claims upon which relief can be

granted.  (Id. at 2.)

        A.      Standing

        The First, Second, and a portion of the Fifth Counts of the FACC are

brought by the HECO/MECO Defendants as assignee to UBC's rights.  (FACC

¶ 28.)  BlueEarth relies on Section 8.01 of the Operating Agreement to challenge

the validity of this assignment.  It provides:

> No member [including UBC] may sell, transfer, assign . . . or
> otherwise dispose of (a "Disposition") all or any part of his interest in
> the LLC (whether voluntarily, involuntarily, or by operation of law)
> unless the Board of Managers [including Maez and two other
> BlueEarth appointees] and the Requisite Interest of the Members shall
> have previously consented to such Disposition in writing.  The
> provisions of this Section 8.01(a) shall not apply to any Disposition of
> an interest to a Permitted Transferee.

(Operating Agreement ¶ 8.01.)  BlueEarth contends that UBC did not seek consent to an assignment of its interest from the Board of Managers and that the HECO/MECO Defendants do not allege that there was such consent.  As a result, BlueEarth urges, UBC could not have transferred its claims to the HECO/MECO Defendants because the claims are a part of its interest as contemplated by Section 8.01.  (MD at 8–9, 11, 15.)  The Court disagrees.

The Court begins its analysis of this contractual provision with its plain language.  See State Farm Fire and Cas. Co. v. Pacific Rent-All, Inc., 978 P.2d 753, 762 (Haw. 1999) ("[C]ontractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech. The court should look no further than the four corners of the document to determine whether an ambiguity exists.").  On its face, Section 8.01 of the Operating Agreement is limited only to a transfer of "an interest in [BEMB]" and is silent on whether a BEMB member may transfer its claims against another BEMB member or manager stemming from an alleged breach of the BEMB agreements.  Indeed, nothing in the contract suggests that the term "interest" in the Operating Agreement should include a subsequent claim for breach of a contractual, fiduciary or other tort duty.

BlueEarth urges that the assignment of interest barred in Section 8.01 should be read to include a bar on assignment of claims because there is "no other

provision in the [BEMB Agreements which] governs a member's assignment of claims, as differentiated from a member's interests." (MD at 9.) The Court disagrees—silence on this point is not probative of whether an assignment of interest encompasses an assignment of a subsequent claim for breach in this context. Instead, a review of the Operating Agreement suggests that the parties did not agree one way or another with respect to the assignment of claims. Whether a claim for breach is an "interest" as contemplated by the Operating Agreement such that it could not be assigned without consent is therefore governed by relevant case law.

Hawaii follows the "modern trend [which] now favors the assignability of causes of action." TMJ Haw., Inc. v. Nippon Trust Bank, 153 P.3d 444, 450 (Haw. 2007). Indeed, claims alleging non-personal economic injuries are generally assignable in Hawaii. See id.; see also Sprague v. Cal. Pacific Bankers & Ins. Ltd., 74 P.3d 12, 22 n.11 (Haw. 2003) ("[I]t is the personal nature of the damages, not the label, that ultimately determines assignability.") Moreover, other courts facing this exact scenario have concluded that a contract provision prohibiting the assignment of the contract itself (or an interest therein) does not prohibit the assignment of a claim for breach of the same contract. See, e.g., Berschauer/Phillips Const. Co. v. Seattle Sch. Dist No. 1, 881 P.2d 986, 993–94

(Wash. 1994) ("[A] general anti-assignment clause, one aimed at prohibiting the assignment of a contractual performance, does not, absent specific language to the contrary, prohibit the assignment of a breach of contract cause of action."); Lomas Mortg. U.S.A., Inc. v. W.E. O'Neill Const. Co., 812 F. Supp. 841, 844 (N.D. Ill. 1993) ("The term 'interests' does not manifest an intent to include the right to sue.")  The Restatement of Contracts, which Hawaii courts follow, is in accord with these decisions.  Restatement (Second) of Contracts § 322 (1981) ("Unless the circumstances indicate the contrary, a contract term prohibiting assignment of 'the contract' bars only the delegation to an assignee of the performance by the assignor of a duty or condition. . . . A contract term prohibiting assignment of rights under the contract . . . does not forbid assignment of a right to damages for breach of the whole contract . . . ."); cf. 6 Am. Jur. 2d Assignments § 22 (1999) ("A contract term prohibiting an assignment of rights under the contract, unless a different intention is manifested, is for the benefit of the obligor, and does not prevent the assignee from acquiring rights against the assignor or the obligor from discharging his or her duty as if there were no such prohibition.")  Given this abundance of authority favoring assignability in these circumstances, the Court finds no reason to conclude that Section 8.01's prohibition on a disposition of "all or any part of [UBC's] interest in [BEMB]" encompasses UBC's claims against BlueEarth and

Maez for breach of their respective contractual, fiduciary and other tort duties.

Accordingly, Section 8.01 does not prohibit UBC from transferring its claims to

the HECO/MECO Defendants without consent from the BEMB Board of

Managers.

In its Reply, BlueEarth also argues that the HECO/MECO Defendants

did not sufficiently allege the nature of the injury caused by BlueEarth and Maez's

alleged breach of fiduciary duty and it is therefore impossible to determine whether

the claims are assignable.

As noted, Hawaii courts focus on "the personal nature of the

damages" to determine if they are assignable.  Sprague, 74 P.3d at 22 n.11; see also

TMJ 153 P.3d at 455.  Personal damages include general damages which "include

such items as physical pain and suffering, inconvenience, and loss of enjoyment

which cannot be measured definitively in monetary terms."  Sprague, 74 P.3d at

22.  BlueEarth argues that the HECO/MECO Defendants are insufficiently specific

to determine whether the damages they seek are personal in nature.  (MD at 5.)

The Court is not persuaded.  There is not a single pleading in the FACC which

suggests the damages the HECO/MECO Defendants seek are personal.

Accordingly, to the extent that the HECO/MECO Defendants have alleged

damages, they are non-personal and economic in nature.

BlueEarth also argues that "assignment of breach of contract claims must be done in writing." (MD Reply at 3.) It is indeed the general rule in Hawaii that, "[t]he assignee of any nonnegotiable chose in action, assigned in writing, may maintain thereon in the assignee's own name any action which, but for the assignment, might be maintained by the assignor." H.R.S. § 634-1. BlueEarth argues that the HECO/MECO Defendants did not properly plead assignment because nowhere in the FACC or the Opposition did the HECO/MECO Defendants mention that the assignment was in writing. (MD Reply at 4.)

Under Twombly-Iqbal, a complaint "does not require 'detailed factual allegations,' [but does require] more than an unadorned, the defendant-unlawfully-harmed-me accusation." Iqbal, 129 S.Ct. at 1949. "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Id. (quotations omitted). Here the HECO/MECO Defendants set out in the FACC that UBC transferred its claims to them. (FACC ¶ 28.) This suffices to give BlueEarth "fair notice" of the means by which the HECO/MECO Defendants are bringing its claims. The Court is simply not persuaded that the method by which the claims were transferred—although important—must be pled to survive a Twombly-Iqbal

challenge.[4]  This issue is more properly resolved on a motion for summary

judgment after a more complete record with respect to the FACC has been

developed.   Accordingly, the Court finds that the HECO/MECO Defendants have

adequately pled assignment from UBC to the HECO/MECO Defendants.

B.    Count One: breach of contract (BEMB Agreements) by HECO as
UBC's assignee against BlueEarth

The First Count of the FACC alleges that BlueEarth breached the

BEMB agreements when Maez, a manager of BEMB and BlueEarth's agent,

accepted a $50,000 payment from ECP to negotiate the tolling and ground lease

agreements on ECP's behalf without disclosure.  (FACC ¶ 34.)  The HECO/MECO

Defendants argue that this alleged duplicity caused BlueEarth to breach its

contractual obligations to UBC "including BlueEarth's Obligations to obtain the

necessary satisfactory financing for the Project . . . and to work in good faith to

negotiate the tolling and ground lease agreements."  (Id. ¶ 35.)

BlueEarth proffers three primary arguments as to why the

HECO/MECO Defendants have failed to state a claim: (1) the HECO/MECO

Defendants failed to plead new consideration for the BEMB agreements (MD at 9);

(2) the HECO/MECO Defendants failed to properly plead causation or damages

---

[4] BlueEarth provides the Court with no case law on point.

(id. at 10); and (3) pursuant to Section 6.06(a) of the Operating Agreement, Maez's

conduct was permissive (id. at 10–11). The Court agrees that the HECO/MECO

Defendants have failed to properly plead causation or injury with respect to Count

One.[5]

> To prevail on a breach of contract claim, a party must demonstrate:
>
> (1) the contract at issue; (2) the parties to the contract; (3) whether
> [p]laintiff[] performed under the contract; (4) the particular provision
> of the contract allegedly violated . . . ; (5) when and how [d]efendant
> allegedly breached the contract; [and] (6) how Plaintiffs were injured.

Rodenhurst v. Bank of America, --- F. Supp. 2d ---, 10-00167 LEK–BMK, 2011

WL 768674, at *11 (D. Haw. Feb. 23, 2011) (citing Otani v. State Farm Fire &

Cas. Co., 927 F. Supp. 1330, 1335 (D. Haw. 1996) ("In breach of contract actions,

. . . the complaint must, at a minimum, cite the contractual provision allegedly

violated. Generalized allegations of a contractual breach are not sufficient."); see

also Marolda v. Symantec Corp, 672 F. Supp. 2d 992, 1005–06 (N.D. Cal. 2009)

("A cause of action for breach of contract requires pleading of a contract,

plaintiff's performance or excuse for failure to perform, defendant's breach and

damage to plaintiff resulting therefrom." (quotations and citations omitted)).

---

[5] In light of this finding, the Court will not consider whether Defendants pled
or were obligated to plead consideration or whether Maez's conduct was
permissive pursuant to the Operating Agreement.

Here the HECO/MECO Defendants have insufficiently pled their claim. They assert that BlueEarth—through its agent Maez—breached the covenant of good faith and fair dealing incorporated by law into every contract in Hawaii.[6] (FACC ¶ 33.) Maez, according to the HECO/MECO Defendants, breached this provision of the contract when he allegedly accepted a $50,000 retainer from ECP while a manager of BEMB. (FACC ¶ 34.) The HECO/MECO Defendants have not, however, sufficiently identified how this alleged breach resulted in injury to UBC.

In its Opposition, the HECO/MECO Defendants urge the Court to consider Paragraphs 34 through 36 of the FACC. (MD Opp'n at 13.) In their entirety these paragraphs allege:

---

[6] The Hawaii Supreme Court has recognized that "every contract contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement." Best Place, Inc. v. Penn Am. Ins. Co., 920 P.2d 334, 337–38 (Haw. 1996); see also Simmons v. Puu, 94 P.3d 667, 673 (Haw. 2004) ("Restatement (Second) Contracts § 205 (1979) provides that '[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'"). This duty requires all parties to a contract fulfill the obligations of that contract. Best Place, 920 P.2d 334; Joy A. McElroy, M.D., Inc. v. Maryl Group, Inc., 114 P.3d 929, 942 (Haw. Ct. App. 2005). Parties to the agreement must be "faithful to an agreed common purpose and act[] consistently with the justified expectations of the other party." McElroy, 114 P.3d at 436 (quoting Hawaii Leasing v. Klein, 698 P.2d 309, 313 (Haw. Ct. App. 1985)).

34.    BlueEarth breached the [BEMB Agreements] with UBC when BlueEarth's agent Maez, who was also a manager of BEMB, secretly became ECP's agent.  Notwithstanding BlueEarth's contractual obligations, Maez accepted a $50,000 payment from ECP to negotiate the tolling and ground lease agreements on ECP's behalf — without disclosing that fact.  ECP's interest in the negotiations were adverse to those of BEMB, HECO and MECO.

35.    By his willful misconduct and/or gross negligence, including secretly acting on behalf of ECP, falsifying e-mails, and mischaracterizing the parties' position in negotiations, Maez caused BlueEarth, his principal, to breach its contractual obligations to UBC, including BlueEarth's obligations to obtain the necessary satisfactory financing for the Project in consultation with HECO and to work in good faith to negotiate the tolling and ground lease agreements.  This willful or grossly negligent duplicity absolved UBC of any further obligations with respect to the Project.  Because of Maez's undisclosed dual agency, UBC is entitled, at its election, to rescind the [BEMB Agreements] and to obtain restitution from BlueEarth of any benefit received under the Agreements, including the $400,000 payment made by UBC.

36.    As a direct and proximate result of BlueEarth's breach of contract, UBC has sustained damages in an amount to be proven at trial.

(Id. ¶¶ 34–36.)  Paragraph 34 and the first clause of Paragraph 35 plainly allege the

conduct of which the HECO/MECO Defendants complain.  Paragraph 35 goes on

to state that these actions "caused BlueEarth to breach its contractual obligations to

UBC, including BlueEarth's obligation to obtain the necessary satisfactory

financing for the Project."  The Court agrees with the HECO/MECO Defendants

that a failure to obtain the necessary financing as required by the BEMB

agreements could be an injury that results in damages sufficient to survive a

motion to dismiss.  What is unclear to the Court, however, is how Maez's conduct

resulted in BlueEarth's failure to obtain this financing.  That Maez allegedly took a

payment from EBC to negotiate on its behalf with BEMB while also a manager of

BEMB does not necessarily yield the conclusion that BlueEarth was unable to

obtain financing for the Project.  Instead, some aspect of Maez's alleged

misconduct must have lead to this result.

The remainder of Paragraph 35 is equally unconvincing.  The

HECO/MECO Defendants go on to state that as a result of Maez's conduct

BlueEarth did not "work in good faith to negotiate the tolling and ground lease

agreements."  Again, a failure to work in good faith, although  potentially a breach

of contract, does not specify how the HECO/MECO Defendants were injured.  In

these circumstances, Maez's alleged misconduct does not necessarily lead to the

conclusion that BEMB was unable to obtain a favorable tolling or ground lease

agreement.  The Court will not here speculate how Maez's alleged misconduct may

have led to these results.  See Twombly, 550 U.S. at 555 ("Factual allegations must

be enough to raise a right to relief above the speculative level.").  The

HECO/MECO Defendants must therefore allege how exactly Maez's misconduct

resulted in BEMB failing to obtain the necessary financing or failing to obtain

favorable tolling or ground lease agreements.

The Court is also not persuaded that the HECO/MECO Defendants have sufficiently alleged the nature of the relief to which they are entitled. Paragraph 35 alleges that the HECO/MECO Defendants, as assignee of UBC's claims, are entitled to restitution from BlueEarth of the $400,000 payment. This payment, however, was not made to BlueEarth, but to BEMB. The HECO/MECO Defendants have made no argument as to how or why they are entitled to restitution from BlueEarth for a payment UBC made to BEMB—a separate and distinct entity from BlueEarth.

The HECO/MECO Defendants also seek recision of the BEMB agreements based on the alleged breach of good faith and fair dealing. (FACC ¶ 35.) In support of this assertion the HECO/MECO Defendants rely on <u>Television Events & Marketing, Inc. v. Amcon Distrib. Co.</u>, 526 F. Supp. 2d 1118 (D. Haw. 2007), to assert that "UBC is entitled as a matter of Hawai'i law to rescind the BEMB Agreements . . . ." (MD Opp'n at 14.) <u>Television Events</u>, however, is readily distinguishable. It stands for the proposition that where a principal whose agent, in breach of its fiduciary duties, has entered the principal into a binding contract with a third party, the principal is entitled to recision from the contract

with the third party.[7]  See 526 F. Supp. 2d at 1127 ("When an agent breaches the

duty of loyalty and acts on behalf of an adverse party, the principal may recover

the benefits acquired by the agent through the agent's breach and rescind the

contract entered into with a third party who participated in the agent's breach.").

This is not the scenario contemplated in the instant litigation.  The HECO/MECO

Defendants seek recision of the contracts (i.e. the BEMB Agreements) that

allegedly established the fiduciary relationship between UBC and Maez (and

thereby BlueEarth) rather than a subsequent contract into which Maez entered on

UBC's behalf in alleged breach of his fiduciary duties.  The HECO/MECO

Defendants have not, therefore, sufficiently alleged that they are entitled to recision

from the BEMB agreements.

 Finally, Paragraph 36 states in a conclusory fashion only that "[a]s a

direct and proximate result of BlueEarth's breach of contract, UBC has sustained

damages in an amount to be proven at trial."  Without more, the Court cannot

conclude the HECO/MECO Defendants have sufficiently pled the nature of their

breach of contract injury.  See Fed. R. Civ. P. 8(a)(2)–(3) ("A pleading that states a

claim for relief must contain . . . a short and plain statement of the claim showing

---

[7] Indeed, in Television Events, the agent breached his fiduciary duty by being an undisclosed agent of both the principal and the third party.  See 526 F. Supp. 2d at 1127.

that the pleader is entitled to relief [and] a demand for the relief sought");

McGlinchy v. Shell Chemical Co., 845 F.2d 802, 810 ("[C]onclusory allegations

without more are insufficient to defeat a motion to dismiss for failure to state a

claim.")  Accordingly, the Court **GRANTS** BlueEarth's Motion with respect to

Count One of the FACC.

     C.    <u>Count Two: breach of fiduciary duty by HECO as UBC's assignee against BlueEarth and Maez</u>

Count Two of the FACC alleges that BlueEarth via its agent Maez

breached its fiduciary duty to UBC when Maez allegedly acted in secret on behalf

of ECP and falsified emails.  (FACC ¶ 42.)  As a result, UBC, according to the

HECO/MECO Defendants, is entitled to restitution for the $400,000 payment made

by UBC as well as other damages sustained by UBC.  (<u>Id.</u> ¶¶ 42–43.)

Without addressing the extent to which Section 6.06(b) of the

Operating Agreement[8] limits—if at all—the applicability Hawaii Uniform Limited

---

[8] Section 6.06(b) of the Operating Agreement states:

The Members acknowledge and agree that the relationship among
them as members of the LLC as specified in this Agreement is, to the
maximum extent permissible under the Act, contractual in nature and
not fiduciary.  Accordingly, the Members agree that to the maximum
extent permissible under the Act, each Member's fiduciary and other
duties or obligations to the LLC or any other Member (if any) shall be
eliminated (or, if complete elimination of such duties and obligations

(continued...)

Liability Company Act to the instant action, the Court again finds that the HECO/MECO Defendants have failed to state a claim upon which relief can be granted. As noted, Rule 8 mandates that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief [and] a demand for the relief sought." General <u>Twombly-Iqbal</u> considerations are applicable in the instant case as well. <u>See</u> <u>Iqbal</u>, 129 S. Ct. at 1949 ("[A Complaint] demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."); <u>Twombly</u>, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Once more the Court believes the HECO/MECO Defendants have not sufficiently alleged the injury which UBC suffered. Assuming that the FACC suffices to allege a breach of fiduciary duty, the HECO/MECO Defendants have stated only that they are entitled to restitution of the $400,000 payment. According to the FACC itself, however, the $400,000 payment was made to BEMB and not to

_____

[8](...continued)
is deemed to be not permissible under the Act, then reduced to the maximum extent permissible) hereby.

(Operating Agreement at 22–23.) The Act that Section 6.06(b) references is the Hawaii Uniform Limited Liability Company Act, codified at H.R.S. Ch. 28. (<u>See</u> <u>id.</u> at 1.)

BlueEarth. As with Count One, however, the HECO/MECO Defendants have not specified why they are entitled to recover that amount on UBC's behalf from BlueEarth—a separate and distinct entity. See Rule 8 ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief [and] a demand for the relief sought." (emphasis added)). The HECO/MECO Defendants also argue that they are entitled to recision as a matter of law with respect to this Count as well. Once more they rely on Television Events. As discussed supra, however, this case is inapposite.

      The HECO/MECO Defendants only other related pleading with respect to Count Two is in Paragraph 43 where they again assert that "[a]s a direct and proximate result of these breaches of duty, UBC has sustained damages in an amount to be proven at trial." This bald assertion alone, however, insufficient to demonstrate how Maez's conduct entitles UBC to damages. See Iqbal, 129 S. Ct. at 1949 ("[A Complaint] demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."); Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Count Two of the Complaint is therefore not sustainable in its present form, and, accordingly, the Court **GRANTS** BlueEarth's Motion with respect to Count Two of the FACC.

D.     Count Three: breach of fiduciary duty by HECO and MECO against BlueEarth

Count Three of the FACC incorporates the TAC and alleges that because the HECO/MECO Defendants and BlueEarth were engaged in a joint venture to develop the Project, they had a fiduciary relationship.  (FACC ¶ 45.) According to the HECO/MECO Defendants, BlueEarth breached this fiduciary duty when its agent, Maez, secretly became ECP's agent and accepted payment from ECP to negotiate on their behalf without disclosure.  (Id. ¶ 46.)  "As a direct and proximate result of these breaches of duty," according to the HECO/MECO Defendants, "HECO and MECO have sustained damages in an amount to be proven at trial."  (Id. ¶ 49.)

The HECO/MECO Defendants have run afoul of the same problem which plagued its first two counts—they have failed to plead how this alleged breach of fiduciary duty has resulted in injury to them.  See Iqbal, 129 S. Ct. at 1949 ("[A Complaint] demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."); Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

The Court here, however, wants to distinguish its February Order upon which the HECO/MECO Defendants rely in their Opposition. (MD Opp'n at 21.) The issue the Court was called upon to resolve in its February Order was the applicability of the Economic Loss Rule to BlueEarth's claim for breach of fiduciary duty. (Feb. Order at 47–49.) That is a distinct issue from whether causation or injury were sufficiently alleged. Although not explicitly addressed by the Court (or briefed by the parties), implicit in the Court's finding was that BlueEarth did sufficiently allege causation and injury. In Count Eleven of the TAC, BlueEarth alleged it was injured when it was deprived of participation in the Project. (TAC ¶ 98.) BlueEarth was allegedly deprived of participation when Aloha and the HECO/MECO Defendants entered into negotiations to its exclusion and in violation of the HECO/MECO Defendants' fiduciary duty. (See id. ¶¶ 32–42.) The injury stemming from their exclusion were also clearly alleged. (See id. ¶ 43.)

There are no comparable allegations in the FACC. Specifically, there is no allegation connecting Maez's conduct to the breakdown of negotiations between the parties. Indeed, the HECO/MECO Defendants actually state that negotiations broke down because ECP and the HECO/MECO Defendants could not agree with respect to basic terms "for economic, accounting and regulatory

38

reasons." (FACC ¶ 43; MD Opp'n at 6.)  The HECO/MECO Defendants simply

do not allege in anyway that the breach of BlueEarth's fiduciary duty via Maez's

conduct resulted in any injury.  In light of <u>Twombly-Iqbal</u> the Court cannot

conclude without more, that the HECO/MECO Defendants have stated a claim

upon which relief can be granted.  Accordingly, the Court **GRANTS** BlueEarth's

Motion with respect to Count Three.

      E.    <u>Count Four: breach of contract (the NDAs) by HECO and MECO against BlueEarth</u>

      After incorporating Paragraphs 1 through 28, Count Four, in its

entirety, alleges the following:

> 51.    The NDAs provide that the parties will not solicit or accept business from sources made available by the other party.
> 52.    HECO and MECO introduced ECP to BlueEarth.  ECP was thus a source made available by HECO and MECO.
> 53.    Maez, BlueEarth's managing member, later solicited ECP for business and accepted a $50,000 payment to negotiate the tolling and ground lease agreements on ECP's behalf.  BlueEarth never made HECO or MECO aware of his dual role.
> 54.    Because of Maez's undisclosed dual agency, HECO and MECO are entitled, at their election, to rescind the NDAs and to obtain restitution from BlueEarth of any benefit received under the NDAs.
> 55.    As a direct and proximate result of this breach, HECO and MECO have sustained damages in an amount to be proven at trial.

(FACC ¶¶ 51–55.)  For the reasons explained <u>supra</u>, the Court finds that the FACC

insufficiently describes how Maez's conduct resulted in injury to the

HECO/MECO Defendants and insufficiently describes the injury for which the

HECO/MECO Defendants are entitled to recover.[9]  See Iqbal, 129 S. Ct. at 1949

("[A Complaint] demands more than an unadorned, the

defendant-unlawfully-harmed-me accusation."); Twombly, 550 U.S. at 555

("Factual allegations must be enough to raise a right to relief above the speculative

level.").  The Court **GRANTS** BlueEarth's Motion with respect to Count Four.

 F. Count Five: tortious interference with contracts (the BEMB
Agreement and NDAs) by HECO, for itself and as UBC's assignee, and MECO, all
against Maez

  The Fifth Count of the FACC alleges tortious interference with

contractual relations.  (FACC ¶¶ 56–61.)  Specifically, the HECO/MECO

Defendants allege that UBC had an existing contract with BlueEarth (the BEMB

Agreements) and that HECO and MECO had an existing contract with BlueEarth

(the NDA).  (FACC ¶ 57.)  According to the FACC, Maez knew of these contracts

and intentionally interfered with them by becoming ECP's agent causing BlueEarth

to breach its contractual and fiduciary obligations.  (Id. ¶ 59.)  The HECO/MECO

---

[9] BlueEarth also argues in reply that this Count should be dismissed because the HECO/MECO Defendants only allege that Maez solicited business and Maez was not a party to the Contract.  (MD Reply at 9–10.)  The Court will not now consider this argument as, in light of the foregoing, it is unnecessary for resolution of the instant motion. The Court notes, however, that there may be agency issues at play here that could establish BlueEarth's liability.

Defendants again allege that "[a]s a direct and proximate result of Maez's tortious interference with the above contracts, HECO, MECO and UBC have sustained damages in an amount to be proven at trial." (Id. ¶ 61.)

To prevail on a claim for tortious interference with contractual relations, a plaintiff must demonstrate:

> 1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of the third party to breach the contract; 4) the absence of justification on the defendant's part; 5) the subsequent breach of the contract by the third party; and 6) damages to the plaintiff . . . .

Meridian Mortgage, Inc. v. First Hawaiian Bank, 122 P.3d 1133, 1142 (Haw. Ct. App. 2005) (modification and emphasis omitted) (quoting Weinberg v. Mauch, 890 P.2d 277, 287 (1995)).

The Court first finds that, as with the rest of the FACC, the HECO/MECO Defendants have insufficiently alleged causation, injury or damages to the Plaintiff as discussed supra. This suffices to dismiss this Count of the FACC. The Court also notes, however, it is skeptical that Maez can be considered a third-party to the contracts. Taking all of the HECO/MECO Defendants allegations as true, Maez was at most an agent for ECP as well as an agent for BlueEarth and BEMB. Were this the case, Maez would be immune from a tortious interference suit as an employee and agent of BlueEarth and BEMB. See Kahala

Royal Corp. v. Goodsill Anderson Quinn & Stifel, 151 P.3d 732, 754–755 (Haw. 2007). The HECO/MECO Defendants admit as much in their briefing. (See MD Opp'n at 23.) To avoid this result, the HECO/MECO Defendants have pled in the alternative that by accepting payment from ECP "Maez acted for his own benefit, outside the scope of his authority as BlueEarth's agent." (FACC ¶ 59.) The Court has estoppel concerns with this argument given that the underlying basis for asserting liability against BlueEarth in each of the other counts of the FACC was on an agency basis.[10] (See id. ¶¶ 34 (Count One); 39 (Count Two); 46 (Count Three); 53 (Count Four).) The Court need not resolve this issue now, however, in light of the HECO/MECO Defendants' failure to adequately plead causation, injury or damages with respect to this Count. The Court **GRANTS** BlueEarth's Motion with respect to Count Five.

---

[10] "Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Samson v. NAMA Holdings, LLC, --- F.3d ---, Nos. 09-55835, 09-56394, 2011 WL 652519, at *17 (9th Cir. Feb. 11, 2011) (quotations omitted). One factor in considering whether to apply the doctrine is "whether the party has successfully advanced the earlier position, such that judicial acceptance of an inconsistent position in the later proceeding would create a perception that either the first or second court had been misled." Id. Here, the HECO/MECO Defendants have not prevailed so the Court need not consider this doctrine's applicability here.

G.     <u>Dismissal Without Prejudice</u>

BlueEarth requests that the Court to dismiss the FACC with prejudice. (MD at 19.) Pursuant to Rule 15(a)(2), courts should "freely give leave [to amend] when justice so requires." Further, "requests for leave should be granted with extreme liberality." <u>Moss v. U.S. Secret Service</u>, 572 F.3d 962, 792 (9th Cir. 2009). "Dismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by an amendment." <u>Id.</u> The Court cannot say that it is clear that the FACC could not be saved by amendment. It may well be that Maez's conduct led to the breakdown of negotiations between the parties or injured UBC or the HECO/MECO Defendants in some other way. Further, the Court believes equity dictates the HECO/MECO Defendants be afforded at least another opportunity to amend the FACC given that BlueEarth has amended their Complaint three times.

Accordingly, BlueEarth's Motion to Dismiss is **GRANTED**. The FACC is hereby **DISMISSED WITHOUT PREJUDICE**. The HECO/MECO Defendants, if they elect to do so, shall file an amended counterclaim on or before thirty days from the filing of this Order.

II.     <u>The Motions for Summary Judgment</u>

       The HECO/MECO Defendants and Aloha filed their Summary Judgment Motions on January 19, 2011.  Aloha filed for summary judgment on the fifth through tenth causes of action of the TAC.  (Doc. # 433.)  The HECO/MECO Defendants filed for summary judgment on the first, second, fourth, sixth, seventh, ninth, tenth, and eleventh causes of action.  (Doc. # 447.)  On February 8, 2011, the Court issued its February Order dismissing Counts Four, Seven, Eight, and Ten of the TAC.  (Feb. Order at 2.)  Count Six of the TAC was also dismissed without prejudice.  (<u>Id.</u>)  Accordingly, the Court **DENIES AS MOOT** Aloha's Motion to the extent that it seeks summary judgment on Counts Seven, Eight and Ten.  The Court also **DENIES AS MOOT** the HECO/MECO Defendants' Motion to the extent that it seeks summary judgment on Counts Four, Seven, and Ten of the Complaint.  The Court will now only consider Counts One, Two, Five, Nine, Eleven, and Six.

A.     <u>Count IX</u>

       The Ninth Count of the TAC alleges that Aloha and the HECO/MECO Defendants violated HUTSA.  (TAC ¶¶ 90–93.)  To prevail on a HUTSA claim, a plaintiff must establish that there exists a trade secret and a misappropriation of that trade secret.  <u>See</u> Haw. Rev. Stat. § 482B-2; <u>see also</u>

Dealertrack, Inc. v. Huber, 460 F. Supp. 2d 1177, 1183 (C.D. Cal. 2006);

AccuImage Diagnostics Corp. v. Terarecon, Inc., 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003).

The TAC alleges that BlueEarth "has, at considerable expense and effort, developed valuable contact lists, know-how, and information for conducting its business, and these lists and information give BlueEarth a distinct advantage over its competitors who do not know or use them." (TAC ¶ 91.) By allegedly failing to comply with the NDAs and Confidentiality Agreement, the Defendants are now "using or disclosing BlueEarth's trade secrets and confidential information without permission and for the purpose of circumventing BlueEarth's participation in the project." (Id. ¶ 92.)

Aloha and the HECO/MECO Defendants argue they are entitled to summary judgment because BlueEarth does not own the trade secrets. (AMSJ at 17; HMSJ at 12–14.) Specifically, Defendants contend that at the time of the alleged misappropriation, the trade secrets and confidential information had already been assigned to BEMB per the Operating Agreement. (AMSJ at 17–18.) Aloha additionally asserts that BlueEarth's interest in BEMB does not give it standing to assert rights belonging to BEMB. (Id. at 18.) Further, according to Aloha, BlueEarth's interest in BEMB does not allow it to direct BEMB to assert a

claim as only the Board of Managers has that power per the Operating Agreement. For the BEMB Board of Managers to prosecute such an action requires "'the vote of a majority of all Managers . . . , including the affirmative vote of at least one BlueEarth Manager and at least one UBC Manager.'" (Id. at 18–19 (quoting Operating Agreement ¶¶ 6.01(b)(iv), 6.02(g)).)

BlueEarth proffers three primary arguments in response. First, BlueEarth argues it never transferred its confidential information to BEMB because the Operating Agreement states that BlueEarth agreed subsequently to execute "'such documents and take such actions as UBC may reasonably request to effectuate or evidence the transfer and assignment of the Work Product to the LLC.'" (AMSJ Opp'n at 22 (quoting Operating Agreement ¶ 3.01(a)).)[11] Second, according to BlueEarth, a Plaintiff need not prove ownership of a trade secret to prevail on a UTSA claim. (Id. at 24–26.) Finally, BlueEarth relies upon one sentence of the Court's November Order which states that "'the Operating Agreement made clear that BEMB was to develop the Project . . . and that BlueEarth had transferred to BEMB all of its development work and related

---

[11] The Court will cite to BlueEarth's Opposition to Aloha's Motion for Summary Judgment but notes that BlueEarth made identical arguments in opposition to the HECO/MECO Defendants' Motion as well. (See HMSJ Opp'n at 15–20.)

rights . . . that it had accumulated <u>since the signing of the MOU</u> . . . .'" (<u>Id.</u> at 26

(quoting Nov. Order at 35.))

      i.    <u>Transfer of Confidential Information</u>

     Whether a contract is ambiguous is a question of law for the court.

<u>Local Motion, Inc. v. Niescher</u>, 105 F.3d 1278, 1280 (9th Cir. 1997). This Court's

review is limited to the express terms of a contract unless an ambiguity exists in

the contract terms. <u>See</u> <u>United Pub. Workers, AFSCME, Local 646, AFL-CIO v.</u>

<u>Dawson Int'l, Inc.</u>, 149 P.3d 495, 508–09 (Haw. 2006); <u>State Farm</u>, 978 P.2d at

762; <u>Amfac, Inc. v. Waikiki Beachcomber Inv. Co.</u>, 839 P.2d 10, 31–32 (Haw.

1992); <u>Hanagami v. China Airlines, Ltd.</u>, 688 P.2d 1139, 1144–45 (Haw. 1984).

"Since the determination of whether an ambiguity exists in a contract is to be made

on an objective basis, not by the subjective contentions of parties, a conclusion of

ambiguity is not compelled by the fact that the parties to a document, or their

attorneys, have or suggest opposing interpretations of a contract, or even disagree

as to whether the contract is reasonably open to just one interpretation." 11

<u>Williston on Contracts</u> § 30:4 (4th ed. 1999 & Supp. 2010). "'[T]he test lies not

necessarily in the presence of particular ambiguous words or phrases but rather in

the purport of the document itself, whether or not particular words or phrases in

themselves be uncertain or doubtful in meaning.'" <u>Found. Int'l, Inc. v. E.T. Ige</u>

Constr., Inc., 78 P.3d 23, 33 (Haw. 2003).  Moreover, "[t]he existence of mutual assent or intent to accept is determined by an objective standard."  Standard Mgmt., Inc. v. Kekona, 53 P.3d 264, 273 (Haw. 2001).

The Hawaii Supreme Court has "adopt[ed] the view allowing extrinsic evidence, i.e., all evidence outside of the writing including parol evidence, to be considered by the court to determine the true intent of the parties if there is any doubt or controversy as to the meaning of the language embodying their bargain."  Hokama v. Relinc Corp., 559 P.2d 279, 283 (Haw. 1977) (emphasis added); see In re Lock Revocable Living Trust, 123 P.3d 1241, 1247–48 (Haw. 2005); Matter of Ikuta's Estate, 639 P.2d 400, 406 (Haw. 1981).  In the absence of ambiguity or claims of fraud, duress, or mutual mistake, extrinsic evidence is inadmissible.  See State Farm, 978 P.2d at 762.

Defendants rely upon Sections 2.03 and 3.01 of the Operating Agreement to argue that BlueEarth effectuated a complete transfer of the trade secrets and confidential information to BEMB.  Section 2.03 states that "the purpose of the L[L]C is to evaluate fund and develop the Project . . . ."  (Operating Agreement ¶ 2.03.)  Section 3.01 provides as follows:

48

3.01   Capital Contributions and Commitments

>    (a)    BlueEarth Biofuels hereby assigns and transfers, a Non-Cash Capital Contribution to the LLC, reflecting Project development work in progress and results, and all intellectual property and proprietary rights relating hereto, resulting from expenses paid or accrued as trade payables by BlueEarth Biofuels prior to the date hereof . . . (collectively the "Work Product"). BlueEarth Biofuels represents and warrants that its Initial Non-Cash Capital Contribution (net of trade payables) represents the actual aggregate amount of cash it has expended in connection with such construction, work and results for the benefit of the LLC, and that the LLC is the exclusive owner of all the Work Product. BlueEarth Biofuels agrees to execute such documents and take such actions as UBC may reasonably request to effectuate or evidence the transfer and assignment of the Work Product to the LLC.

(Id. ¶ 3.01.) The Court agrees that these sections of the Operating Agreement, by their plain terms, operated to transfer all confidential information and trade secrets relating to the Project from BlueEarth to BEMB. See State Farm, 978 P.2d at 762 ("[C]ontractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech. The court should look no further than the four corners of the document to determine whether an ambiguity exists."). The Operating Agreement clearly states that "BlueEarth Biofuels hereby assigns and transfers . . . to the LLC . . . all intellectual property and proprietary rights" relating to the Project development work that is both in progress and finished. (See id.) This result is bolstered by Section 2.03 which states that the purpose of BEMB

"is to evaluate, fund and develop the Project." (Id. ¶ 2.03.) Accordingly,

BlueEarth transferred to BEMB all intellectual and property rights relating to the

Project. BlueEarth does not, therefore, own the trade secrets and confidential

information at issue.[12]

BlueEarth does not dispute that Defendants' reading of the contract

yields the conclusion that it does not own the trade secrets and confidential

information here at issue.[13] Instead, BlueEarth argues that the last sentence of

Section 3.01 demonstrates that there is at least a question of material fact as to

whether the Operating Agreement effectuated such a transfer. The sentence, as

noted, states "BlueEarth Biofuels agrees to execute such documents and take such

actions as UBC may reasonably request to effectuate or evidence the transfer and

assignment of the Work Product to the LLC." BlueEarth contends "[t]he addition

of this sentence indicates that the parties believed that the assignment and/or

transfer of BlueEarth's Work Product to BEMB would not be final without the

_____

[12] Indeed, the Court already made this finding in its November Order. (Nov. Order at 35 ("[T]he Operating Agreement made clear that BEMB was to develop the Project . . . and that BlueEarth had transferred to BEMB all of its development work and related rights . . . .").)

[13] BlueEarth also does not dispute that it cannot pursue a claim on behalf of BEMB nor direct BEMB to file suit on its own behalf. (See AMSJ at 18–19.)

execution of additional documents or the taking of additional actions." (AMSJ Opp'n at 22.) The Court is not persuaded.

First, the Court notes that BlueEarth was required to execute such documents that <u>may</u> be reasonably requested by UBC. "May" denotes discretion. <u>State v. Kahawai</u>, 83 P.3d 725, 728 (Haw. 2004); Webster's Third New International Dictionary 1396 (2002) (defining "may" as meaning "have permission to"); Black's Law Dictionary at 1068 (9th ed. 2009) (defining "may" to mean "[t]o be permitted to"). "The term 'may' is generally construed to render optional, permissive, or discretionary the provision in which it is embodied" <u>Kahawai</u>, 83 P.3d at 728. This alone would not defeat BlueEarth's contention as the parties could conceivably have agreed UBC had the right to request a transfer at a later date.[14] Section 3.01, however, also includes the word "hereby" which means "[b]y this document; by these very words." Black's, <u>supra</u>, at 794; <u>see also</u> <u>St. Joseph and Denver City R. Co. v. Baldwin</u>, 103 U.S. 426, 429 (1880) (finding the term "hereby . . . import[s] an immediate transfer of interest"). Accordingly,

---

[14] Such a reading, however, would arguably result in BlueEarth being in breach of the Operating Agreement. Specifically, Schedule A of the Operating Agreement stated that BlueEarth would contribute an "Initial Non-Cash Capital Contribution" worth $1.2 Million. (Operating Agreement, Sched. A.) Section 3.01 was the means by which BlueEarth contributed the non-cash contribution. (<u>See</u> <u>id.</u> ¶ 3.01.)

the Operating Agreement itself was the means by which the confidential

information relating to the Project was transferred to the BEMB.

Reading the terms "hereby" and "may" together, the intentions of the

parties are unambiguously clear.  The Operating Agreement was the means by

which the confidential information and trade secrets were transferred to BEMB and

if UBC desired additional documentation to evince that the transfer took place, it

was permitted to request it.  Such a request was not, as BlueEarth suggests,

necessary for the transfer of the confidential information and trade secrets.[15]  See

State Farm, 978 P.2d at 762. ("[C]ontractual terms should be interpreted according

to their plain, ordinary meaning and accepted use in common speech.")

Accordingly, the Court finds there exists no genuine issue of material fact as to

whether the confidential information and trade secrets at issue and the rights

relating thereto were transferred from BlueEarth to BEMB.

---

[15] The Court notes that there are other problems with BlueEarth's proposed
construction.  Not only would it arguably put BlueEarth in breach as discussed
supra, but the Operating Agreement clearly differentiates between present and
future transfers.  (Compare Operating Agreement ¶ 3.01(a) (". . . hereby
transfers . . .") with id. ¶ 3.01(b)–(d) ("promptly following" and "as soon as
practicable").)  Conceivably if the parties had intended for a future transfer to take
place with respect to the trade secrets and confidential information they would
have used similar "future transfer" language in Section 3.01(a).

ii.    HUTSA and Ownership

BlueEarth argues, seemingly in the alternative, that ownership of trade secrets is not a requirement to prevail on a HUTSA claim. BlueEarth cites to myriad out of district cases where states that have adopted the UTSA have found that a plaintiff need not be the "owner" of the trade secret to pursue a UTSA claim. (AMSJ Opp'n at 24–25.) BlueEarth contends that Hawaii's version of the UTSA requires the Court to reach a similar result here. Specifically, BlueEarth argues that the language in the HUTSA does not require that an individual pursuing a HUTSA claim must be an "owner" of the trade secrets and, in fact, the Hawaii Legislature specifically omitted owner and "chose to use the broader term 'person seeking relief.'" (Id. at 26.)

BlueEarth is quite correct that the HUTSA nowhere specifies that the entity pursuing a HUTSA claim must be an owner. See, e.g., Haw. Rev. Stat. § 482B-2(2)(B)(iii) (defining misappropriation as "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use (emphasis added)); id. § 482B-4 ("a complainant is entitled to recover damages for misappropriation" (emphasis added)). Defendants responds to this argument with treatises as well as citations to the UTSA's

comments to argue that a plaintiff seeking relief under the HUTSA must be the owner of the trade secret.  (AMSJ Reply at 17–18.)

The Court need not, however, resolve the issue of whether an individual must be an owner to pursue a HUTSA claim.  According to case law, at the very least a plaintiff must be a lawful possessor of the trade secrets or confidential information.  See, e.g., DTM Research, LLC v. AT&T Corp., 245 F.3d 327, 331 (4th Cir. 2001) (noting that Plaintiff conceded that "as part of its prima facie case, it must show either that it developed the trade secret at issue or otherwise is in lawful possession of it"); DaimlerChrysler Servs. v. Summit Nat'l, No 02-71871, 2006 WL 1420812, at *8 (E.D. Mich. May 22, 2006) (dismissing defendant's claim "[b]ecause [it] . . . never possessed [the] source code"); Metso Minerals Industries, Inc. v. FLSmidth-Excel LLC, 733 F. Supp. 2d 969, 970–71 (E.D. Wis. 2010) (plaintiff retained a "non-exclusive . . . right to continue to use" the trade secrets).  Here, BlueEarth was no longer legally in possession of the trade secrets because it had transferred, without reservation, all of the relevant confidential information and trade secrets to BEMB.  (Operating Agreement at ¶ 3.01 ("BlueEarth Biofuels hereby assigns and transfers [to BEMB] . . . all intellectual property and proprietary rights relating hereto, resulting from expenses paid or accrued as trade payables by BlueEarth Biofuels prior to the date hereof . . .

54

(collectively the "Work Product"). BlueEarth Biofuels represents and warrants

that . . . [BEMB] is the exclusive owner of all the Work Product." (emphasis

added)). Indeed, once transferred, a party is "enjoined from continuing to use the

trade secret or making it available to others." Roger M. Milgrim, Milgrim on

Trade Secrets § 2.02[2]. Given the transfer effectuated by the Operating

Agreement, BlueEarth cannot now claim lawful possession of the trade secrets or

confidential information at issue in this case. As such, it does not have standing to

pursue a HUTSA claim.

        iii.   <u>November Order</u>

        BlueEarth's final argument with respect to Count Nine is also without

merit. To argue it has at least some ownership over the trade secrets and

confidential information at issue in this litigation, BlueEarth relies on the following

sentence from this Court's November Order: "[T]he Operating Agreement made

clear . . . that BlueEarth had transferred to BEMB all of its development work and

related rights . . . that it had accumulated <u>since the signing of the MOU</u> . . . ."

(Nov. Order at 35 (emphasis added).) According to BlueEarth, this Court thereby

determined that Section 3.01 of the operating agreement "only govern[s] those

trade secrets and confidential information developed after the signing of the MOU,

or January 29, 2007. All trade secrets and confidential information developed by

BlueEarth prior to January 29, 2007, remain BlueEarth's exclusive property."

(AMSJ Opp'n at 26.)  The Court cannot agree.

First, as discussed above, Section 3.01 unambiguously transferred to

BEMB <u>all</u> relevant materials and rights relating thereto.  Further, the Court focused

its inquiry on the time period after the signing of the MOU because that was the

time period relevant to the novation issue the Court was called upon to address in

the November Order.  Finally, the Court's conclusion that BlueEarth transferred all

trade secrets <u>after</u> the signing of the MOU does not preclude the Court from now

finding that BlueEarth transferred trade secrets it developed <u>before</u> the signing of

the MOU as well.  The Court is not therefore persuaded that this language saves

BlueEarth's Ninth Cause of Action.

In sum, the Court **GRANTS** Aloha and the HECO/MECO

Defendants' Motions for Summary Judgment on Count Nine of the TAC.

Specifically, the Court finds that BlueEarth does not have standing to assert the

HUTSA claim because it is neither the owner nor legal possessor of the trade

secrets or confidential information at issue in this litigation.[16]

---

[16] The HECO/MECO Defendants and BlueEarth brief extensively whether, assuming BlueEarth had rights to the trade secrets, they had independent economic value or were generally known or ascertainable by others.  Given the Court's conclusion with respect to this Count, it need not reach these issues.

B.    Count V

The Fifth Count of the TAC alleges that Aloha breached the Aloha NDA as well as the Confidentiality Agreement.[17]  Aloha allegedly did so "by soliciting or attempting to solicit business with HECO and MECO" and "by disclosing BlueEarth's confidential information to third parties."  (TAC ¶ 67.)  The Confidentiality Agreement, which Aloha, BlueEarth and Company A[18] executed on July 14 and 15 2008, provides, inter alia:

> No party will solicit or attempt to solicit business from any other party's client or client subsidiaries or affiliates without the prior written consent of the other party.  This restriction shall not apply to any client or client subsidiary for which a party had established a prior business relationship with the intention of performing services within the sphere of that party's existing business or reasonable expansion thereof; and

> The Confidential Information . . . will not be used other than in connection with the purposes described above, and will be kept confidential by each Party's directors, officers, employees and representatives . . . .

("Conf. Agreement," Doc. # 518-17, at 1, 2.)  The Aloha NDA was executed on January 28, 2008 by BlueEarth and Aloha and it provides, inter alia:

---

[17] For the purposes of maintaining potentially confidential sources and information, the Court will refer to the three companies at issue in this section of its Order as Company A, Company B, and Company C.  Along with this Order, the Court will file a supplement under seal which will identify for the parties alone these companies.

[18] Company A and BlueEarth had produced a draft construction contract for the Project which was provided to Aloha.  (AMSJ at 4.)

The Information of the originating party will be kept confidential by the receiving party and/or its Representatives and will not be disclosed by the receiving party and/or its Representatives and will not be disclosed by the receiving party or its Representatives without the prior written consent of the originating party. . . .

The confidentiality obligations of this Agreement will not apply to any portion of the Information that . . . was already known to the receiving party on a non-confidential basis or was independently developed.

("Aloha NDA," Doc. # 518-16, at 1–2.)  Notably, as BlueEarth concedes, the

Aloha NDA omits any reference to solicitation.  (See id.; AMSJ Opp'n at 31.)

As a preliminary matter, the Court finds that in light of its November

Order Aloha cannot be liable for soliciting business from the HECO/MECO

Defendants.  First, as noted, the Aloha NDA omits any reference to solicitation of

business.  As to the Confidentiality Agreement, in the November Order the Court

found that "Aloha was a source that was already known to the HECO/MECO

[Defendants] on a non-confidential basis or was independently developed and any

business solicited by HECO/MECO from Aloha was not in contravention of the

NDAs."  (Nov. Order at 51.)  In concluding that this fact protected the

HECO/MECO Defendants from liability, the Court relied upon the Provision of the

HECO/MECO NDA which states that "[t]he confidentiality obligations of this

Agreement will not apply to any portion of the Information that . . . was already

known to the receiving party on a non-confidential basis or was independently developed." (Id. at 49 (emphasis added).)  As a result, the NDA did not prohibit the HECO/MECO Defendants from soliciting business from Aloha.  (Id. at 51.)

The same result is warranted here.  The Aloha Confidentiality Agreement contains a similar exception which states that the restriction on solicitation "shall not apply to any client or client subsidiary for which a party had established a prior business relationship with the intention of performing services within the sphere of that party's existing business or reasonable expansion thereof." (Conf. Agreement at 2 (emphasis added).)  Given that the Court found Aloha and the HECO/MECO Defendants had a relationship prior to the development of the Project in its November Order and that the HECO/MECO Defendants were protected from liability for allegedly soliciting business from Aloha, the reverse must be true as well—Aloha should be shielded from liability for soliciting business from the HECO/MECO Defendants under this provision of the Aloha Confidentiality Agreement for the same reason.[19]  Accordingly, Aloha's alleged solicitation of business from the HECO/MECO Defendants are not a grounds for finding a breach of either the Aloha NDA or Confidentiality Agreement.

---

[19] BlueEarth concedes this in its Opposition.  (AMSJ Opp'n at 31.)

Second, the Court's conclusion with respect to Count Nine of the TAC also dictates the result here. Specifically, the Court finds that BlueEarth did not own or legally posses the confidential information at issue because BlueEarth transferred both the confidential information as well as all "rights relating thereto" to BEMB.[20]  (Operating Agreement ¶ 3.01(a).)  BlueEarth therefore cannot allege a breach of either the Aloha NDA or Confidentiality Agreement on these grounds.[21]

The only remaining dispute with respect to this Count relates to the extent to which Aloha may be liable for soliciting business from Company B, Company A, or Company C in violation of the confidentiality agreement.[22]  With respect to Company B, there plainly is no genuine issue of material fact.  Prior to signing the Confidentiality Agreement, BlueEarth provided written authorization for "[Company B] and associates to have discussions with Aloha Petroleum, Ltd

---

[20] There are no allegations in the TAC or facts on the record to support the contention that any alleged breach of the Aloha NDA or Confidentiality Agreement took place before the signing of the BEMB agreements on February 14, 2008.  In fact, the Confidentiality Agreement was signed after the BEMB agreements in July 2008.

[21] BlueEarth does not dispute that this conclusion follows from the Court's findings with respect to Count Nine in its Opposition.  Instead, BlueEarth merely incorporates the arguments it made with respect to Count Nine to assert that it still has some lawful possession over the trade secrets and confidential information. (AMSJ Opp'n at 33.)  For the reasons stated supra, the Court is not persuaded.

[22] Company C is a Malaysia-based palm oil producer.  (AMSJ Opp'n at 33.)

relating to feedstock supply to the BlueEarth biodiesel facility." (See Doc. 434-

37.) Given that the Confidentiality Agreement specifically excepts solicitation of

clients where a party has provided "prior written consent" and that Company B

was plainly known to Aloha prior to the execution of the Confidentiality

Agreement, there is no triable issue of material fact with respect to Company B on

this Count.[23]

The Court also finds that there is no question of material fact with

respect to Company A. Company A was a party to the Confidentiality Agreement,

not a party's client. (See Conf. Agreement at 1 ("The Agreement is made . . . by

and between . . . [BlueEarth], . . . [Aloha], . . . and [Company A] . . . hereinafter

known as the "Parties.").) BlueEarth has not explicitly pointed the Court to any

evidence which suggests a contrary conclusion.[24] Even assuming, however, that

---

[23] BlueEarth does not contest this point in its Opposition.

[24] Once a moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings. Porter, 419 F.3d at 891 (quoting Anderson, 477 U.S. at 256). In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers. S. Cal. Gas Co., 336 at 889; Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties."). Here, Aloha produced evidence which suggests Company A was a

(continued...)

Company A had business relations with BlueEarth prior to the signing of the

Confidentiality Agreement, the Court cannot consider Company A to be a "client"

for the purposes of the Confidentiality Agreement.  Indeed, if the Court construed

the Confidentiality Agreement such that Company A was both a <u>party</u> and a <u>client</u>

it would lead to an untenable result: the Confidentiality Agreement would both

permit and prohibit Aloha from soliciting business from Company A.  Specifically,

Aloha would be able to solicit business from Company A consistent with the

Confidentiality Agreement's purpose but also be prohibited from doing so as

Company A was allegedly BlueEarth's client.  This reading must be rejected.[25]  <u>See</u>

<u>Amfac, Inc. v. Waikiki Beachcomber Inv. Co.</u>, 839 P.2d 10, 25 (Haw. 1992)

("[T]he interpretation which makes a fair, rational and probable contract must be

---

[24](...continued)
party rather than a client, specifically the Confidentiality Agreement.  BlueEarth
has not pointed the Court to any evidence in the record which suggests Company A
could be considered a client as contemplated by the Confidentiality Agreement.

[25] The Court notes that, alternatively, Company A could be considered a
"client" as contemplated by the Confidentiality Agreement but to ensure a rational
construction, the agreement itself would have to be construed as the written means
by which BlueEarth granted Aloha permission to solicit business from Company
A.  (<u>See</u> Operating Agreement at 2 ("No party will solicit or attempt to solicit
business from any other part's client . . . <u>without written consent of the other</u>
<u>party</u>." (emphasis added)).)  In any event, BlueEarth has proffered no argument on
a reasonable construction of the Confidentiality Agreement, despite Aloha squarely
raising the matter in its Motion.

preferred.").[26]  The only reading of the Confidentiality Agreement which leads to a rational result is one whereby Company A is a "party" to the agreement but not a "client."

BlueEarth points to two pieces of evidence which suggest that Aloha solicited business from Company A: (1) a document which demonstrates that Aloha wished to enter into an NDA with Company A to the exclusion of BlueEarth and; (2) an email which suggests that Aloha informed Company A that it had taken

---

[26] Although neither briefed nor mentioned by the parties, the Court notes that the Confidentiality Agreement contains a choice of law provision which states that "[t]he Agreement shall be governed and construed in accordance with the internal laws of the State of Minnesota applicable to such agreements."  (Operating Agreement at 2.)  The Court notes it reaches the same result applying Minnesota law as here because Minnesota's case law is substantively identical to Hawaii's case law with respect to contract construction.  See, e.g., Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 364 (Minn. 2009) (finding that interpretation of a contract is a question of law); Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998) (contract language is to be given its plain and ordinary meaning); Travertine Corp. v. Lexington-Silverwood, 683 N.W.2d 267, 271 (Minn. 2004) (finding that if the contract is memorialized in a written instrument, a court determines the parties' intent "from the plain language of the instrument itself"); Medica, Inc. v. Atl. Mut. Ins. Co., 566 N.W.2d 74, 77 (Minn. 1997) (noting that language in a policy is ambiguous if it is susceptible to two or more reasonable interpretations); Art Goebel, Inc. v. N. Suburban Agencies, Inc., 567 N.W.2d 511, 515 (Minn. 1997) (determination of whether a contract  is ambiguous depends "not upon words or phrases read in isolation, but rather upon the meaning assigned to the words or phrases in accordance with the apparent purpose of the contract as a whole"); Current Tech. Concepts, Inc. v. Irie Enters., Inc., 530 N.W.2d 539, 543 (Minn. 1995) (contract must be interpreted in a way that gives all of its provisions meaning).

over the Project from BlueEarth. (AMSJ Opp'n at 32.) This evidence, according to BlueEarth "supports BlueEarth's position that Aloha solicited [Company A] for a role in the version of the BlueEarth Project that did not include BlueEarth." (Id.) Neither piece of evidence, however, suggests that Company A was BlueEarth's client as contemplated by the Confidentiality Agreement.[27] In other words, while it may be that Aloha sought Company A's participation in a version of the Project that excluded BlueEarth, BlueEarth has not shown that such conduct resulted in a breach of the Confidentiality Agreement.[28] Accordingly, there is no genuine issue of material fact with respect to Aloha's solicitation of Company A on this Count.

Finally the Court is not persuaded that BlueEarth's remaining contention with respect to this Count—that Aloha improperly solicited business from Company C—can withstand Aloha's Motion. First, the Court notes that BlueEarth did not raise Aloha's alleged misconduct with respect to Company C until its Opposition to Aloha's Motion for Summary Judgment. Indeed, Aloha

---

[27] Nor does BlueEarth proffer any argument as to how, assuming Company A was BlueEarth's client, the Court should construe the Confidential Agreement in a rational or logical way.

[28] To the extent BlueEarth argued at the Hearing that the agreement prohibited Aloha and Company A from discussing a plan to the exclusion of BlueEarth, there is simply nothing in the contract which limits the subject matter of the parties' discussions.

specifically requested in its interrogatories that BlueEarth "[i]dentify each person from whom BlueEarth alleges in paragraph 40 of the Complaint that Aloha 'solicited business.'" (Doc. # 446-15 at 12.) In response, BlueEarth listed HECO, MECO, Company A and Company B. (Id. at 12–13.) There was no mention of Company C.[29] This is sufficient grounds to disregard BlueEarth's argument with respect to Company C. See Samuel, Son & Co. Inc. v. Sierra Stainless, Inc., 3:09-cv-00291-RAM, 2010 WL 4237993, at *5 (D. Nev. Oct. 19, 2010) (declining to consider an issue raised for the first time in an opposition to a motion for summary judgment where argument was not raised "in response to [a] request for admission or interrogatories"); Redevelopment Agency of City of Stockton v. Burlington N. and Santa Fe Ry. Corp., S-05-02087, 2007 WL 1793755, at *2 n.4 (E.D. Cal. June 19, 2007) (finding no issue of material fact where party raised an issue "for the first time in their opposition to the Railroads' motion for summary judgment" and "the theory of liability [was] not mentioned in . . . disclosures, interrogatory responses, or expert reports") Wasco Products, Inc. v. Southwall Techs, Inc., 435 F.3d 989, 992 (9th Cir. 2006) (finding it improper for a party to oppose a motion

---

[29] BlueEarth objected to this Interrogatory "as premature, since discovery is ongoing, and also vague." It has been, however, nearly two years since this interrogatory was served upon BlueEarth.

for summary judgment on grounds that are being asserted for the first time in the response to a summary judgment motion).

In any event, BlueEarth has also failed to demonstrate that Company C was a client as contemplated by the Confidentiality Agreement sufficient to survive a motion for summary judgment.  As noted, in Hawaii courts ascribe to contract terms their plain and ordinary meaning.  <u>See</u> <u>State Farm</u>, 978 P.2d at 762 ("[C]ontractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech.")  "Client" is defined as a "patron" or "customer."  Webster's, <u>supra</u>, at 422.  "Customer," in turn, is defined as "one that purchases some commodity or services," <u>id.</u> at 559, while "patron" is defined as "a steady or regular client" <u>id.</u> at 1656.  The only evidence proffered by BlueEarth to suggest Company C is BlueEarth's "client" is one phrase of one sentence in an email which states "[Company C has] <u>been in direct contact with Landis Maez</u> and have spent a lot of time with HECO so we won't get a clear run at them, but we are in a good position."  (Doc. 519-15, at 2 (emphasis added).)  Without more the Court simply cannot conclude that there is a genuine issue of material fact as to whether Company C was BlueEarth's client.  A non-moving party must make more than a <u>de minimus</u> showing to survive a motion for summary judgment.  <u>Addisu</u>, 198 F.3d at 1134 ("A scintilla of evidence or

evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.")  One passing statement about a party being "in direct contact" with a company is insufficient to raise a genuine issue of material fact as to whether that company is a client.  This assertion is not "significantly probative" but is instead merely a scintilla of evidence.  Without more, the Court cannot conclude the record suggests there is a genuine issue of material fact with respect to Company C on this Count.  Accordingly, the Court **GRANTS** Aloha's Motion for Summary Judgment with respect to Count Five of the Complaint.[30]

C.    Counts One and Two

The first Count of the Complaint alleges that HECO breached the HECO NDA.  (TAC ¶¶ 44–48.)  Specifically the Count alleges that HECO breached by

> disclosing BlueEarth's confidential Information to third parties without BlueEarth's consent and by using BlueEarth's Confidential Information for purposes other than evaluating the Project with BlueEarth.  Further, HECO breached the HECO NDA by soliciting, negotiating, transacting, and accepting business with Aloha without BlueEarth's written consent.  Moreover, HECO breached the HECO NDA by failing to pay applicable fees, commissions, and other remuneration to BlueEarth, and by failing to pay the maximum profits

---

[30] Because the Court grants summary judgment on this motion, it need not consider Aloha's argument that BlueEarth cannot seek lost profits as a remedy on these grounds.

BlueEarth should have realized and to reimburse BlueEarth for its
expenses and monies it invested in the Project.

(Id. ¶ 47.)  The second Count makes identical allegations with respect to MECO

and the MECO NDA.  (See ¶¶ 49–53.)

In its November Order, the Court partially addressed Count One of the

TAC.  Specifically, as noted earlier, the Court found that "Aloha was a source that

was already known to the HECO/MECO [Defendants] on a non-confidential

basis . . . and any business solicited by HECO/MECO from Aloha was not in

contravention of the NDAs."[31]  (Nov. Order at 51.)  The Court therefore granted

the HECO/MECO Defendants' Counter-Motion for Partial Summary Judgment

with respect to Count One.  (Id.)  Soon after the HECO/MECO Defendants

requested that the Order be amended "to state explicitly that the Court grants the

Counter-Motion for Partial Summary Judgment filed by HECO and MECO as to

Count Two—i.e., in favor of Defendant MECO on Plaintiff's Second Cause of

Action for breach of the MECO NDA . . . ."  (Doc. # 397, at 2 (emphasis omitted).)

BlueEarth filed a statement of no opposition.  (Doc. # 399.)  Nonetheless the Court

denied the HECO/MECO Defendants' request because, pursuant to Local Rule 7.9,

_____

[31] The Court explicitly noted, however, that the November Order addressed
"only one of multiple factual grounds upon which BlueEarth seeks relief as to the
HECO NDA."  (Nov. Order at 51 n.16.)  The Court will discuss the remaining
factual grounds infra.

"a counter motion may only be as broad as the original motion" and BlueEarth's

Motion for Summary Judgment only involved Counts 1 and 3. (Doc. # 400 at 3.)

As a result "the Court could not properly grant summary judgment in favor of

HECO and MECO in their Counter-Motion for Partial Summary Judgment as to

Count 2." (Id.) Now that the HECO/MECO Defendants have filed their own

properly supported Motion for Summary Judgment which includes arguments with

respect to Count Two, the Court agrees with the parties that its November Order

rational suffices to partially defeat Count Two of the TAC. Specifically, because

the Court found that "Aloha was a source that was already known to the

HECO/MECO [Defendants] on a non-confidential basis . . . and any business

solicited by HECO/MECO from Aloha was not in contravention of the NDAs," the

HECO/MECO Defendants are entitled to summary judgment on Count Two of the

TAC to the extent that BlueEarth alleges that the HECO/MECO Defendants

improperly solicited business from Aloha in violation of the MECO NDA.[32]

      Turning to the remaining allegations in Count One and Two of the

TAC, the Court first finds that—as with Count Five discussed supra—its

conclusion with respect to Count Nine of the TAC dictates a finding that there is

no genuine issue of material fact with respect to the alleged dissemination of

_____

[32] BlueEarth agrees with this result. (See HMSJ Opp'n at 33–34.)

confidential information in violation of either NDA.  Specifically, the Court finds

that BlueEarth did not own or legally posses the confidential information at issue

because BlueEarth transferred both the information as well as all "rights relating

thereto" to BEMB per the Operating Agreement.[33]  (Operating Agreement

¶ 3.01(a).)  BlueEarth therefore cannot prevail on a claim that the HECO/MECO

Defendants breached either the HECO or MECO NDAs on these grounds.

The HECO/MECO Defendants also assert that there is no "genuine

issue for trial on BlueEarth's allegations that HECO and MECO breached their

respective NDAs by failing to pay applicable fees, commissions and other

remuneration to BlueEarth" for two reasons.  (HMSJ at 23.)  First, "[t]he NDAs

themselves specify no fees, commissions or other remuneration owing to

BlueEarth" but only that "'the circumvented party shall be entitled to a legal

monetary penalty equal to the maximum services it should realize from such a

transaction . . . .'"  (Id. at 24 (quoting HECO NDA at 3; MECO NDA at 3).)

Second, because the Court ruled that HECO and MECO did not contravene the

_____

[33] As noted supra, there are no allegations in the TAC or facts on the record
to support any contention that an alleged breach of the HECO NDA or MECO
NDA took place before the signing of the BEMB agreements on February 14,
2008.

NDAs by discussing the project with Aloha, BlueEarth cannot establish any circumvention of the NDAs and resulting damages. (Id.)

BlueEarth states that "'[c]ircumvent" is formally defined as "'to evade or find a way around.'" (HMSJ Opp'n at 35 (citing 3 Oxford English Dictionary 243 (2d ed. 1989)). Given this definition of circumvent, BlueEarth contends it has set forth evidence sufficient to support its assertion that the HECO/MECO Defendants circumvented BlueEarth's role in the project by contacting Aloha. (See id. (citing exhibits).) The Court cannot agree.

As noted, "contractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech." State Farm, 978 P.2d at 762. "A word or phrase within a contract is ambiguous if, examining the word or phrase in the context of the entire contract, the word or phrase is reasonably susceptible to more than one meaning." Luke, 96 P.3d at 269 (emphasis added). The Court agrees with BlueEarth that "circumvent" means "to evade or find a way around," but finds that the context in which the term was used does not create a general "non-circumvention" duty as BlueEarth describes.

To begin, in the NDAs the term "circumvention" is mentioned only three times. Once in the title, (HECO NDA at 1 ("Mutual Non-Circumvention and

71

Non-Disclosure Agreement" (emphasis added)); MECO NDA at 1 (same),) and

twice in one paragraph on the third page relating to damages:

> Neither party shall avoid payment of any fees, commissions or other remuneration in any way whatsoever. In the event of <u>circumvention</u> by said party directly or indirectly, the <u>circumvented</u> party shall be entitled to a legal monetary penalty equal to the maximum services it should realize from such a transaction and any and all expenses, including, but not limited to, legal fees that would involve the recovery of said funds.

(HECO NDA at 3; MECO NDA at 3.)

Here the first instance of the term "circumvention" in the body of the

NDA plainly relates to the sentence before it which prohibits a party from avoiding

payment of fees, commissions or other remuneration.  The relationship between the

two sentences is established via the close relationship between the word "avoid" as

used in the first sentence and "circumvention" as used in the second sentence.

Additionally, the second sentence explicitly references the subject of the first

sentence by noting a circumvention by "said party," <u>i.e.</u> the party that attempted to

"avoid payment of fees, commissions or other remuneration."  Therefore, the

parties plain and unambiguous meaning of the phrase "in the event of

circumvention" means in the event that a party tries to avoid, evade, or find a way

around paying fees, commissions or other remuneration.

The second instance of "circumvention" occurs later in the second sentence of the same paragraph where the parties agree that "the circumvented party shall be entitled to a legal monetary penalty . . . ." (HECO NDA at 3; MECO NDA at 3.) In this context, the circumvented party can only be interpreted as the party that did not attempt to avoid, evade, or find a way around paying fees, commissions or other remuneration.

Given this context it is clear that "circumvention" as used in the NDA does not relate to a circumvention of BlueEarth or the Project generally. Instead it has a very specific meaning in a very limited context. Specifically, it relates to a party that avoids paying "fees, commissions or other remuneration." In such an event, the "circumvented" party—the party to whose detriment the other party acted by avoiding payment—is entitled to "a legal monetary penalty equal to the maximum services it should realize from such a transaction and any and all expenses, including, but not limited to, legal fees that would involve the recovery of said funds." (HECO NDA at 3; MECO NDA at 3.)

The only other place the NDA uses the word circumvention is in the title of the document which, in its entirety, reads: "Mutual Non-Circumvention and Non-Disclosure Agreement" (HECO NDA at 1; MECO NDA at 1.) The title alone, however, cannot be said to raise a genuine issue of material fact as to

whether the HECO/MECO Defendants owed an additional non-circumvention duty

beyond what was described in the non-solicitation and non-disclosure provisions;

this is especially so given the limited context in which the term "circumvention"

was used in the body of the NDA.  Addisu, 198 F.3d at 1134 ("A scintilla of

evidence or evidence that is merely colorable or not significantly probative does

not present a genuine issue of material fact.")  Despite BlueEarth's arguments to

the contrary, the NDA plainly creates no duty on the part of the HECO/MECO

Defendants to refrain from "circumventing" the Project or BlueEarth generally.

Simply put, the term "circumvent" is used only in a remedial provision and does

not impose additional duties on the parties that are separate and distinct from the

non-solicitation and non-disclosure duties described in the remainder of the

NDA.[34]

---

[34] Further weighing against BlueEarth's proposed interpretation of the NDA
is the fact that in its filings with this Court it has used the terms "non-
circumvention" and "non-solicitation" interchangeably when discussing the NDA.
For instance, BlueEarth has stated:

> The NDAs signed by HECO and BlueEarth and MECO and
> BlueEarth, respectively contained identical non-circumvention
> provisions:
>
> "The parties shall not in any manner solicit nor accept any business
> nor accept any business from sources or their affiliates that are made
> valuable by the other parties or parties to this Agreement . . . ."

(continued...)

Given this construction, the Court agrees with the HECO/MECO Defendants that there is no genuine issue of material fact that HECO or MECO breached their respective NDAs by failing to pay applicable fees, commissions and other remuneration to BlueEarth. The NDAs themselves provide for no fees commissions or other remunerations and BlueEarth has nowhere specified what fees the HECO/MECO Defendants should have paid. BlueEarth has further not demonstrated how the HECO/MECO Defendants circumvented paying any such fees. Accordingly, the Court **GRANTS** the HECO/MECO Defendants' Motion to Dismiss with respect to Counts One and Two.

---

[34](...continued)
(Doc. # 268-1 at 32 (quoting non-solicitation provisions); see also id. at 33 ("Aloha was thus a 'source . . . made available by [BlueEarth]' pursuant to the non-circumvention provision of the NDA.").) These arguments suggest that BlueEarth at most believed that the non-circumvention provisions encompassed the non-solicitation provisions also on page three of the NDAs. Relying on this representation, the Court itself had heretofore equated the phrases "non-circumvention" and "non-solicitation." (Nov. Order at 45 ("BlueEarth asserts that both the HECO and MECO NDAs provide for identical non-circumvention or non-solicitation provisions." (emphasis added)).) Even assuming, however, this is an appropriate construction of the contract, it does not support BlueEarth's contention that there exists a general "non-circumvention" duty beyond what was prohibited in the non-solicitation and non-disclosure provisions. Further, the Court has already found that the only instance of solicitation BlueEarth has alleged with respect to the HECO/MECO Defendants and their respective NDAs is not actionable.

D.    Count Eleven

The Eleventh Count of the TAC alleges that the HECO/MECO

Defendants breached their fiduciary duties.  Specifically, BlueEarth alleges:

> 97.    BlueEarth, HECO, and MECO were engaged in a joint
> venture to develop the Project and therefore had a fiduciary
> relationship.  Among other duties, HECO and MECO owed BlueEarth
> a duty of loyalty and utmost good faith, a duty to refrain from self-
> dealing, a duty of full disclosure and a duty not to prefer their own
> interests ahead of the interests of BlueEarth.

> 98.    HECO and MECO have breached their fiduciary duties
> owed to BlueEarth, injuring BlueEarth by depriving BlueEarth of
> participation in the Project as well as monies to which BlueEarth is
> rightfully owed, and benefitting HECO and MECO by wrongfully
> retaining monies that belong to BlueEarth.

(TAC ¶¶ 97–98.)

The HECO/MECO Defendants argue that BlueEarth has failed to

present evidence that they deprived "BlueEarth of participation in the Project as

well as monies [that it] is rightfully owed."  (HMSJ at 31.)  They assert that the

BEMB agreements governed the extent to which BlueEarth would participate in

the project and there is no allegation they were breached.  (Id. at 31.)  They also

assert that there is no indication that BlueEarth is "rightfully owed" money as UBC

satisfied the amended funding obligation and there has been no indication of a

breach of the NDA.  (Id. at 32.)

BlueEarth counters that the HECO/MECO Defendants have such a fiduciary duty because "the HECO Defendants circumvented BlueEarth, and by doing so, contravened the NDAs." (HMSJ Opp'n at 39.) As a result, according to BlueEarth, the HECO/MECO Defendants breached their fiduciary duty and are entitled to recompense under the NDAs.

As discussed <u>supra</u>, however, the Court finds that BlueEarth overreaches in its reading of the NDAs. Specifically, the Court finds that the HECO/MECO Defendants did not have a duty to refrain from circumventing BlueEarth generally. The HECO/MECO Defendants duty extended only to refraining from breaching the non-solicitation and non-disclosure duties as discussed. Accordingly, BlueEarth cannot demonstrate that the HECO/MECO Defendants breached any duty they owed to BlueEarth, nor can they demonstrate that they are entitled to any moneys. Accordingly, the Court **GRANTS** the HECO/MECO Defendants' Motion for Summary Judgment with respect to Count Eleven as well.

III.   <u>Count VI</u>

Despite the Court's February Order dismissing Count VI without prejudice after the instant Motions were filed, at the Hearing and in their briefings the parties urged the Court to consider Count VI of the Complaint, which is now a

live pleading that alleges an unfair method of competition claim against

Defendants.

In its February Order, the Court determined that BlueEarth's

pleadings with respect to Count VI of the TAC were inadequate.  Specifically the

Court found that BlueEarth had insufficiently alleged the nature of the competition

by failing to allege " how the Defendants' conduct . . . negatively affected

competition" such that BlueEarth could recover.  (Feb. Order at 29–30 (citations

and quotations omitted).)  As a result, the Court granted Aloha and the

HECO/MECO Defendants' Motions with respect to this count.  (<u>Id.</u> at 31.)

The Court, however, declined to dismiss Count VI with prejudice.

Specifically, the Court stated:

> The Court notes . . . that on January 20, 2011, Plaintiff filed a Motion
> for Leave to File Supplemental Pleadings that affected this Count of
> the Complaint.[]  (Doc. # 450.)  Magistrate Judge Kevin S. C. Chang
> orally granted this motion on February 7, 2011.  (Doc. # 487.)
> Accordingly, Plaintiff's Claim as to Count VI is **DISMISSED
> WITHOUT PREJUDICE**.

(<u>Id.</u> (footnote omitted).)  The Court was concerned that the Supplemental

Pleadings, which had not at the time been briefed by the parties, could potentially

have affected the Court's analysis with respect to Count Six.  Now, having had the

benefit of the parties' briefings as well as the opportunity to review BlueEarth's

Supplemental Pleadings, the Court concludes the Supplemental Pleadings do not substantially affect the Court's analysis in its February Order and Count VI should again be dismissed.

In its February Order, the Court found that BlueEarth's pleading with respect to the nature of the competition was insufficient. Specifically the Court held:

> Despite Plaintiff's protestations to the contrary, it has not sufficiently alleged the nature of the competition. In <u>HMA</u>, for instance, the Plaintiff successfully alleged the nature of the competition by asserting the following:
>
> > 11. . . . [HMSA's] conduct has adversely impacted, and continues to adversely impact, members of [HMSA's] plans by, among other things: (a) imposing financial hardships on, and in some cases threatening the continued viability of, the medical practices run by [the plaintiffs]; (b) threatening the continuity of care provided to patients by [the plaintiffs], as required by sound medical judgment; (c) requiring [the plaintiffs] to expend considerable resources seeking reimbursement that could otherwise be available to provide enhanced healthcare services to [HMSA's] plan members; (d) making it more costly and difficult for [the plaintiffs] to maintain and enhance the availability and quality of care that all patients receive; and (e) increasing the costs of rendering healthcare services in Hawaii as a result of the additional costs incurred and considerable effort expended by HMA members in seeking reimbursement from HMSA for services rendered . . . .
>
> > . . .

26. HMSA dominates the enrollee market in Hawaii with over 65% of Hawaii's population enrolled in one of HMSA's plans. In this regard, HMSA is the largest provider of fee-for-service insurance in the State with more than 90% of the market and is the second largest HMO provider in the State. Similarly, HMSA dominates the physician market, with approximately 90% of Hawaii's physicians participating in HMSA's networks.

27. It is through such market dominance that HMSA is able to dictate the terms and amount of reimbursement HMA physicians will receive.

Davis, 228 P.3d at 436 n.24 (citing and quoting HMA, 148 P.3d at 1214) (brackets in original) (emphasis omitted).

A review of Plaintiff's complaint reveals no similar allegation here. BlueEarth's complaint alleges:

a.    HECO and MECO represented that they would work exclusively and in good faith with BlueEarth, yet engage in unilateral negotiations with Aloha concerning the development, investment, and ownership of the Project without BlueEarth's knowledge or consent, and to its exclusion.

b.    HECO and MECO represented that they would work exclusively and in good faith with BlueEarth, yet willfully interfered with the HECO NDA, the MECO NDA, and the Confidentiality Agreement.

(TAC ¶ 71.)

Assuming, for the moment, that these paragraphs suffice to show injury caused by the HECO/MECO Defendants and Aloha,[] there is simply no corresponding nature of the competition allegation nor an allegation of how the Defendants' "conduct . . . negatively affect[ed] competition" such that Plaintiff may recover.[] Davis, 228 P.3d at 317–18.

(Id. at 28–30 (footnotes omitted).)

The Supplemental Pleadings do not to remedy this defect.[35]  In its "Factual Allegations Common to All Causes of Action" section of its Supplemental Pleadings, BlueEarth alleges that HECO announced at a press conference that it awarded a biofuels contract to Aina Koa Pono and facts relating thereto.  (Doc. # 509 ¶¶ 44–51.)  With respect to Count VI in particular BlueEarth cites the Aina Koa Pono deal as a further example of Defendants' "engagements in deceptive practices and unfair methods of competition."  (Id. ¶ 71; TAC ¶ 70–71.)

Even with this further example, BlueEarth's pleading is still deficient There are no pleadings similar to HMA that the Court discussed in its February Order.  BlueEarth has not sufficiently alleged the nature of the competition nor the anticompetitive conduct which "negatively affect[ed] competition."  Davis v. Four Seasons Hotel Ltd., 228 P.3d 303, 318 (Haw. 2010).  Simply stated, BlueEarth has failed to state a claim upon which relief can be granted.  Without more in the Supplemental Pleadings, the Court is persuaded by the rational in its February Order.  Accordingly, Count Six of the TAC is hereby **DISMISSED**.

---

[35] Perhaps realizing this, BlueEarth requested permission from Magistrate Judge Kevin S.C. Chang to further amend their Supplemental Pleadings after this Court issued its February Order.  (See Doc. # 533.)

<u>CONCLUSION</u>

For the reasons stated above, the Court: (1) **GRANTS** BlueEarth's

Motion (Doc. # 425); (2) **GRANTS IN PART** and **DENIES IN PART** the

HECO/MECO Defendants' Motion (Doc. # 437); (3) **GRANTS IN PART** and

**DENIES IN PART** Aloha's Motion (Doc. # 433); (4) **GRANTS** the Joinder

Motion (Doc. # 463) and; (5) **DISMISSES** Count Six of the Third Amended

Complaint.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 25, 2011.



_____
David Alan Ezra
United States District Judge

BlueEarth Biofuels, LLC v. Hawaiian Electric Company, Inc., et al., Civ. No. 09-00181 DAE-KSC; ORDER: (1)
GRANTING PLAINTIFF AND COUNTERCLAIM-DEFENDANT BLUEEARTH BIOFUELS, LLC AND
COUNTERCLAIM-DEFENDANT LANDIS MAEZ'S MOTION TO DISMISS FIRST AMENDED
COUNTERCLAIM OF HAWAIIAN ELECTRIC COMPANY, INC. AND MAUI ELECTRIC COMPANY, LTD.;
(2) GRANTING IN PART AND DENYING IN PART DEFENDANTS HAWAIIAN ELECTRIC COMPANY,
INC., MAUI ELECTRIC COMPANY LTD. AND KARL E. STAHLKOPF'S MOTION FOR SUMMARY
JUDGMENT ON THE FIRST, SECOND, FOURTH, SIXTH, SEVENTH, NINTH, TENTH AND ELEVENTH
CAUSES OF ACTION OF THE THIRD AMENDED COMPLAINT; (3) GRANTING IN PART AND DENYING
IN PART DEFENDANT ALOHA PETROLEUM LTD.'S MOTION FOR SUMMARY JUDGMENT ON THE
CLAIM FOR LOST PROFITS AND ON THE FIFTH THROUGH TENTH CAUSES OF ACTION OF THE
THIRD AMENDED COMPLAINT;  (4) GRANTING DEFENDANTS HAWAIIAN ELECTRIC COMPANY,
INC., MAUI ELECTRIC COMPANY, LTD. AND KARL E. STAHLKOPF'S JOINDER IN DEFENDANT
ALOHA PETROLEUM, LTD.'S MOTION FOR SUMMARY JUDGMENT AND; (5) DISMISSING COUNT SIX
OF THE THIRD AMENDED COMPLAINT